UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE GRAND JURY SUBPOENAS TO THE OFFICE OF THE NEW YORK STATE ATTORNEY GENERAL | Case No.: _____ |

## MEMORANDUM OF LAW IN SUPPORT OF
## THE OFFICE OF THE NEW YORK STATE ATTORNEY GENERAL'S
## <u>MOTION TO QUASH GRAND JURY SUBPOENAS</u>

OFFICE OF THE NEW YORK
STATE ATTORNEY GENERAL
Kumiki Gibson
Michael Jaffe
28 Liberty Street
New York, New York 10005

MUNGER, TOLLES & OLSON LLP
Donald B. Verrilli
601 Massachusetts Avenue NW, Suite 500 E
Washington, D.C. 20001

Brad D. Brian
Hailyn J. Chen
E. Martin Estrada
Victoria A. Degtyareva
350 South Grand Avenue, 50th Floor
Los Angeles, California 90071-3426

CAPEZZA HILL, LLP
Benjamin W. Hill (Bar Roll #514953)
30 South Pearl Street, Suite P-110
Albany, New York 12207

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ...........................................................................................1

II.     BACKGROUND ............................................................................................5

        A.      *People of the State of New York v. Trump* ...............................................5

        B.      *People of the State of New York v. National Rifle Association of America* ............9

        C.      Donald Trump's Attacks on the New York Attorney General ...........................11

        D.      The Subpoenas at Issue ..............................................................14

III.    ARGUMENT ...............................................................................................15

        A.      The Subpoenas Were Issued in Retaliation and with an Intent To Harass. ..........16

                1.      The subpoenas lack any legitimate purpose...............................16

                2.      The subpoenas are the latest attack in the President's long-running
                        campaign of retribution against OAG........................................19

                3.      The federal government's attempt to use the grand jury power to
                        punish its critics demands judicial intervention.........................20

        B.      The Subpoenas Are Unreasonable Intrusions on New York's Sovereign
                Authority to Enforce Its Laws...................................................22

                1.      The subpoenas compromise bedrock state interests. ...................24

                2.      The burdens on New York far outweigh any legitimate federal
                        interest....................................................................26

        C.      The Subpoenas Unjustifiably Infringe on the Office of the Attorney
                General's First Amendment Rights. .............................................28

                1.      The subpoenas burden OAG's First Amendment right to petition
                        courts for relief...........................................................28

                2.      The federal government cannot justify the subpoenas' intrusion on
                        protected activity..........................................................29

        D.      The Subpoenas Were Issued Without Proper Authorization. ................31

        E.      The Subpoenas Are Impermissibly Overbroad and Unduly Burdensome,
                and They Seek Privileged Information. .........................................34

IV.     CONCLUSION.............................................................................................37

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**F**EDERAL **C**ASES

*ABC v. Koch*,
    547 F. App'x 46 (2d Cir. 2013) ......................................................................30

*In re Babin*,
    2022 WL 1658701 (5th Cir. 2022) ................................................................25

*Bates v. City of Little Rock*,
    361 U.S. 516 (1960)........................................................................................29

*Bill Johnson's Rests., Inc. v. NLRB*,
    461 U.S. 731 (1983)..................................................................................28, 29

*Bond v. United States*,
    564 U.S. 211 (2011)..................................................................................26, 27

*Branzburg v. Hayes*,
    408 U.S. 665 (1972)..................................................................................28, 30

*Brown v. United States*,
    245 F.2d 549 (8th Cir. 1957) .........................................................................22

*Bursey v. United States*,
    466 F.2d 1059 (9th Cir. 1972) ......................................................1, 21, 30, 31

*Cal. Motor Transp. Co. v. Trucking Unlimited*,
    404 U.S. 508 (1972)........................................................................................28

*Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio*,
    364 F. Supp. 3d 253 (S.D.N.Y. 2019), *aff'd*, 788 F. App'x 85 (2d Cir. 2019) ........................6

*In re Dep't of Investigation of City of New York*,
    856 F.2d 481 (2d Cir. 1988)...........................................................................36

*Ealy v. Littlejohn*,
    569 F.2d 219 (5th Cir. 1978) .........................................................................21

*Eng v. Cooley*,
    552 F.3d 1062 (9th Cir. 2009) .......................................................................29

*In re Grand Jury, John Doe No. G.J.*
    2005-2, 478 F.3d 581 (4th Cir. 2007) ...............................................15, 16, 23

*In re Grand Jury Matters*,
    751 F.2d 13 (1st Cir. 1984)......................................................................16, 23

*In re Grand Jury Proceedings*,
    776 F.2d 1099 (2d Cir. 1985)............................................................................30

*In re Grand Jury Subpoena Dated Dec. 19, 1978*,
    599 F.2d 504 (2d Cir. 1979)............................................................................36

*In re Grand Jury Subpoena Duces Tecum Dated Jan. 2, 1985 (Simels)*,
    767 F.2d 26 (2d Cir. 1985)............................................................................22

*In re Grand Jury Subpoena Duces Tecum Dated Nov. 15, 1993*,
    846 F. Supp. 11 (S.D.N.Y. 1994) ..................................................................34

*In re Grand Jury Subpoena for N.Y. State Income Tax Records*,
    468 F. Supp. 575 (N.D.N.Y. 1979).............................................................23, 24

*In re Grand Jury Subpoena for THCF Med. Clinic Records*,
    504 F. Supp. 2d 1085 (E.D. Wash. 2007) ..................................................23, 28

*In re Grand Jury Subpoena: Subpoena Duces Tecum*,
    829 F.2d 1291 (4th Cir. 1987) ..................................................................30, 31

*Gregory v. Ashcroft*,
    501 U.S. 452 (1991)........................................................................................27

*Hoffman v. United States*,
    341 U.S. 479 (1951)......................................................................................4, 21

*In re Horowitz*,
    482 F.2d 72 (2d Cir. 1973)..........................................................................34, 35

*Jenner & Block LLP v. U.S. Dep't of Justice*,
    2025 WL 1482021 (D.D.C. May 23, 2025) ....................................................2

*Kramer v. Time Warner, Inc.*,
    937 F.2d 767 (2d Cir. 1991)............................................................................6

*McDonald v. Smith*,
    472 U.S. 479 (1985)........................................................................................28

*McKenna v. Nassau Cnty.*,
    2023 WL 8455670 (E.D.N.Y. Dec. 6, 2023) ..................................................6

*Medtronic, Inc. v. Lohr*,
    518 U.S. 470 (1996)........................................................................................24

*Miracle Mile Assocs. v. City of Rochester*,
    617 F.2d 18 (2d Cir. 1980)..............................................................................28

*Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills*,
  701 F. Supp. 2d 568 (S.D.N.Y. 2010) .......................................................29

*Nat'l Rifle Ass'n of Am., Inc. v. Vullo*,
  602 U.S. 175 (2024) ...............................................................................20

*Nat'l Rifle Ass'n of Am. v. Cuomo*,
  332 F.R.D. 420 (N.D.N.Y. 2019) ............................................................36

*NLRB v. SW Gen., Inc.*,
  580 U.S. 288 (2017) ...........................................................................33, 34

*Perez v. FBI*,
  707 F. Supp. 891 (W.D. Tex. 1988), *aff'd*, 956 F.2d 265 (5th Cir. 1992) ...............22

*Perkins Coie LLP v. U.S. Dep't of Justice*,
  2025 WL 1276857 (D.D.C. May 2, 2025) ...................................................2

*In re Persico*,
  522 F.2d 41 (2d Cir. 1975) .....................................................................34

*Printz v. United States*,
  521 U.S. 898 (1997) ..........................................................................27, 28

*Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*,
  508 U.S. 49 (1993) .................................................................................29

*Relevant Grp., LLC v. Nourmand*,
  116 F.4th 917 (9th Cir. 2024) .................................................................29

*In re Sealed Case*,
  121 F.3d 729 (D.C. Cir. 1997) ...............................................................36

*In re Special Apr. 1977 Grand Jury*,
  581 F.2d 589 (7th Cir. 1978) .............................................................23, 26

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
  547 F.3d 406 (2d Cir. 2008) .....................................................................6

*Susman Godfrey LLP v. Exec. Off. of President*,
  2025 WL 1779830 (D.D.C. June 27, 2025) .................................................2

*Trump v. Clinton*,
  653 F. Supp. 3d 1198 (S.D. Fla. 2023) ................................................9, 18

*Trump v. James*,
  647 F. Supp. 3d 1292 (S.D. Fla. 2022) ..........................................9, passim

iv

*Trump v. James,*
    2022 WL1718951 (N.D.N.Y. May 27, 2022) ............................................................. 6, passim

*Trump v. Vance,*
    591 U.S. 786 (2020) ...................................................................................................16

*United States v. Am. Honda Motor Co.,*
    273 F. Supp. 810 (N.D. Ill. 1967) ..............................................................................22

*United States v. Baldwin,*
    541 F. Supp. 2d 1184 (D.N.M. 2008) .........................................................................32

*United States v. Bergeson,*
    425 F.3d 1221 (9th Cir. 2005) ...................................................................................15

*United States v. Calandra,*
    414 U.S. 338 (1974) ...................................................................................................36

*United States v. Calk,*
    87 F.4th 164 (2d Cir. 2023), *cert. denied*, 145 S. Ct. 144 (2024) .............................17

*United States v. Lanier,*
    520 U.S. 259 (1997) ...................................................................................................18

*United States v. R. Enters., Inc.,*
    498 U.S. 292 (1991) ......................................................................................... 15, passim

*United States v. Vilar,*
    2007 WL 1075041 (S.D.N.Y. Apr. 4, 2007) ..............................................................35

*Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President,*
    2025 WL 1502329 (D.D.C. May 27, 2025) ............................................................2, 20

*Wood v. Georgia,*
    370 U.S. 375 (1962) .....................................................................................................1

*Younger v. Harris,*
    401 U.S. 37 (1971) ...................................................................................................8, 23

**STATE CASES**

*People v. Nat'l Rifle Ass'n of Am., Inc.,*
    171 N.Y.S.3d 782 (N.Y. Sup. Ct. 2022) ..............................................................10, 19

*People v. Nat'l Rifle Ass'n of Am., Inc.,*
    223 A.D.3d 84 (1st Dep't 2023) ................................................................10, 11, 19, 29

*People v. Trump,*
    2023 WL 6307177 (N.Y. Sup. Ct. Sept. 26, 2023) ..................................................6, 7

*People v. Trump Org., Inc.*,
    2022 WL 489625 (N.Y. Sup. Ct. Feb. 17, 2022) ........................................ 7, passim

*People v. Trump Org., Inc.*,
    205 A.D.3d 625 (1st Dep't 2022) .............................................................. 7, passim

*People v. Trump Org., Inc.*,
    38 N.Y.3d 1053 (N.Y. 2022) ....................................................................7, 8, 18

**FEDERAL STATUTES**

5 U.S.C. § 3345 *et seq* .............................................................................32, 33

5 U.S.C. § 3345(a) ...................................................................................33

5 U.S.C. § 3345(a)(1)-(3) ..........................................................................33

18 U.S.C. § 242 .....................................................................................14, 18

28 U.S.C. § 515 ....................................................................................33, 34

28 U.S.C. § 515(a) ...................................................................................33

28 U.S.C. § 546(c) .................................................................................31, 32

28 U.S.C. § 546(d) ...................................................................................32

42 U.S.C. § 1983 .............................................................................8, 9, 17, 18

**STATE STATUTES**

N.Y. Pub. Off. Law § 87(2)(e) (McKinney 2024) ...........................................36

**FEDERAL RULES**

Federal Rule of Criminal Procedure 17 .......................................................36

Federal Rule of Criminal Procedure 17(c) ...............................................23, 35

Federal Rule of Criminal Procedure 17(c)(2) ........................................4, 5, 15, 35

Federal Rule of Evidence 201 .....................................................................6

**CONSTITUTIONAL PROVISIONS**

United States Constitution, First Amendment ............................................ 3, passim

United States Constitution, Fourteenth Amendment ....................................3, 8, 10, 17

**OTHER AUTHORITIES**

Robert H. Jackson, U.S. Att'y Gen., Address at the Second Annual Conference of
    United States Attorneys: The Federal Prosecutor (Apr. 1, 1940),
    https://www.justice.gov/sites/default/files/ag/legacy/2011/09/16/04-01-
    1940.pdf (last visited Aug. 15, 2025) ....................................................................22

Ross E. Wiener, *Inter-Branch Appointments After the Independent Counsel:*
    *Court Appointment of United States Attorney*,
    86 Minn. L. Rev. 363, 402 (2001) ........................................................................32

I.     **INTRODUCTION**

For years, Donald J. Trump,[1] while a private businessman, waged a public smear campaign calling for the criminal prosecution of New York Attorney General Letitia James for pursuing a meritorious civil lawsuit against him and his businesses.  Now, President Trump's Department of Justice has authorized two sweeping grand jury subpoenas targeting her office simply because the President is unhappy that it successfully enforced the laws of the State of New York against him and his allies.[2]

While the powers of a grand jury are broad, they have vital limits.  At the end of the day, the grand jury is not meant to serve as a tool of the Executive: The role of a grand jury is to protect the "innocent against hasty, malicious and oppressive persecution," to "stand[] between the accuser and the accused," and to "determine whether a charge is founded upon reason or was dictated by . . . malice and personal ill will."  *Wood v. Georgia*, 370 U.S. 375, 390 (1962).  "It would be a cruel twist of history to allow" an institution designed to protect political dissent and shield the populace against abuse at the hands of the Executive to "become an instrument of political suppression."  *Bursey v. United States*, 466 F.2d 1059, 1089 (9th Cir. 1972).

The grand jury subpoenas issued against the Office of the New York State Attorney General ("OAG"), led by Attorney General James, are precisely the instruments of political suppression that the Supreme Court warned against.  When OAG successfully proved to the court, the finder of fact, that the Trump Organization had engaged in massive fraud, Mr. Trump, then a private citizen, and his allies vowed revenge.  After the court entered judgment, Alina Habba, then one of Mr. Trump's personal lawyers and now the Acting U.S. Attorney for the

---

[1] This brief refers to President Trump as "President" when discussing his time in office and refers to him as "Mr. Trump" when discussing his time as a private citizen.
[2] *See* Declaration of Roxanne Wild ("Wild Decl.") Exs. 1, 2.

District of New Jersey, told the media in 2024, "I think the biggest message I can give the American people tonight is that . . . Letitia James is not going to get away with it . . . We will come at them."[3]  Even before the investigation leading to the successful trial had concluded, another one of Mr. Trump's then private lawyers, Pam Bondi, now the United States Attorney General, declared in 2020, that Attorney General James "can't get away with this. . . . I think she needs to be looked at."[4]  And when a jury found the National Rifle Association ("NRA") and two of its officers liable for financial wrongdoing and self-dealing, Mr. Trump publicly complained that Attorney General James was "illegally" using the law to destroy the NRA.[5]

Now, President Trump and his Administration are doing just what they vowed—targeting Attorney General James and OAG for proving in court that the Trump Organization and President Trump's political ally, the NRA, engaged in massive fraud and malfeasance against the people of New York.  That the Trump Administration would take such action is not surprising: At least four federal courts have already found that his Administration has abused its authority by unconstitutionally targeting private lawyers for representing clients and causes that the President disfavors.[6]  The actions here are even more egregious because he is now using the full force of his Administration to target OAG, New York's chief law enforcement agency, with two sweeping subpoenas.  The subpoenas, both purportedly authorized by the illegitimate Acting United States Attorney, John Sarcone III, command OAG to produce "any and all documents and

---

[3] Declaration of Hailyn J. Chen ("Chen Decl.") Ex. 24.
[4] *Id*. Ex. 23.
[5] Declaration of Noelle Smith ("Smith Decl.") Ex. 1.
[6] *See, e.g.*, *Susman Godfrey LLP v. Exec. Off. of President*, 2025 WL 1779830, at *12, *18 (D.D.C. June 27, 2025); *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President*, 2025 WL 1502329, at *14, *18 (D.D.C. May 27, 2025); *Jenner & Block LLP v. U.S. Dep't of Justice*, 2025 WL 1482021, at *6 (D.D.C. May 23, 2025); *Perkins Coie LLP v. U.S. Dep't of Justice*, 2025 WL 1276857, at *38 (D.D.C. May 2, 2025).

records" related to civil enforcement actions that OAG successfully pursued against Mr. Trump, as a private citizen, and the NRA.

The Trump Administration has not sought to hide its unconstitutional motive.  During the investigation and months-long trial of the Trump Organization—and after the Trump Organization was found liable by a judge for inflating its assets by as much as $2.2 billion a year and ordered to disgorge over $350 million in unlawful profits—Mr. Trump, in his role as a private citizen, repeatedly called for the criminal prosecution of Attorney General James.  And when OAG investigated the NRA—resulting in the NRA and two of its officers being found liable by a jury for financial wrongdoing and self-dealing and a court ordering the NRA to enact dozens of reforms to its governance—Mr. Trump publicly went so far as to call Attorney General James a "racist" who was "illegally" using the law to destroy the NRA.

All the while, Mr. Trump and the NRA repeatedly asserted claims in every conceivable posture alleging that the Attorney General's enforcement actions were motivated by political animus or retaliation, suppressed their speech in violation of the First Amendment, and constituted selective prosecution in violation of the Fourteenth Amendment.  Each and every state and federal court presented with such claims, including this Court, has flatly rejected those arguments.  Having been met with uniform judicial rejection of those efforts when he brought claims as a private citizen, President Trump and his Administration are now abusing the federal prosecutorial power to investigate the Attorney General's Office *criminally* for the very same protected conduct of enforcing the laws of New York against the Trump Organization and the NRA and successfully obtaining verdicts and judgments against those wrongdoers.

This Court should put an immediate halt to this wanton abuse of the grand jury process. The Supreme Court has long cautioned prosecutors and courts to be vigilant about "abuses of the

investigatory power" of the grand jury because "the most valuable function of the grand jury [has been] not only to examine into the commission of crimes, but to stand between the prosecutor and the accused." *Hoffman v. United States*, 341 U.S. 479, 485 (1951) (internal quotation marks and citations omitted).

The Court should heed that directive here and quash these unlawful, unreasonable, and oppressive subpoenas for any one (or more) of a slew of independent reasons. *See* Fed. R. Crim. P. 17(c)(2) (a court may quash a subpoena when "compliance would be unreasonable or oppressive").

*First*, the subpoenas were issued in bad faith. As evidenced by the multitude of judicial decisions finding that the OAG cases into which the subpoenas inquire were well-founded and constitutionally sound, there is no conceivable legitimate basis for the U.S. Department of Justice ("DOJ") to investigate OAG's actions. The lack of any valid ground for pursuing OAG, together with the President's unabashed public attacks on OAG and Attorney General James, make crystal clear that these subpoenas are motivated by nothing more than retaliation against OAG for enforcing the law against Mr. Trump (and his personal interests) and his political allies, as it was required to do to protect the people of New York.

*Second*, the subpoenas must be quashed because they unreasonably interfere with the State of New York's sovereignty. By demanding every last document and communication related to *People of the State of New York v. Trump* and to *People of the State of New York v. National Rifle Association of America, Inc.*—both still ongoing cases—the Executive Branch seeks to exercise control over the inner workings of two significant and pending state enforcement actions. That interference with New York's enforcement of its laws is federal

overreach, plain and simple.  It is a direct and unlawful affront to New York State sovereignty, which should not be countenanced by this Court.

*Third*, by targeting OAG for exercising its First Amendment right to petition the court for redress—and thereby discouraging future OAG court actions to enforce the laws that may displease the President—the subpoenas unjustifiably trample on constitutionally protected First Amendment activity.  For that reason alone, they must be quashed.

*Fourth*, each subpoena was invalidly authorized by a purported Acting U.S. Attorney whose appointment was rejected by the federal judges of this Court just one month ago.

*Fifth and finally*, the subpoenas are grossly overbroad, unduly burdensome, and implicate large swaths of privileged materials.  Compliance with these subpoenas would be "unreasonable" and "oppressive."  Fed. R. Crim P. 17(c)(2).

For any one or a combination of these reasons, this Court must quash the subpoenas to stop this flagrant abuse of the grand jury process.

## II.    <u>BACKGROUND</u>

In response to reports of illegal conduct, OAG investigated, sued, and won cases against Mr. Trump and his private businesses and the NRA.  Those cases incited a retaliation campaign by Mr. Trump and his allies, which culminated in the issuance of these unlawful subpoenas after Mr. Trump assumed the presidency of the United States.

### A.    <u>*People of the State of New York v. Trump*</u>

In September 2022, OAG filed a complaint in New York Supreme Court alleging that Mr. Trump, then a private business owner, and his affiliates defrauded lenders and insurers, repeatedly inflating the value of his assets by as much as $2.2 billion a year.  Chen Decl. Ex. 1 at

8.[7]  The complaint arose out of an extensive three-year investigation that began in March 2019

based on reports of misconduct contained in the sworn congressional testimony of Michael

Cohen, a former confidante and legal adviser to Mr. Trump.  *Trump v. James¸* 2022 WL1718951,

at *3 (N.D.N.Y. May 27, 2022); *see also id.* at *3-7 (describing the case history).

     The New York Supreme Court granted OAG's motion for a preliminary injunction.  Chen

Decl. Ex. 2 at 1.  In doing so, it explained that the "defendants have failed to submit an iota of

evidence" "rebutting OAG's comprehensive demonstration of persistent fraud."  *Id*. at 6.  The

court further ruled that the defendants' misconduct warranted an injunction because "given

defendants' demonstrated propensity to engage in persistent fraud, failure to grant such an

injunction could result in extreme prejudice to the people of New York."  *Id*. at 9.

     After discovery, the court granted OAG partial summary judgment and held that Mr.

Trump and his co-defendants had committed fraud.  *People v. Trump*, 2023 WL 6307177, at *21,

*28 (N.Y. Sup. Ct. Sept. 26, 2023).  The court explained that Mr. Trump's financial statements

"clearly contain fraudulent valuations."  *Id.*  His defenses were "wholly without basis in law or

fact" and amounted to an argument that "the Court should not believe its own eyes."  *Id.*

---

[7] Certain publicly available court records, news articles, press releases, and social media posts
are attached as Exhibits 1-62 to the Chen Declaration and Exhibits 1-20 to the Smith Declaration.
OAG respectfully requests that the Court take judicial notice of these exhibits under Federal Rule
of Evidence 201. *See Kramer v. Time Warner, Inc.,* 937 F.2d 767, 774 (2d Cir. 1991) ("courts
routinely take judicial notice of documents filed in other courts"); *Staehr v. Hartford Fin. Servs.
Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) ("We have previously held that it is proper to take
judicial notice of the *fact* that press coverage, prior lawsuits, or regulatory filings contained
certain information, without regard to the truth of their contents . . . ."); *Christa McAuliffe
Intermediate Sch. PTO, Inc. v. de Blasio*, 364 F. Supp. 3d 253, 263 (S.D.N.Y. 2019), *aff'd¸* 788 F.
App'x 85 (2d Cir. 2019) (taking judicial notice of social media posts by mayor); *McKenna v.
Nassau Cnty.*, 2023 WL 8455670, at *6 (E.D.N.Y. Dec. 6, 2023) (court may "properly take
judicial notice of the Facebook posts. Courts have regularly taken judicial notice of publicly
available social media posts, news articles, and other writings on websites when the parties do
not dispute the authenticity of the documents").

The court resolved the remaining claims after an eleven-week bench trial before Justice Engoron between October 2023 and January 2024. In February 2024, the court held Mr. Trump liable for all but one of the remaining claims and ordered the defendants to disgorge over $350 million in unlawful profits. Chen Decl. Ex. 3 at 1, 81. In its ruling, the court detailed the "overwhelming evidence" that "each of the[] defendants made or participated in making a false statement in the business records of an enterprise, the Trump Organization, with the intent to defraud." *Id*. at 78. The "deviations from truth represent hundreds of millions of dollars, and in the case of Mar-a-Lago, possibly a billion dollars or more." *Id*. at 77. "When confronted at trial with the statements," the court wrote, "defendants' fact and expert witnesses simply denied reality." *Id*. at 1. The defendants appealed, and that appeal is still pending in New York's Appellate Division, First Department.[8] Chen Decl. Ex. 6.

Throughout the investigation and after the complaint was filed, Mr. Trump, again, acting as a private citizen, made repeated attempts to dismiss the case or enjoin OAG from pursuing it. Courts rejected all of those attempts.

First, after Mr. Trump was subpoenaed in December 2021, he moved to quash the subpoenas, arguing that OAG was selectively investigating him for exercising his First Amendment rights. *James*¸ 2022 WL 1718951, at *6. At *every* level, New York state courts rejected that argument and affirmed the legality of OAG's investigation. *People v. Trump Org., Inc.*, 2022 WL 489625, at *5 (N.Y. Sup. Ct. Feb. 17, 2022); *People v. Trump Org., Inc.*, 205 A.D.3d 625, 626-27 (1st Dep't 2022); *People v. Trump Org., Inc.*, 38 N.Y.3d 1053, 1054 (N.Y. 2022). As the New York Supreme Court held, "OAG is not violating any rights that … the

---

[8] Until the appeal is resolved, the court has stayed certain injunctive relief and the disgorgement order conditioned on defendants' posting a $175 million bond. Chen Decl. Ex. 5 at 2.

United States and New York State Constitutions afford" Mr. Trump. *Trump Org.*, 2022 WL 489625, at \*5. The "impetus for the investigation" was "sworn congressional testimony by former Trump associate Michael Cohen" that Mr. Trump and his employees were "'cooking the books.'" *Id.* In light of that testimony, the court explained, "[f]or OAG *not* to have investigated" Mr. Trump "would have been a blatant dereliction of duty." *Id.* (emphasis added).

The Appellate Division, First Department, likewise concluded that "the investigation was lawfully initiated at its outset and well founded." *Trump Org.*, 205 A.D.3d at 626. And the New York Court of Appeals dismissed Mr. Trump's challenge "upon the ground that no substantial constitutional question is directly involved." *Trump Org.*, 38 N.Y.3d at 1054.

Second, federal courts rejected Mr. Trump's subsequent attempts to undermine the legitimacy of this investigation into his personal affairs. After Mr. Trump filed a 42 U.S.C. § 1983 lawsuit in this Court against Attorney General James, the Court dismissed the lawsuit on res judicata and *Younger* abstention grounds. *James*¸ 2022 WL 1718951, at \*14, \*19-20. In analyzing the bad faith exception to *Younger*, the Court rejected Mr. Trump's arguments that OAG brought the investigation in bad faith or that it violated his First or Fourteenth Amendment rights. *Id.* at \*12-13. The Court explained that the investigation had "a legitimate factual predicate" (*i.e.*, Cohen's testimony), and that "Plaintiffs do not identify what protected speech or conduct [Attorney General James] allegedly retaliated against them for or demonstrate any causal connection between any such protected activity and the decision to commence the subpoena enforcement proceeding." *Id.* at \*13. The Court also rejected as "wholly unsupported" "Plaintiffs' assertions that [Attorney General James] conducted a 'baseless fishing expedition' and 'knowingly advanced claims that were unwarranted under existing law.'" *Id.* at \*12 n.13. To the contrary, the Court explained, "[Attorney General James] has repeatedly

obtained favorable outcomes in the New York proceeding which belie the notion that the

positions she has taken in that proceeding are unwarranted." *Id.*

Copying substantial portions of the dismissed New York federal complaint, Mr. Trump

then filed another failed § 1983 suit against Attorney General James in Florida. *Trump v. James*,

647 F. Supp. 3d 1292, 1298 (S.D. Fla. 2022). The U.S. District Court for the Southern District

of Florida denied Mr. Trump's motion for a temporary injunction, warning that "[t]his litigation

has all the telltale signs of being both vexatious and frivolous" and concluding that "[t]o now

impede a civil Enforcement Action by the New York Attorney General would be unprecedented

and contrary to the interests of the people of New York." *Id.* at 1297-98, 1298 n.6. Mr. Trump

dismissed the Florida case against the Attorney General, *see* Chen Decl. Ex. 7, only after he and

his lawyer had been sanctioned by another court for "abuse of the judicial process." *Trump v.*

*Clinton*, 653 F. Supp. 3d 1198, 1210, 1223 (S.D. Fla. 2023) (finding that Mr. Trump's "attempt

to sidestep rulings by the New York courts" was "plainly frivolous").

### B.    *People of the State of New York v. National Rifle Association of America*

In August 2020, OAG filed a lawsuit on behalf of the People of New York against the

NRA, a nonprofit organization incorporated in the State of New York, and its senior executives

for alleged violations of New York's not-for-profit laws. Chen Decl. Ex. 15 at 1, Ex. 8. Like the

case against Mr. Trump, the case against the NRA arose out of a lengthy investigation based on

reports of serious misconduct. *Id.* Ex. 8. OAG's complaint alleged that the NRA failed to

properly administer its assets and that its executives exploited millions of dollars in charitable

funds for their private benefit. *Id.* ¶¶ 2-12.

Hours after OAG filed its complaint, the NRA filed a countersuit against Attorney

General James in this Court. Chen Decl. Ex. 19. The NRA claimed that OAG's investigation of

and lawsuit against the NRA was selective enforcement that retaliated against the NRA for its

political advocacy, violating the NRA's First and Fourteenth Amendment rights. *Id.* Ex. 20, ¶¶ 68-69, 80, 95. After OAG moved to dismiss the NRA's case, the NRA withdrew its complaint in June 2021 before the Court ruled on OAG's motion. *Id.* Exs. 21, 22.

The NRA asserted similar counterclaims against OAG in February 2021 in the state court lawsuit. Chen Decl. Exs. 9, 10. Again, the NRA argued that OAG's investigation was selective retaliation for NRA's political speech that violated the First and Fourteenth Amendments. *People v. Nat'l Rifle Ass'n of Am., Inc.*, 171 N.Y.S.3d 782, 787, 790 (N.Y. Sup. Ct. 2022). The New York Supreme Court granted OAG's motion to dismiss the counterclaims, holding that "the narrative that the Attorney General's investigation into these undeniably serious matters was nothing more than a politically motivated—and unconstitutional—witch hunt is simply not supported by the record." *Id.* at 786. The court explained that "[t]he investigation followed reports of serious misconduct and it uncovered additional evidence that, at a bare minimum, undermines any suggestion that [it] was a mere pretext to penalize the NRA for its constitutionally protected activities." *Id.* OAG's lawsuit asserted "serious claims based on detailed allegations of wrongdoing at the highest levels of a not-for-profit organization as to which the Attorney General has legitimate oversight responsibility." *Id.*

The Appellate Division affirmed the dismissal of the NRA's counterclaims. *People v. Nat'l Rifle Ass'n of Am., Inc.*, 223 A.D.3d 84, 92 (1st Dep't 2023). The court held that "the NRA's First Amendment retaliation claims were properly dismissed for lack of causation." *Id.* at 89. OAG "showed as a matter of law that it had probable cause to investigate and sue the NRA" and "public reports of malfeasance at the NRA predated the investigation." *Id.* at 89. The complaint "extensively details, among other things, widespread and longstanding executive malfeasance." *Id.* at 86. "Tellingly," the court observed, "the NRA does not affirmatively argue

that the NYAG lacked probable cause for this enforcement action." *Id.* After dismissing the NRA's counterclaims, the trial court also granted OAG's motion to dismiss related affirmative defenses of retaliation, bias, selective prosecution in violation of free speech and association, suppression of political speech, and unclean hands. Chen Decl. Ex. 10 at 160-61, Ex. 11 at 8-17, Ex. 12.

In February 2024, following a six-week trial, a jury found that the NRA failed to properly administer charitable funds in violation of the laws of New York. *Id.* Ex. 13; *see* Ex. 30. The jury also found that Executive Vice President Wayne LaPierre had abused his position for his personal benefit and had steered lucrative contracts to friends and relatives, including spending millions of charitable organization dollars on lavish travel, private planes, and expensive clothing. *Id.* Ex. 13 at 3. And the jury found the NRA's former Treasurer and Chief Financial Officer Wilson Phillips liable for financial misconduct and corruption in managing the organization. *Id.* at 5. The case then proceeded to a bench trial to determine equitable remedies. Following that trial, the court ruled in December 2024 that the NRA must enact more than a dozen reforms to its governance to prevent future violations of law. *Id.* Ex. 14 at 3-6. The NRA and Mr. LaPierre then filed appeals, both of which are currently pending.[9] *Id.* Exs. 16-18.

### C.    Donald Trump's Attacks on the New York Attorney General

President Trump has waged a years-long, public smear campaign against Attorney General James and OAG over their pursuit of *New York v. Trump* and *New York v. NRA*. Although the factfinders in both cases found OAG's claims meritorious, and although courts roundly rejected *every* challenge to the legality of the investigations, President Trump and his

---

[9] The NRA gave notice that the sole issue they will raise on appeal is a challenge to the trial court's dismissal of the NRA's counterclaims alleging that OAG's investigation and lawsuit was selective retaliation for NRA's political speech that violated the First and Fourteenth Amendments. Chen Decl. Ex. 16 at 5-6.

allies (many of whom are now top officials in his Administration) have relentlessly disparaged the New York Attorney General and repeatedly called for her prosecution in retaliation for OAG's work.  *See* Declaration of Noelle Smith ("Smith Decl.") Exs. 1-20.

Shortly after OAG began its investigations, in April 2019, then-President Trump tweeted that the NRA investigation was illegal: "The NRA is under siege by [New York Gov. Andrew] Cuomo and the New York State A.G., who are illegally using the State's legal apparatus to take down and destroy this very important organization, & others."  *Id*. Ex. 1.  As the investigations continued, then-President Trump's personal lawyer (now the current U.S. Attorney General) Pamela Bondi joined in the attacks.  She tweeted: "What Letitia James did is abhorrent. . . . Instead of focusing on the people of NY who need help, she's targeted Potus [*sic*] and his family on the 1st day of RNC."  *Id*. Ex. 2.  Bondi also asserted that Attorney General James "can't get away with this" and "needs to be looked at."  Chen Decl. Ex. 23.

Mr. Trump's accusations mounted as the litigation moved forward.  He protested that OAG was "consumed with the NRA (and me)" and that "'Racist in Reverse' New York State Attorney General, Letitia James," was "fighting with every ounce of her strength, which shouldn't be much, to destroy the NRA, and the Republican Party along with it."  Smith Decl. Ex. 4.  He repeatedly denounced Attorney General James as a "Racist scoundrel" and accused her of "criminal Election Interference" and fraud.  *Id*. Exs. 5, 14; *see also id.* Exs. 3, 6-18.  He claimed that she had colluded with the trial judge, who was "totally controlled by Letitia James and her Thugs," *id*. Ex. 7, and was "intimidated by the big, nasty, and ugly mouth of Leticia [*sic*] James, considered by many to be the WORST Attorney General in the U.S."  *Id*. Ex. 17.

Mr. Trump regularly called for Attorney General James to be prosecuted for pursuing the suits that courts have repeatedly found to be wholly meritorious.  In the days after OAG filed its

complaint against Mr. Trump, he posted: "New York Attorney General Letitia James Must Resign and Be Prosecuted for Abuse of Power."  Smith Decl. Ex. 3.  He encouraged her impeachment for "Prosecutorial Misconduct." *Id*. Ex. 11; *see also id*. Exs. 8, 10.  And he recommended criminal action against her: "James . . . should be sanctioned and prosecuted over this complete and very obvious MISCARRIAGE OF JUSTICE!!!"  *Id.* Ex. 9.  Mr. Trump also reposted comments calling for the Attorney General's arrest and punishment.  *See, e.g.*, *id*. Ex. 12.  At the end of the trial, he actually told reporters outside the courtroom that Attorney General James "should be criminally liable for this."  *Id*. Ex. 15.[10]

In the wake of the court's final judgment against him in February 2024, Mr. Trump vowed revenge.  He reposted comments by U.S. Representative Marjorie Taylor Greene that Attorney General James and Justice Engoron "belong in jail for the abuse of power they are wielding against President Trump and his family."  Smith Decl. Ex. 16.  Mr. Trump's personal attorney Alina Habba appeared on television and said: "I think the biggest message I can give the American people tonight is that . . . Letitia James is not going to get away with it . . . We will come at them.  We will come hard and we will literally fight until the truth comes out. . . . And that is scaring them because they know when he goes back in November 2024, he is going to clean house."  Chen Decl. Ex. 24 at 3-4.

Since Mr. Trump's inauguration as President in 2025, his attacks on Attorney General James have continued to intensify.  In April 2025, President Trump renewed his calls for Attorney General James's resignation: "Letitia James, a totally corrupt politician, should resign from her position as New York State Attorney General, IMMEDIATELY. Everyone is trying to

---

[10] These are just a few examples of Mr. Trump's innumerable attacks on Attorney General James and her office for pursuing their meritorious suit against him the Trump Organization.

MAKE NEW YORK GREAT AGAIN, and it can never be done with this wacky crook in office." Smith Decl. Ex. 18. Days later, White House Deputy Chief of Staff Stephen Miller told reporters that Attorney General James is "guilty of multiple, significant, serial criminal violations" based on her case against Trump. *Id*. Ex. 19.

     **D.**     **The Subpoenas at Issue**

     On August 5, 2025, OAG was served with two grand jury subpoenas authorized by the self-proclaimed Acting U.S. Attorney John Sarcone III, whom the judges on this Court had declined to appoint as the U.S. Attorney less than a month earlier. Wild Decl. Exs. 1, 2; *see* Chen Decl. Ex. 28. The first subpoena targets *New York v. Trump*, and the second targets *New York v. NRA.* Wild Decl. Exs. 1, 2. Anonymous sources reported to the media that the subpoenas were part of a grand jury investigation into OAG's and Attorney General James's alleged violations of 18 U.S.C. § 242, which makes it a crime for government officials to willfully violate the legal rights of others. Chen Decl. Ex. 25 at 2-3;[11] 18 U.S.C. § 242. The Trump Administration reportedly claims that OAG and Attorney General James violated Mr. Trump's First Amendment rights when OAG sued him, when a private businessman, on behalf of the People of the State of New York. Smith Decl. Ex. 20.

     Both subpoenas call for production, dating back to 2022 (*New York v. Trump*) and 2020 (*New York v. NRA*), of "[a]ny and all documents and records relating to the Subject Case" or "reflecting communications about the Subject Case between any agent and/or employee of the

---

[11] The online version of the New York Times article is available at https://www.nytimes.com/2025/08/08/nyregion/letitia-james-subpoena-trump-doj.html (last visited on August 17, 2025) and states that DOJ's investigation of OAG "reflects a strategy that has been championed by some of Mr. Trump's supporters, who have argued that his Justice Department should pursue cases against those who investigated or prosecuted him" and that those supporters "have suggested that a specific civil rights statute, which makes using law-enforcement authority to deprive a person of rights a crime, provides the grounds to do so." The article's mention of a "specific civil rights statute" includes a hyperlink to 18 U.S.C. § 242.

Office of the New York State Attorney General and any other third-party individual and/or entity." Wild Exs. 1, 2. Thus, the subpoenas demand, without limitation, every single document connected to years of investigation and litigation. Wild Decl. ¶¶ 2, 4; Declaration of Andrew Amer ("Amer Decl.") ¶¶ 4-10; Declaration of Emily Stern ("Stern Decl.") ¶¶ 3-9; *see supra* pp. 5-11. The scope of that demand encompasses the work of at least 100 lawyers, paralegals, and other OAG employees and spans millions of pages of documents. Amer Decl. ¶¶ 6, 11; Stern Decl. ¶¶ 5, 10. Indeed, the court dockets alone are nearly 300 pages long and include over 5,000 entries. Amer Decl. ¶ 10; Stern Decl. ¶ 9; Chen Decl. Exs. 4, 15. Responding to the subpoenas would virtually cripple OAG's ability to pursue pending and future investigations and litigation, including more than 30 lawsuits against the federal government that OAG is currently pursuing to protect the rights of New Yorkers. Amer Decl. ¶ 12; Stern Decl. ¶ 11; Chen Decl. Exs. 31-62.

## III.    <u>ARGUMENT</u>

It is well settled that a court should quash a subpoena when "compliance would be unreasonable or oppressive." Fed. R. Crim. P. 17(c)(2). That standard is neither self-defining nor mechanical; it requires a case-by-case judgment and is heavily context dependent. *United States v. R. Enters., Inc.*, 498 U.S. 292, 299 (1991) (citation omitted); *United States v. Bergeson*, 425 F.3d 1221, 1225 (9th Cir. 2005). A subpoena may be "unreasonable or oppressive" if it infringes on "a constitutional, statutory, or common-law privilege" or "if it is irrelevant, abusive or harassing, overly vague, or excessively broad." *In re Grand Jury, John Doe No. G.J.2005-2*, 478 F.3d 581, 585 (4th Cir. 2007) (internal citations omitted). Additionally, courts may quash a subpoena "that intrudes gravely on significant interests outside of the scope of a recognized privilege, if compliance is likely to 'entail consequences more serious than even severe inconveniences occasioned by irrelevant or overbroad requests for records.'" *Id.* (quoting *In re*

*Grand Jury Matters*, 751 F.2d 13, 19 (1st Cir. 1984)).  Here, the subpoenas are "unreasonable and oppressive" for a number of independent reasons and must be quashed.

A.    <u>**The Subpoenas Were Issued in Retaliation and with an Intent To Harass.**</u>

These subpoenas are part a vendetta by President Trump against Attorney General James and OAG.  They are also part of a larger pattern of Trump Administration actions targeting lawyers for their advocacy for clients and causes the President disfavors, which represents an unprecedented and unconstitutional assault on the rule of law.  But "[g]rand juries are not licensed to engage in arbitrary fishing expeditions, nor may they select targets of investigation out of malice or an intent to harass."  *R. Enters.,* 498 U.S. at 299; *see also Trump v. Vance*, 591 U.S. 786, 805 (2020).  Such an improper purpose renders a grand jury subpoena both unreasonable and oppressive as a matter of law.

The subpoenas here are unreasonable and oppressive in just that way.  Not a shred of evidence substantiates the government's supposed theory that OAG has violated Mr. Trump's or the NRA's constitutional rights in investigating them for rampantly illegal conduct.  Indeed, multiple courts, including this one, have already determined that such a theory is baseless, and one court even found that claim to be worthy of sanctions.  What the evidence does support is that President Trump and other top officials have a long-running retaliation campaign against OAG, Attorney General James, and others who espouse views and take actions his Administration does not like.  This Court should halt this extraordinary attack.

1.    **The subpoenas lack any legitimate purpose.**

While grand jury subpoenas are generally afforded a "presumption of regularity," "courts may not ignore possible abuse of the grand jury process."  *United States v. Calk*, 87 F.4th 164, 186 (2d Cir. 2023), *cert. denied*, 145 S. Ct. 144 (2024) (the court's role in "[e]nsuring the regularity of the grand jury process is especially important because of the risks for abuse that

inhere in proceedings over which trial and appellate courts rarely have insight"). The party alleging abuse of that process bears the "initial burden of presenting 'concrete allegations of Government misconduct.'" *Calk*, 87 F.4th at 186. If the initial burden is satisfied, the burden then shifts to the government to "show that the subpoena was not motivated by an improper purpose." *Id.*; *see also R. Enters.*, 498 U.S. at 302 ("[A] court may be justified in a case where unreasonableness is alleged in requiring the Government to reveal the general subject of the grand jury's investigation before requiring the challenging party to carry its burden of persuasion.").

Here, the abuse of the grand jury process is not merely possible, it is undeniable. The extensive evidence of the validity and necessity of OAG's lawsuits and the retaliatory motives of President Trump and his Administration is more than enough to satisfy OAG's initial burden and precludes any possible showing by the government of a proper purpose.

To start, there is plainly no legitimate basis for the government's investigation. Mr. Trump (as a private citizen) and the NRA have brought section 1983 actions, counterclaims, affirmative claims, and affirmative defenses alleging that the OAG suits at issue here reflect bias, retaliation, suppression of political speech, violation of the First Amendment, and violation of the Fourteenth Amendment—and every court that has considered these claims has soundly rejected them. Now, after Mr. Trump's attacks on OAG as a private citizen as well as the NRA's were rejected by both state and federal courts, President Trump and his Administration seek to investigate OAG *criminally* for the exact same protected conduct, reportedly under the guise of a civil rights investigation into violations of 18 U.S.C. § 242. There is no conceivable proper purpose for such an investigation. Every single court presented with these issues held that OAG acted lawfully and responsibly in pursuing Mr. Trump and the NRA for their illegal activities.

Those findings foreclose any argument that OAG has violated any rights, let alone done so willfully. *See United States v. Lanier*, 520 U.S. 259, 264 (1997) (elements of 18 U.S.C. § 242).

In the *Trump* case, four New York state and federal courts, including this one, rejected the argument that OAG investigated Mr. Trump in retaliation for exercising his First Amendment rights, finding instead that OAG began investigating in response to Michael Cohen's testimony that Trump had committed rampant fraud. *Trump Org.*, 38 N.Y.3d at 1054; *Trump Org.*, 205 A.D.3d at 627; *Trump Org.*, 2022 WL 489625, at *5; *James*, 2022 WL 1718951, at *13. And a fifth court regarded that retaliation argument as so "plainly frivolous" that it warranted sanctions. *Clinton*, 653 F. Supp. 3d at 1223. As this Court explained, OAG's investigation had a "legitimate factual predicate" in Cohen's sworn testimony, and Mr. Trump failed to establish that the proceeding "was commenced for the purpose of retaliation." *James*, 2022 WL 1718951, at *13. The New York Supreme Court went even further, holding that in light of Cohen's testimony, "[f]or OAG *not* to have investigated" Mr. Trump "would have been a blatant dereliction of duty." *Trump Org.*, 2022 WL 489625, at *5 (emphasis added). The New York Appellate Division affirmed the New York Supreme Court's finding that "OAG is not violating any rights that the . . . United States and New York State Constitutions afford" Mr. Trump. *Id.*; *see Trump Org.*, 205 A.D.3d at 627. And this Court reached the same conclusion in its § 1983 analysis, holding that Mr. Trump and his family members failed to identify "what protected speech or conduct Defendant allegedly retaliated against them for" and failed to demonstrate "any causal connection between any such protected activity and the decision to commence the subpoena enforcement proceeding." *James*, 2022 WL 1718951, at *13.

Courts likewise have repeatedly rejected claims that OAG violated the NRA's rights. The New York courts rejected the argument that OAG was selectively investigating the NRA in

retaliation for its speech, given that the investigation followed rampant reports of serious misconduct. *Nat'l Rifle Ass'n*, 171 N.Y.S.3d at 789; *Nat'l Rifle Ass'n*, 223 A.D.3d at 92. The New York Supreme Court specifically found that the "narrative that the Attorney General's investigation into these undeniably serious matters was nothing more than a politically motivated—and unconstitutional—witch hunt is simply not supported by the record." *Nat'l Rifle Ass'n*, 171 N.Y.S.3d at 786; *see id.* at 789 & n.6. And the Appellate Division explained that the NRA's claims of First Amendment retaliation were "properly dismissed for lack of causation" because OAG "had probable cause to investigate and sue the NRA." *Id.* Indeed, neither Mr. Trump nor the NRA could identify any comparable offender that OAG had *not* pursued. *Trump Org.*, 205 A.D.3d at 627; *Nat'l Rifle Ass'n*, 223 A.D.3d at 90-91.

In light of these repeated rejections of claims that OAG violated anyone's constitutional rights and the ultimate verdicts in favor of OAG in the underlying matters, the contention that a grand jury is now investigating OAG's actions for a *legitimate* purpose is simply untenable. Pursuing meritorious actions that multiple courts determined to be well-founded—and, indeed, that one court noted would be a "blatant dereliction of duty" not to pursue, *Trump Org.*, 2022 WL 489625, at *5—simply cannot, as a matter of law and a matter of logic, rise to the level of criminal activity.

### 2. The subpoenas are the latest attack in the President's long-running campaign of retribution against OAG.

There is extensive evidence and repeated court rulings that OAG did not violate anyone's constitutional rights. In contrast, there is ample evidence that the grand jury subpoenas were issued in bad faith to retaliate against OAG for holding Mr. Trump and his allies accountable for their unlawful conduct. Executive officials, including Bondi, Habba, and Miller, have been vocal about their desire to punish OAG precisely because OAG pursued Mr. Trump and his

businesses.  Chen Decl. Exs. 23, 24; Smith Decl. Ex. 19.  The President himself has been the loudest among them.  Even after courts had repeatedly rejected claims of constitutional violations, Mr. Trump reposted comments urging that Attorney General James and Justice Engoron "belong in jail for the abuse of power they are wielding" and that they "be arrested and punished accordingly."  Smith Decl. Exs. 13, 16; *see also id*. Ex. 10 (calling enforcement action a "political Witch Hunt").  The day after his trial ended, Mr. Trump told reporters outside the courtroom that Attorney General James "should be criminally liable for this."  *Id*. Ex. 15.  And Habba made similar threats following the trial, stating that "Letitia James is not going to get away with it . . . We will come at them. We will come hard . . . [W]hen [Trump] goes back in November 2024, he is going to clean house."  Chen Decl. Ex. 24 at 3-4.

        That is exactly what President Trump and his Administration have done through the issuance of the expansive subpoenas at issue here.  The retaliatory motive supporting the government's investigation is clear—because President Trump and his allies have admitted it.  Using "'the power of the State to punish or suppress disfavored expression'" of those who "engag[e] in litigation conduct the President personally disfavors" is an abuse of power, plain and simple.  *Wilmer*, 2025 WL 1502329, at *16, *22 (quoting *Nat'l Rifle Ass'n of Am., Inc. v. Vullo*, 602 U.S. 175, 188 (2024)).

> **3.    The federal government's attempt to use the grand jury power to punish its critics demands judicial intervention.**

        "When the grand jury goes on a fishing expedition in forbidden waters, the courts are not powerless to act."  *Ealy v. Littlejohn*, 569 F.2d 219, 227 (5th Cir. 1978).  The U.S. Department of Justice ("DOJ") has not often attempted to use the grand jury power to suppress its critics—but when it has, courts have not hesitated to intervene.  *See e.g.*, *id*. at 230; *Bursey*, 466 F.2d at 1089.

        In *Ealy*, for example, the Fifth Circuit examined grand jury subpoenas that compelled

testimony by members of a civil rights organization who had criticized a prosecutor.  Although the subpoenas were allegedly issued to investigate a crime, the record revealed that the proceedings were in fact intended to harass the civil rights organizations. Finding the record "barren" of a "plausible explanation" for the subpoenaed testimony, the court concluded that the government conducted the proceedings "in bad faith for the purpose of harassing those who, in the exercise of their First Amendment rights, had criticized" the district attorney, and it enjoined the proceedings against the organization's members.  569 F.2d at 230.  "It would be a sorry day were we to allow a grand jury to delve into the membership, meetings, minutes, organizational structure, funding and political activities of unpopular organizations on the pretext that their members might have some information relevant to a crime," the court wrote.  *Id.* at 229-30.  "This abuse of the grand jury process cannot be tolerated in a free society."  *Id.* at 230.

The same is true here.  In the absence of any plausible explanation for a grand jury investigation of OAG, this Court must recognize the subpoenas for what they are—a bad faith attempt to harass Mr. Trump's critics.  And it must quash them.  The Supreme Court has emphasized the "continuing necessity" for courts to be "'alert to repress' any abuses of the investigatory power invoked."  *Hoffman*, 341 U.S. at 485.

It is particularly important that courts enjoin abuses of the grand jury because judicial oversight is one of the only checks on the grand jury process.  Because grand juries are convened "without actual authorization of the citizens who make up that body," they pose a "significant danger of abuse by members of the executive branch."  *Perez v. FBI*, 707 F. Supp. 891, 934 (W.D. Tex. 1988), *aff'd*, 956 F.2d 265 (5th Cir. 1992).  As Justice Robert H. Jackson stated when he was the U.S. Attorney General, "The prosecutor has more control over life, liberty, and reputation than any other person in America. … While the prosecutor at his best is one of the

most beneficent forces in our society, when he acts from malice or other base motives, he is one

of the worst."  Robert H. Jackson, U.S. Att'y Gen., Address at the Second Annual Conference of

United States Attorneys: The Federal Prosecutor (Apr. 1, 1940), at 1.[12]  Justice Jackson warned

that "the greatest danger of abuse of prosecuting power" exists where "the prosecutor picks some

person whom he dislikes or desires to embarrass."  *Id.* at 5.  In such instances of abuse, courts

have stepped in to reject subpoenas issued for improper purposes.  *See In re Grand Jury*

*Subpoena Duces Tecum Dated Jan. 2, 1985 (Simels)*, 767 F.2d 26, 29 (2d Cir. 1985) (reversing

denial of motion to quash grand jury subpoena where "[t]he timing of the subpoena casts

significant light on its purposes"); *Brown v. United States*, 245 F.2d 549, 554-55 (8th Cir. 1957);

*United States v. Am. Honda Motor Co.*, 273 F. Supp. 810, 815, 819-20 (N.D. Ill. 1967).

Because the subpoenas here were issued to retaliate and harass, they must likewise be

quashed.

B.    **The Subpoenas Are Unreasonable Intrusions on New York's Sovereign Authority to Enforce Its Laws.**

State sovereignty is foundational to our federal system.  Under that system, states retain

the authority to govern their own territory and their own people, without undue interference from

the federal government, and courts have routinely abstained from being the tool for such

interference.  *See Younger v. Harris*, 401 U.S. 37, 44 (1971) ("[O]ur cases to repeat time and

time again that the normal thing to do when federal courts are asked to enjoin pending

proceedings in state courts is not to issue such injunctions."); *see also James*, 2022 WL 1718951,

at *11 (abstaining from hearing challenge to OAG's investigation of Trump given the

"important" state interest "in investigating and enforcing its laws").  This structure reflects the

---

[12] *Available at* https://www.justice.gov/sites/default/files/ag/legacy/2011/09/16/04-01-1940.pdf
(last visited Aug. 15, 2025).

22

"fact that the entire country is made up of a Union of separate state governments" and stems from the Founders' belief that the "National Government will fare best if the States and their institutions are left to perform their separate functions in their separate ways." *Younger*, 401 U.S. at 44.

These bedrock principles apply to grand jury proceedings as well. When determining whether a subpoena is "unreasonable and oppressive" under Rule 17(c), courts must "balance the burden of compliance, on the one hand, against the governmental interest in obtaining the documents on the other." *R. Enters.*, 498 U.S. at 303 & n.1 (Stevens, J., concurring); *see also, e.g.*, *In re Grand Jury, John Doe No. G.J.2005-2*, 478 F.3d at 585; *In re Grand Jury Matters*, 751 F.2d at 19. When the recipient of a subpoena "is a sovereign," the "context" changes. *In re Grand Jury Subpoena for THCF Med. Clinic Records*, 504 F. Supp. 2d 1085, 1090 (E.D. Wash. 2007). In that circumstance, a court *must* afford "some deference to" the state's powers of independent self-government. *In re Grand Jury Subpoena for N.Y. State Income Tax Records*, 468 F. Supp. 575, 577 (N.D.N.Y. 1979); *see also THCF Med. Clinic Recs.*, 504 F. Supp. 2d at 1090 (quashing a subpoena because the state "ha[d] an important interest in the integrity of its" legal regime). Though, of course, state sovereignty does not entirely insulate a state from its "responsibility to provide evidence to the grand jury," *In re Special Apr. 1977 Grand Jury*, 581 F.2d 589, 592 (7th Cir. 1978), "[p]rinciples of comity and federalism . . . *dictate* that [a] federal grand jury *not* be given authorization to run roughshod over" important state interests. *N.Y. State Income Tax Recs.*, 468 F. Supp. at 578 n.2 (emphasis added).

The subpoenas here do just that. Without offering any legitimate basis, they seek all records from two civil enforcement proceedings (both of which are still on appeal)—proceedings that are a core exercise of OAG's duty to execute the laws of the State of New York. Requiring

compliance would gravely interfere with New York's assertions of its sovereign authority and would give the federal government a dangerous weapon for undermining state autonomy. And it would do so despite the lack of any substantial countervailing federal interest. The subpoenas should accordingly be quashed as unreasonable and oppressive.

### 1.    The subpoenas compromise bedrock state interests.

The subpoenas implicate the most essential of New York's interests—that is, the State's interest in enforcing its laws. The authority to regulate lies at the heart of New York's sovereignty. Each state has a fundamental duty to ensure the health, safety, and prosperity of its citizens. *See Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996). A state pursues that mission by passing, implementing, and executing legislation. *See id.* Indeed, New York's criminal and civil laws and state authorities' enforcement of those laws are the key mechanisms by which the State maintains public order, deters misconduct, and safeguards the wellbeing of its people. And both *New York v. Trump* and *New York v. NRA* are quintessential examples of such efforts—actions by the State's top law enforcement office to enforce State regulation of its businesses and charities. *See James*, 2022 WL 1718951, at *11 (abstaining from hearing challenge to OAG's investigation of Trump given the "important" state interest "in investigating and enforcing its laws"); *James*, 647 F. Supp. 3d at 1298 (court order impeding OAG's investigation of the Trump Organization "would be unprecedented and contrary to the interests of the people of New York").

Allowing the federal government to subpoena *all* records and communications associated with these two civil enforcement proceedings would badly impair New York's interest in enforcing its laws. *Cf. In re Babin*, 2022 WL 1658701, at *3-*4 (5th Cir. 2022) (recognizing that even a mere demand to "provide information" about the state's enforcement activities "for *in camera* review by a district judge" would represent a significant intrusion into the state's affairs).

The federal government has already demonstrated its willingness to abuse the machinery of the federal justice system in retaliation for pursuing litigation it does not like. *See supra* p. 2 & fn.6. Permitting it to serve far-reaching grand jury subpoenas whenever a state initiates an investigation with which the President disagrees would have a grave chilling effect on pending and future state enforcement actions.

Going forward, state officials may hesitate before initiating or pursuing such investigations, lest they trigger burdensome federal interference or even federal criminal investigations, which bring with them the full weight of grand jury subpoena power. OAG's critical law enforcement efforts may become increasingly difficult to staff if OAG personnel fear that working on high-profile matters adverse to the federal government—or adverse to those whom the President favors—puts them at risk for exposure to and targeting by federal officials. Similarly, prospective cooperating witnesses may be deterred from contributing vital information if they know their identities could end up in a federal subpoena return. If the federal government is permitted to obtain sensitive internal OAG records and communications, OAG employees may fear to speak their mind in the future, worried that something they say could be misinterpreted or taken out of context. And the burden of complying with such expansive subpoenas would impose substantial demands on OAG attorneys and staff, thereby hampering its current enforcement efforts. *See infra* p. 35; Amer Decl. ¶ 12; Stern Decl. ¶ 11.

These concerns are not hypothetical. OAG is currently pursuing numerous lawsuits against the federal government to protect the rights of New Yorkers, many of which seek to restore funding that has been lawlessly and abruptly stripped from entities providing essential social services. Amer Decl. ¶ 12; Stern Decl. ¶ 11; Chen Decl. Exs. 31-62. Permitting these subpoenas to stand—and thereby giving the federal government latitude to serve similar

subpoenas for any pending or future cases—would seriously undermine New York's ability to enforce its laws.

The sweeping nature of the subpoenas compounds their intrusion on New York State's sovereignty. These demands are not a narrow request for a targeted set of materials. Rather, they are an unvarnished effort to put ongoing State enforcement proceedings into what amounts to federal receivership. Such a "grandiose, brazen fishing expedition into the affairs of" New York compromises its "ability to function effectively" as an independent sovereign in a federal system. *Special Apr. 1977 Grand Jury*, 581 F.2d at 592.

The political valence of the subpoenas further exacerbates the problem. The Executive Branch is targeting State enforcement actions that sought to hold Mr. Trump (then a private citizen) and his political allies responsible for violating State laws. In that way, the subpoenas are doubly anathema to our federal structure, which not only "ensure[s] that States function as political entities in their own right," but also "secures to citizens the liberties that derive from the diffusion of sovereign power." *Bond v. United States*, 564 U.S. 211, 220-21 (2011). Indeed, a key aspect of the Nation's state-federal balance is the insight that when states operate as individual sovereigns, they act as a check on the federal government and thereby "protect[] the liberty of the individual from arbitrary power." *Id.* at 222; *see also Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991). By retaliating against State efforts to hold Mr. Trump and his associates to account, the subpoenas compromise New York's critical role as a check on federal excess.

> ### 2.    The burdens on New York far outweigh any legitimate federal interest.

On the other side of the ledger, President Trump and his Administration do not have *any* valid interest in enforcing the subpoenas. As discussed above, they were issued in bad faith, to retaliate against OAG for its efforts to hold Mr. Trump and his associates accountable for

violating the laws of New York.  *See supra* pp. 16-22.  That illegitimate objective easily yields to New York's weighty sovereign interests in enforcing its own laws.

Even if the subpoenas were not motivated by retaliation, it is incontrovertible that whatever investigation DOJ may be conducting related to OAG's cases is not well-founded. Numerous courts and a jury have already found that OAG's enforcement actions were lawful and meritorious.  Allowing the federal government to compel production of all records associated with a state enforcement action based on groundless speculation that the investigation could have been initiated for an improper purpose would open the floodgates to federal superintendence of state law enforcement.  If DOJ can demand the wholesale production of *all* documents and communications related to two entire investigations, lawsuits, and judicial proceedings— spanning years of activities—it can exert control over the prosecution of such actions and micromanage state law enforcements.  Under such a regime, the federal government could effectively "direct the function[] of the state executive," a result that would "compromise the structural framework of dual sovereignty."  *Printz v. United States*, 521 U.S. 898, 932 (1997). Whatever (pretextual) law enforcement interest the Executive Branch attempts to invoke here cannot justify such offense to the "very *principle* of state sovereignty."  *Id.*[13]  This baseless intrusion into New York's assertions of its sovereign authority to execute its own laws should not stand, and the Court therefore should quash the subpoenas as oppressive and unreasonable.

---

[13] Even if the subpoenas were issued in furtherance of some legitimate grand jury investigation (which they were not), the federal government cannot establish that the necessity and relevance of the extremely broad document requests are sufficient to override New York's substantial state interests.  *See supra* pp. 24-28; *see also THCF Med. Clinic Recs.*, 504 F. Supp. 2d at 1089 (requiring a heightened standard for necessity and relevance when state sovereignty was at issue).

**C.    The Subpoenas Unjustifiably Infringe on the Office of the Attorney
General's First Amendment Rights.**

The subpoenas are unlawful, unreasonable, and oppressive for the separate reason that

they infringe on OAG's First Amendment right to petition courts for relief.  *See Branzburg v.*

*Hayes*, 408 U.S. 665, 707-08 (1972) ("We do not expect courts will forget that grand juries must

operate within the limits of the First Amendment . . . .").  The subpoenas substantially burden

constitutionally protected petitioning activity, and the Executive Branch has not come anywhere

close to making the showing necessary to sustain them.

**1.    The subpoenas burden OAG's First Amendment right to petition
courts for relief.**

The subpoenas impair OAG's exercise of its First Amendment right to petition.  The right

to petition includes a "right of access to the courts," *Cal. Motor Transp. Co. v. Trucking*

*Unlimited*, 404 U.S. 508, 510 (1972), and accordingly protects the filing and prosecution of a

lawsuit, *McDonald v. Smith*, 472 U.S. 479, 484 (1985); *Bill Johnson's Rests., Inc. v. NLRB*, 461

U.S. 731, 743 (1983).[14]  The subpoenas infringe this essential guarantee.  Specifically, they

target OAG for past petitioning activity and discourage further attempts to enforce the laws

against the President and his allies.  *See supra* pp. 17-28.  Those efforts to "retaliate against and

chill an attorney's advocacy" on behalf of clients "strikes at the heart of the First Amendment."

*Eng v. Cooley*, 552 F.3d 1062, 1069 (9th Cir. 2009) (alterations adopted); *see also Bates v. City*

---

[14] Though some courts have questioned the level of protection that the First Amendment
provides to government entities, the Second Circuit has suggested, without deciding, that the
First Amendment does safeguard a government entity's petitioning activity.  *See Miracle Mile*
*Assocs. v. City of Rochester*, 617 F.2d 18, 21 (2d Cir. 1980) (applying the *Noerr-Pennington*
doctrine—which derives from the First Amendment right to petition—to protect a proceeding
filed by the City of Rochester).  And at least one district court in this Circuit has drawn on that
decision to conclude that "government actors are afforded some measure of protection . . . to
petition," not only under *Noerr-Pennington*, but also under the First Amendment.  *Mosdos*
*Chofetz Chaim, Inc. v. Vill. of Wesley Hills*, 701 F. Supp. 2d 568, 601 (S.D.N.Y. 2010).

*of Little Rock*, 361 U.S. 516, 523 (1960) (First Amendment freedoms "are protected not only against heavy-handed frontal attack, but also from being stifled by more subtle governmental interference").

While the President has tried to cast OAG's petitioning activity as baseless litigation that is not afforded First Amendment protections, *Bill Johnson's Rests.*, 461 U.S. at 743 (citation omitted), the cases that are the subject of the subpoenas are not baseless. Courts have repeatedly ruled that OAG had ample grounds to bring the cases. *See Trump Org.*, 205 A.D.3d at 626 (concluding that the "sequence of events" predating the inquiry into the Trump Organization "suggests that the investigation was lawfully initiated at its outset and well founded" and rejecting a selective prosecution claim); *Trump Org.*, 2022 WL 489625, at *4; *Nat'l Rifle Ass'n*, 223 A.D.3d at 89 ("[T]he NYAG showed as a matter of law that it had probable cause to investigate and sue the NRA."). And, critically, judges and a jury alike ultimately returned judgments and verdicts in OAG's favor in the two cases: such "winning lawsuit[s]" are, "by definition … not a sham." *Relevant Grp., LLC v. Nourmand*, 116 F.4th 917, 932 (9th Cir. 2024) (alterations adopted); *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus.*, *Inc.*, 508 U.S. 49, 62-63 (1993).

### 2.    The federal government cannot justify the subpoenas' intrusion on protected activity.

Where, as here, a subpoena recipient raises a substantial claim that enforcement of the subpoena would run afoul of the First Amendment, a "well established" standard governs this Court's review. *In re Grand Jury Proceedings*, 776 F.2d 1099, 1102 (2d Cir. 1985). A court can enforce the subpoena only if three requirements are satisfied. "First, the interests of the state must be 'compelling.'" *Id.* (citations omitted). "Second, there must be some 'substantial relation' between the governmental interest and the information required to be disclosed." *Id.* at

1103 (citation omitted).  And third, the government may not choose "unduly broad means" of

investigation.  *Id.*  The government bears the burden of establishing that these requirements are

satisfied.  *Bursey*, 466 F.2d at 1088; *see ABC v. Koch*, 547 F. App'x 46, 50-51 (2d Cir. 2013)

(noting the government's "convincing showing").  The federal government fails on all three.

    *First,* the Executive Branch has not made and cannot make the necessary showing of a

compelling interest here.  As explained, the overwhelming evidence establishes that the

subpoenas here were issued in bad faith.  *See supra* pp. 17-22.  They therefore do not serve any

compelling governmental interest.  *Cf. Branzburg*, 408 U.S. at 669-700.

    *Second,* even if the federal government's current investigation were valid (which it is

not), it certainly does not have an "unlimited right" to subpoena any and all documents and

communications that may refer to the "possible existence of [illegal] practices."  *In re Grand

Jury Subpoena: Subpoena Duces Tecum*, 829 F.2d 1291, 1297 (4th Cir. 1987).  Instead, it "is

obliged to show that there is a substantial possibility that the information sought will expose

criminal activity," *Bursey*, 466 F.2d at 1083, and to substantiate its "need" for the particular

information at issue, *see Koch*, 547 F. App'x at 50.  Here, the Executive Branch has not come

close to establishing the requisite connection.  It has merely speculated—publicly and

vociferously—that OAG has engaged in wrongdoing.  It has made no effort to establish why its

investigation requires "any and all" documents related to the two cases.  And it certainly cannot

establish that there is a "substantial possibility" that OAG has committed criminal acts in

investigating the Trump Organization and the NRA—not when courts have repeatedly rejected

each and every challenge to the OAG's legal authority to bring both civil enforcement actions.

Across the board, the federal government's showing is insufficient.

    *And third,* the Executive Branch cannot establish that its investigative methods are

appropriately tailored.  When "First Amendment interests are at stake, the Government must use a scalpel, not an ax." *Bursey*, 466 F.2d at 1088..  The subpoenas here are a blunderbuss demand for all materials from a multi-year period related to two civil enforcement proceedings, but it is "contrary to the first principles of justice" to allow the Executive Branch to ferret through the State's records, "relevant or irrelevant, in the hope that something will turn up." *In re Grand Jury Subpoena*, 829 F.2d at 1297-98.

There is no conceivable compelling government interest served by these subpoenas for "any and all" documents and communications related to two successful lawsuits pursued by OAG on behalf of the People of the State of New York.  The subpoenas are a clear infringement on OAG's First Amendment right to petition courts for relief, and the Court therefore should quash the subpoenas as unreasonable and oppressive.

###    D.    The Subpoenas Were Issued Without Proper Authorization.

The subpoenas are also facially invalid because they were issued at the request of Sarcone in his purported capacity as Acting U.S. Attorney, a position that he has no authority to hold.  Under 28 U.S.C. § 546(c), the U.S. Attorney General may appoint an interim U.S. Attorney for a maximum period of 120 days.  After this 120-day period expires, only the federal district court for the relevant district may appoint an interim U.S. Attorney.  *Id.* § 546(d); *see also United States v. Baldwin*, 541 F. Supp. 2d 1184, 1192-93 (D.N.M. 2008) (noting congressional intent to shift appointment authority from the Attorney General to the district courts after the 120-day period expires).

Here, U.S. Attorney General Bondi appointed Sarcone in March 2025 to serve as the interim U.S. Attorney for the Northern District of New York under § 546(c).  Chen Decl. Ex. 27. As the interim 120-day period approached its July 2025 expiration, Sarcone told the press that this Court had appointed him to continue serving as interim U.S. Attorney, *id.* Ex. 26, but the

Court had done no such thing.  To the contrary, the Court "decline[d] to exercise the authority granted pursuant to 28 U.S. Code § 546(d) to appoint a United States attorney for the Northern District of New York."  *Id*. Ex. 28.

In the absence of district court approval, Bondi appointed Sarcone as a "Special Attorney to the United States Attorney General" and then designated him the "First Assistant United States Attorney for the Northern District of New York."  *Id*. Ex. 29.  Sarcone has falsely argued that this procedure allows him to continue to serve as Acting U.S. Attorney.  *Id*. at 1.

The Administration's attempt to circumvent this Court's decision by appointing Sarcone as "First Assistant" after his interim 120-day term expired violates the Federal Vacancies Reform Act ("FVRA").[15]  Under the FVRA, when an executive officer "whose appointment to office is required to be made by the President, by and with the advice and consent of the Senate, dies, resigns, or is otherwise unable to perform the functions and duties of the office," the first assistant shall perform the functions of that office in an acting capacity.  5 U.S.C. § 3345(a).  The Supreme Court has described this provision as "mandatory and self-executing," noting that first assistants "automatically assume acting duties under (a)(1)."  *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 303, 305 (2017).  As such, the provision is only triggered at the moment the Senate-confirmed U.S. Attorney departs from the role—not when an *interim* U.S. Attorney's term ends—and the individual serving as first assistant *at the time* the vacancy arises "automatically"

---

[15] This attempt to continue Sarcone's tenure as an interim U.S. Attorney despite this Court's rejection also directly contradicts the U.S. Department of Justice's own longstanding guidance. As then-Deputy Assistant Attorney General Samuel Alito wrote in a 1986 memo, "[t]he statutory plan discloses a Congressional purpose that after the expiration of the 120-day period further interim appointments are to be made by the court rather than by the Attorney General."  Ross E. Wiener, *Inter-Branch Appointments After the Independent Counsel: Court Appointment of United States Attorney*, 86 Minn. L. Rev. 363, 402 (2001) (quoting Memorandum from Samuel A. Alito, Jr., Deputy Assistant Attorney General, Office of Legal Counsel, to William P. Tyson, Director, Executive Office for United States Attorneys (Nov. 13, 1986), at 3).

assumes the acting role.  A "mandatory and self-executing" provision cannot give the U.S. Attorney General authority to designate any person as "first assistant" at any time after a Senate-confirmed U.S. Attorney leaves office.  Holding otherwise would permit an end-run around the carefully crafted statutory scheme of the FVRA, which outlines the only methods by which someone may be temporarily appointed to fill a vacant position—none of which apply here.  *See* 5 U.S.C. § 3345(a)(1)-(3).

Nor does the U.S. Attorney General's attempt to name Sarcone as a "Special Attorney," under 28 U.S.C. § 515, allow him to exercise the powers of a U.S. Attorney.  Section 515 states that a Special Attorney may conduct legal proceedings, including grand jury proceedings, only "when specifically directed by the Attorney General."[16]  28 U.S.C. § 515(a). This limitation makes clear that § 515 cannot be used to appoint a *de facto* U.S. Attorney through the expedient of a different title, because a U.S. Attorney could conduct such proceedings on his own, *without* needing any direction from the Attorney General.  *See In re Persico*, 522 F.2d 41, 66 (2d Cir. 1975) (contrasting the power of a U.S. Attorney or an Assistant United States Attorney with that of a Special Attorney appointed under § 515, who must be "'specifically directed' to conduct grand jury proceedings").  Any other interpretation would evade statutory limits and undermine the Senate's constitutional power to confirm certain Presidential nominees.  *See SW Gen., Inc.*, 580 U.S. at 295.

---

[16] Whether Sarcone could have authorized these subpoenas in his role as a "Special Attorney" if directed by the Attorney General is irrelevant here because that is not what happened.  Instead, he attempted to authorize them in his self-proclaimed role as "Acting U.S. Attorney" and personally requested the subpoenas using that title.

Accordingly, because Sarcone has no legitimate authority to serve as Acting U.S. Attorney, any process sought by him in that capacity, like these two subpoenas, is unauthorized and unlawful.

**E.    The Subpoenas Are Impermissibly Overbroad and Unduly Burdensome, and They Seek Privileged Information.**

Even setting aside the ample evidence of the subpoenas' retaliatory and unlawful purposes, their infringement on bedrock constitutional principles and rights, and their authorization by an illegitimate public official, the subpoenas must be quashed for completely independent reasons:  Both are overbroad and unduly burdensome and both seek privileged information.

As an initial matter, even if the federal government could identify some legitimate purpose for a grand jury investigation here (which it cannot), the subpoenas are impermissibly overbroad because they require "production of all documents contained in the [OAG's case] files, without any attempt to define classes of potentially relevant documents."  *In re Horowitz*, 482 F.2d 72, 79 (2d Cir. 1973); *see also R. Enters.*, 489 U.S. at 301 (grand jury subpoena must be quashed when "there is no reasonable possibility that the category of materials the Government seeks will produce information relevant to the general subject of the grand jury's investigation"); *In re Grand Jury Subpoena Duces Tecum Dated Nov. 15, 1993*, 846 F. Supp. 11, 13-14 (S.D.N.Y. 1994) ("[B]ecause the subpoena at issue unnecessarily demands documents that are irrelevant to the grand jury inquiry, it is unreasonably broad under Federal Rule of Criminal Procedure 17(c)."); *United States v. Vilar*, 2007 WL 1075041, at *46 (S.D.N.Y. Apr. 4, 2007) (excising certain document requests from subpoena because they are "too broad" and "beyond the scope of the investigation").  On their face, the subpoenas would require production of every single e-mail sent in connection with the cases, every single calendar entry, every single

voicemail and text message, and every single document created or received—the majority of which would have no conceivable relevance to supposed civil rights violations by OAG.

Moreover, because of the subpoenas' extreme overbreadth, compliance would be unreasonably burdensome. *See Vilar*, 2007 WL 1075041, at *48 ("A subpoena [] may be quashed or modified" pursuant to Rule 17(c)(2) of the Federal Rules of Criminal Procedure if "compliance therewith would be overly burdensome.") (citing *Horowitz*, 482 F.2d at 77). The subpoenas demand "any and all" materials connected to years of investigation and litigation in two complex and heavily litigated matters. The two matters combined involved at least 100 lawyers, paralegals, and other OAG employees; millions of pages in discovery; and over 5,000 entries on the court dockets. Amer Decl. ¶ ¶ 6, 10-11; Stern Decl. ¶ ¶ 5, 9-10. Requiring OAG to collect several million documents and then review those documents for privilege (which, as noted below, would likely to apply to many of the documents in the files) would consume an inconceivable amount of attorney time, taking substantial resources (*i.e.,* State personnel and taxpayer dollars) away from OAG's vital mission of protecting New Yorkers, combatting crimes and defending constitutional rights. Amer Decl. ¶ 12; Stern Decl. ¶ 11.

And, finally, large swaths of the materials sought by the subpoenas are privileged and beyond reach. A grand jury may not "itself violate a valid privilege, whether established by the Constitution, statutes, or the common Law." *United States v. Calandra,* 414 U.S. 338, 346 (1974). Many of the materials related to these two cases are protected by the attorney-client privilege and attorney work-product doctrine, including confidential communications and documents reflecting attorney analyses and mental impressions. *See In re Grand Jury Subpoena Dated Dec. 19, 1978*, 599 F.2d 504, 509 (2d Cir. 1979) ("It is now clear, however, that discovery by the Government in grand jury proceedings is subject to the attorney-client privilege as

developed at common law, as well as to the work-product rule." (citations omitted)).  In addition, the investigation and litigation files are highly likely to contain documents "reflecting advisory opinions, recommendation, and deliberations" that are part of OAG's decision-making process (such as whether to file litigation), which would also be protected by the deliberative process privilege.  *See Nat'l Rifle Ass'n of Am. v. Cuomo*, 332 F.R.D. 420, 433 (N.D.N.Y. 2019); *see also In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997) (indicating that deliberative process privilege applies to grand jury subpoenas).  And disclosure of many of the materials in the files could reveal non-public law enforcement techniques and procedures, expose confidential sources, and threaten the safety of individuals involved in the investigations.  *See In re Dep't of Investigation of City of New York*, 856 F.2d 481, 484 (2d Cir. 1988) (applying law enforcement privilege and declining to enforce Rule 17 subpoena that would "disclos[e] law enforcement techniques and procedures"); *see also* N.Y. Pub. Off. Law § 87(2)(e) (McKinney 2024) (exempting from disclosure records that "are compiled for law enforcement purposes . . . to the extent that disclosure would" "identify a confidential source or disclose confidential information relating to a criminal investigation" or "reveal criminal investigative techniques or procedures, except routine techniques and procedures").  While the subpoenas claim not to call for production of privileged documents, sorting through the *millions* of documents related to these two OAG investigations and litigation to identify all privileged documents—and then logging those documents, as the subpoenas purport to require—would impose an extraordinary and unreasonable burden on OAG.

In sum, the subpoenas are overbroad and unduly burdensome, and they should therefore be quashed.

IV.    **CONCLUSION**

The Trump Administration seeks to subvert the federal criminal justice system and to use the weight of its governmental powers to retaliate against and punish OAG for its successful enforcement of New York law, on behalf of the People of the State of New York, against Mr. Trump (then a private citizen) and his ally, the NRA.  This Court should see through this brazen and transparent abuse of the grand jury power, and, for any or all of the reasons herein, quash both subpoenas in their entirety.


DATED: August 19, 2025                    OFFICE OF THE NEW YORK STATE
                                          ATTORNEY GENERAL


                                   By: _____
                                          Kumiki Gibson*
                                          (New York Bar #2261063)
                                          Michael Jaffe*
                                          (New York Bar #5357330)
                                          28 Liberty Street
                                          New York, New York 10005
                                          Telephone:    (212) 416-8965
                                          E-mail:  kumiki.gibson@ag.ny.gov
                                          E-mail:  michael.jaffe@ag.ny.gov

DATED: August 19, 2025                MUNGER, TOLLES & OLSON LLP

By: _____
        Hailyn J. Chen*
        Brad D. Brian*
        E. Martin Estrada*
        Victoria A. Degtyareva*
        350 South Grand Avenue, 50th Floor
        Los Angeles, CA 90071-3426
        Telephone:    (213) 683-9100
        Facsimile:    (213) 687-3702
        E-mail:  hailyn.chen@mto.com
        E-mail:  brad.brian@mto.com
        E-mail:  martin.estrada@mto.com
        E-mail:  victoria.degtyareva@mto.com

        Donald B. Verrilli, Jr.**
        (New York Bar #2147825)
        601 Massachusetts Avenue NW, Suite 500 E
        Washington, D.C. 20001
        Telephone:    (202) 220-1100
        Facsimile:    (202) 220-2300
        E-mail:  donald.verrilli@mto.com

        *Pro Hac Vice Pending
        **Reciprocal Admission Pending

DATED: August 19, 2025                CAPEZZA HILL, LLP

By: _____
        Benjamin W. Hill (Bar Roll #514953)
        30 South Pearl Street, Suite P-110
        Albany, New York 12207
        Telephone:    (518) 478-6065
        Facsimile:    (518) 407-5661
        E-mail:  ben@capezzahill.com

        Attorneys for the Office of the New York State
        Attorney General