U.S. DISTRICT COURT – N.D. OF N.Y.

FILED

**Oct 15 - 2025**

John M. Domurad, Clerk

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

IN RE GRAND JURY SUBPOENAS TO
THE OFFICE OF THE NEW YORK STATE
ATTORNEY GENERAL

Case No.: 1:25-MC-00019-LGS

**OFFICE OF THE NEW YORK STATE ATTORNEY GENERAL'S OMNIBUS REPLY
BRIEF IN SUPPORT OF ITS (1) MOTION TO QUASH GRAND JURY SUBPOENAS
AND (2) MOTION TO UNSEAL MOTION TO QUASH**

OFFICE OF THE NEW YORK
STATE ATTORNEY GENERAL
Kumiki Gibson
Michael Jaffe
28 Liberty Street
New York, New York 10005

MUNGER, TOLLES & OLSON LLP
Donald B. Verrilli (Bar Roll # 105107)
601 Massachusetts Avenue NW, Suite 500 E
Washington, D.C. 20001

Brad D. Brian
Hailyn J. Chen
E. Martin Estrada
Victoria A. Degtyareva
350 South Grand Avenue, 50th Floor
Los Angeles, California 90071-3426

CAPEZZA HILL, LLP
Benjamin W. Hill (Bar Roll #514953)
30 South Pearl Street, Suite P-110
Albany, New York 12207

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    INTRODUCTION ............................................................................................1

II.    BACKGROUND ...........................................................................................3

    A.    President Trump's Continued Attacks on the New York Attorney General ..........3

    B.    People of the State of New York v. Trump ...........................................5

III.    ARGUMENT ................................................................................................8

    A.    The Subpoenas Were Issued in Retaliation and with an Intent to Harass. .............8

        1.    DOJ cannot invoke the presumption of regularity.......................................9

        2.    Numerous courts have rejected the theory of selective enforcement that DOJ purports to investigate now as a crime. ...................................11

    B.    The Subpoenas Offend New York's State Sovereignty.........................................16

    C.    The Subpoenas Infringe on OAG's First Amendment Rights. ...........................21

    D.    Sarcone's Improper Appointment Invalidates the Subpoenas. ...........................24

    E.    The Subpoenas Are Overbroad and Unduly Burdensome.....................................28

    F.    The Motion to Quash Should Be Unsealed...........................................................29

IV.    CONCLUSION...............................................................................................30

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**FEDERAL CASES**

*Alberty v. Hunter*,
    144 F.4th 408 (2d Cir. 2025) ............................................................12, 15

*In re Babin*,
    2022 WL 1658701 (5th Cir. May 25, 2022) .................................17, 18

*Brown v. United States*,
    245 F.2d 549 (8th Cir. 1957) ............................................................11

*Bursey v. United States*,
    466 F.2d 1059 (9th Cir. 1972) ....................................................23, 24

*Cobb v. Pozzi*,
    363 F.3d 89 (2d Cir. 2004)................................................................12

*County of Suffolk v. Long Island Lighting Co.*,
    710 F. Supp. 1387 (E.D.N.Y. 1989) .............................................21

*Creek v. Village of Westhaven*,
    80 F.3d 186 (7th Cir. 1996) ..............................................................22

*District of Columbia v. Heller*,
    554 U.S. 570 (2008)............................................................................22

*Doe v. DiGenova*,
    779 F.2d 74 (D.C. Cir. 1985)............................................................27

*Ealy v. Littlejohn*,
    569 F.2d 219 (5th Cir. 1978) ....................................................10, 11

*Fed. Educ. Ass'n v. Trump*,
    2025 WL 2355747 (D.D.C. Aug. 14, 2025) .............................10

*First Nat'l Bank of Tulsa v. DOJ*,
    865 F.2d 217 (10th Cir. 1989) .......................................................27

*In re Grand Jury Investigation (Oshkosh Truck Corp.)*,
    746 F. Supp. 866 (E.D. Wis. 1990)...............................................29

*In re Grand Jury, John Doe No. G.J. 2005-2*,
    478 F.3d 581 (4th Cir. 2007) ...............................................2, 17, 19

*In re Grand Jury Proceedings*,
    776 F.2d 1099 (2d Cir. 1985).......................................................23, 24

*In re Grand Jury Subpoena Duces Tecum Dated Jan. 2, 1985 (Simels)*,
　　767 F.2d 26 (2d Cir. 1985) .................................................................................11, 27

*In re Grand Jury Subpoena for THCF Medical Clinic Records*,
　　504 F. Supp. 2d 1085 (E.D. Wash. 2007) ...........................................................18, 19

*In re Grand Jury Subpoena, JK-15-029*,
　　828 F.3d 1083 (9th Cir. 2016) ..................................................................................29

*In re Grand Jury Subpoena, Judith Miller*,
　　438 F.3d 1138 (D.C. Cir. 2006) ................................................................................30

*In re Horn*,
　　976 F.2d 1314 (9th Cir. 1992) ..................................................................................28

*L.M.-M. v. Cuccinelli*,
　　442 F. Supp. 3d 1 (D.D.C. 2020) ..........................................................................25, 26

*Miracle Mile Associates v. City of Rochester*,
　　617 F.2d 18 (2d Cir. 1980) ........................................................................................21

*Mosdos Chofetz Chaim, Inc. v. Village of Wesley Hills*,
　　701 F. Supp. 2d 568 (S.D.N.Y. 2010) .......................................................................21

*Nat'l Council of Nonprofits v. OMB*,
　　763 F. Supp. 3d 36 (D.D.C. 2025) ............................................................................10

*Netflix, Inc. v. Babin*,
　　88 F.4th 1080 (5th Cir. 2023) ...................................................................................18

*NLRB v. SW Gen., Inc.*,
　　580 U.S. 288 (2017) ...............................................................................................25, 26

*President & Fellows of Harvard Coll. v. DHS*,
　　2025 WL 1737493 (D. Mass. June 23, 2025) ...........................................................10

*In re Press Application for Access to Judicial Records*,
　　678 F. Supp. 3d 135 (D.D.C. 2023) ..........................................................................30

*South Carolina v. Katzenbach*,
　　383 U.S. 301 (1966) ..................................................................................................21

*In re Special April 1977 Grand Jury*,
　　581 F.2d 589 (7th Cir. 1978) ...............................................................................16, 17

*Steffel v. Thompson*,
　　415 U.S. 452 (1974) ..................................................................................................16

*Trump v. Clinton*,
    653 F. Supp. 3d 1198 (S.D. Fla. 2023) .............................................................12, 13

*Trump v. James*,
    2022 WL 1718951 (N.D.N.Y. May 27, 2022)............................................. 5, passim

*United States v. 50 Acres of Land*,
    469 U.S. 24 (1984)...........................................................................................22

*United States v. Am. Honda Motor Co.*,
    273 F. Supp. 810 (N.D. Ill. 1967)....................................................................11

*United States v. Calk*,
    87 F.4th 164 (2d Cir. 2023) ...........................................................................8, 9

*United States v. Egan Marine Corp.*,
    843 F.3d 674 (7th Cir. 2016) ..........................................................................14

*United States v. Garcia*,
    2025 WL 2784640 (D. Nev. Sept. 30, 2025) ............................................ 24, passim

*United States v. Giraud*,
    2025 WL 2416737 (D.N.J. Aug. 21, 2025) ............................................... 24, passim

*United States v. R. Enters., Inc.*,
    498 U.S. 292 (1991)....................................................................................27, 29

*United States v. Rahimi*,
    602 U.S. 680 (2024).......................................................................................22

*United States v. Roberts*,
    852 F.2d 671 (2d Cir. 1988)............................................................................24

*United States v. Trump*,
    740 F. Supp. 3d 1245 (S.D. Fla. 2024) .............................................................28

*United States v. Williams*,
    504 U.S. 36 (1992).........................................................................................2

*Younger v. Harris*,
    401 U.S. 37 (1971)........................................................................................16

## STATE CASES

*People v. Allen*,
    198 A.D.3d 531 (1st Dep't 2021) ....................................................................15

*People v. Ernst & Young, LLP*,
    114 A.D.3d 569 (1st Dep't 2014) ....................................................................15

*People v. Greenberg*,
    21 N.Y.3d 439 (N.Y. 2013) ...................................................................................15

*People v. Nat'l Rifle Ass'n of Am., Inc.*,
    171 N.Y.S.3d 782 (N.Y. Sup. Ct. 2022) ......................................................12, 14

*People v. Nat'l Rifle Ass'n of Am., Inc.*,
    No. 2025-00347 (1st Dep't Sept. 30, 2025)...........................................................8

*People v. Nat'l Rifle Ass'n of Am., Inc.*,
    223 A.D.3d 84 (1st Dep't 2023) ...........................................13, 14, 18, 20

*People v. Trump Org., Inc.*,
    2022 WL 489625 (N.Y. Sup. Ct. Feb. 17, 2022)............................................12, 13

*People v. Trump Org., Inc.*,
    205 A.D.3d 625 (1st Dep't 2022) ..................................................5, 6, 12, 13

*People v. Trump Org., Inc.*,
    38 N.Y.3d 1053 (N.Y. 2022) ..........................................................................12, 13

*People v. Trump*,
    2023 WL 128271 (N.Y. Sup. Ct. Jan. 6, 2023)................................................12, 13

*People v. Trump*,
    217 A.D.3d 609 (1st Dep't 2023) ...................................................................12, 13

*People v. Trump*,
    237 N.Y.S.3d 443 (1st Dep't 2025) ........................................................ 5, passim

**FEDERAL STATUTES**

5 U.S.C. § 3345 ................................................................................................................25

5 U.S.C. § 3347 ...........................................................................................................26, 27

28 U.S.C. § 515 ............................................................................................................26, 27

28 U.S.C. § 541 ................................................................................................................25

**FEDERAL RULES**

Federal Rule of Criminal Procedure 17 ...................................................................19, 27

**CONSTITUTIONAL PROVISIONS**

First Amendment .......................................................................................... 2, passim

Second Amendment.........................................................................................................22

Fifth Amendment ................................................................................................................21

Fourteenth Amendment .......................................................................................................12

**OTHER AUTHORITIES**

*Hearing with Michael Cohen, Former Attorney to President Donald Trump: Hearing Before the H. Comm. on Oversight & Reform*, 116th Cong. 13 (2019), https://www.congress.gov/116/chrg/ CHRG-116hhrg35230/CHRG-116hhrg35230.pdf.....................................................6

S. Rep. No. 105-250 (1998) .................................................................................................26

United States District Court for the Northern District of New York, Jury Plan for the Random Selection of Grand and Petit Jurors—General Order 24 (2024), https://www.nynd.uscourts.gov/sites/nynd/files/general-orders/GO24.pdf..............................10

## I.     __INTRODUCTION__

The U.S. Department of Justice ("DOJ") asks this Court to treat this as an ordinary case. It portrays the subpoenas as routine. And it recites the usual standards governing grand jury investigations—while trying to ignore and trying to convince this Court to ignore the extraordinary reality before it, that these subpoenas are a flagrant abuse of the criminal justice system, even by this President's standards. The normal rules simply do not apply here.

The subpoenas at issue are anything but ordinary. Consider the facts. The New York Attorney General learned, through public accounts, that an associate of then-President Donald J. Trump testified under oath that Mr. Trump[1] and the Trump Organization had engaged in a decades-long scheme of financial fraud. Her office investigated that alleged misconduct and pursued a successful civil enforcement action. Mr. Trump and his allies resisted at every turn, levying baseless accusations of selective prosecution, retaliation, and bad faith. Those efforts to portray the investigations as politically motivated failed resoundingly in *every* court that considered them—and the factual records before those courts encompassed nearly *all* of the statements by the New York Attorney General that DOJ now claims justify this criminal investigation. What's more, months of civil discovery in the litigation against Mr. Trump and his Organization failed to uncover *any* evidence to support Mr. Trump's claims of political retaliation or selective enforcement, which explains why Mr. Trump did not press these arguments at summary judgment or at trial in the civil action.

Now that he has returned to the Oval Office and placed his personal lawyers at the highest levels of DOJ, President Trump is using the grand jury subpoena power to target the

---

[1] This brief refers to President Trump as "President" when discussing his time in office and refers to him as "Mr. Trump" when discussing his time as a private citizen.

Office of the New York State Attorney General ("OAG").  In that way, the Executive Branch seeks to transform a personal grievance, which failed as civil claims, into a federal criminal prosecution—a plain and calculated campaign to harass a law enforcement agency that held Mr. Trump and his Organization to account.

The "presumption of regularity" on which DOJ relies simply does not apply in the face of this unprecedented abuse of the powers of the grand jury.  The grand jury is not meant to serve as a tool for punishing the political adversaries of the President.  Instead, it is a "constitutional fixture in its own right" that "[b]elong[s] to no branch of government."  *In re Grand Jury, John Doe No. G.J.2005-2*, 478 F.3d 581, 584 (4th Cir. 2007) (quoting *United States v. Williams*, 504 U.S. 36, 47 (1992)).  Allowing the federal government to manipulate and abuse this vital device in the service of President Trump's own political and personal ends would vitiate the critical safeguard that the grand jury is intended to provide—not to mention infringe on the sovereign authority of the State of New York and trample on its First Amendment rights.

DOJ's opposition only reinforces the need to quash these subpoenas.  DOJ does not respond directly to OAG's multiple arguments (any one of which suffices to quash the subpoenas).  It ignores the trove of evidence rebutting the President's accusations that OAG acted in bad faith, including numerous judicial decisions upholding the propriety of—and, indeed, the need for—OAG's enforcement actions.  It has nothing to say about the slew of public statements by President Trump, Attorney General Bondi, and other members of the Executive Branch who openly express their desire to retaliate against the New York Attorney General and OAG.  It conspicuously omits any mention of the fact that, in the weeks since OAG's Motion to Quash ("Motion") was filed, the proof that these subpoenas are part of a broader retaliation campaign against the New York Attorney General and OAG has only grown more compelling.

Just last week, that campaign resulted in the indictment of the New York Attorney General in a separate investigation—despite the fact that multiple career prosecutors had concluded that there was insufficient evidence to bring charges against her.

The centerpiece of DOJ's argument is the solo opinion of a single Justice of a New York appellate court—the lone dissenter from a decision upholding the finding that Mr. Trump and his Organization committed fraud.  DOJ treats that Justice's view as if it negates the uniform conclusion of other courts: that OAG's enforcement actions against Mr. Trump and his Organization and the National Rifle Association ("NRA") were well-founded and in good faith. A single dissenting opinion cannot overwrite that record.

Nothing in DOJ's opposition refutes the reality that these subpoenas are an unparalleled abuse of the grand jury.  For multiple independent reasons, this Court should quash them in full.

## II. BACKGROUND[2]

### A. President Trump's Continued Attacks on the New York Attorney General

Since OAG filed its Motion, evidence of the Trump Administration's malice toward OAG and Attorney General Letitia James has only grown stronger.  Having launched an investigation earlier this year into alleged "mortgage fraud" by Attorney General James, prosecutors investigated for five months, interviewed more than a dozen witnesses, and uncovered nothing that could sustain an indictment.  Decl. of Hailyn Chen in Support of Reply Brief ("Chen Decl.") ¶ 10.  According to anonymous sources familiar with the matter, multiple career prosecutors "looked at the evidence against Ms. James and believed it did not merit criminal charges," including a "senior prosecutor" who "relayed that determination to her

---

[2] This Background section presents only new developments that have taken place since OAG filed its Motion.

superiors." *Id.* ¶ 18.  Interim U.S. Attorney for the Eastern District of Virginia Eric Siebert, the head prosecutor of the office where the investigation was based, reportedly told "senior Justice Department officials that investigators found insufficient evidence to bring charges." *Id.* ¶ 11.

Undeterred by the absence of evidence, President Trump continued to insist on an indictment.  In a now-deleted social media post, he complained to the U.S. Attorney General that his political enemies, including "Letitia," are "all guilty as hell, but nothing is going to be done," making clear that he believed charges were necessary to avenge the perceived wrongs against him: "They impeached me twice, and indicted me (5 times!), OVER NOTHING.  JUSTICE MUST BE SERVED, NOW!!!"  Chen Decl. ¶ 14 (emphasis in original).  President Trump also called Attorney General James "SCUM" and "a Complete and Total Disaster" and demanded her removal from office because of her "WITCH HUNT" against him and others.  Decl. of Noelle Smith in Support of Reply Brief ("N. Smith Decl.") Ex. 1.  White House Press Secretary Karoline Leavitt confirmed the President's motives were personal: he wanted to hold Attorney General James and others "accountab[le]" because he believed they "campaigned on trying to put him in jail" and "tried to ruin his life and ruin his businesses."  Chen Decl. ¶ 15.  The DOJ official responsible for the investigation, Ed Martin—who, famously, brought a New York Post photographer to the Attorney General's home to take photos of himself in front of her residence—announced that his goal was to "name" and "shame," even if he lacked sufficient evidence to prosecute.  *Id.* ¶¶ 9-10.

Multiple sources reported that interim U.S. Attorney Siebert "resigned amid pressure from the Trump administration over his decision not to seek indictments."  Chen Decl. ¶ 13.  President Trump posted that he had "fired" Siebert and installed Lindsey Halligan, his former personal lawyer who had no prosecutorial experience, as the new head of the U.S. Attorney's

Office in an effort to "get things moving." *Id.* ¶ 14.  When just days later Halligan filed an

indictment against another of President Trump's adversaries, former FBI Director James Comey,

President Trump threatened that "there will be others." *Id.* ¶ 16.

The Administration has now carried out that threat.  Last Thursday, less than three weeks

after taking office, Halligan filed an indictment against Attorney General James.  *See* Indictment,

*United States v. James*, No. 2:25-cr-122 (E.D. Va. Oct. 9, 2025), Dkt. No. 1.  Executive Branch

officials admitted that the indictment was payback.  Alina Habba, another one of the President's

personal lawyers whom the Administration has attempted to name an Acting U.S. Attorney,

retweeted a post she had made about OAG's fraud case in which she vowed to serve Attorney

General James "humble pie."  N. Smith Decl. Ex. 3.  Martin announced: "Promises made,

Promises kept."  *Id.* Ex. 2.  President Trump himself posted a video of a commentator discussing

the indictment and acknowledging: "You could call it retribution."  *Id.* Ex. 5.

These admissions, along with countless others as outlined in OAG's Motion, make

crystal clear that President Trump, his DOJ, and his appointees are using the power of grand

juries to exact revenge against individuals and institutions who he feels wronged him personally

or politically.  On this record of open retribution, these subpoenas must be quashed.

**B.**  **People of the State of New York v. Trump**

In *People of the State of New York v. Trump* (*Trump VI*), 237 N.Y.S.3d 443 (1st Dep't

2025), the Appellate Division recently issued a decision in the ongoing civil fraud lawsuit

against Mr. Trump.  Nothing in that decision disturbed the findings of multiple courts—

including this one—that OAG's "investigation was lawfully initiated at its outset and well

founded."  *People v. Trump Org., Inc.* (*Trump II*), 205 A.D.3d 625, 626 (1st Dep't 2022); *see*

*also Trump v. James*, 2022 WL 1718951, at *12-13 (N.D.N.Y. May 27, 2022).  The Appellate

Division itself previously unanimously affirmed the trial court's denial of Mr. Trump's efforts

(while a private citizen) to halt OAG's investigation based on claims of selective enforcement and retaliation. *See Trump II*, 205 A.D.3d at 627. As the court explained then, OAG's investigation was initiated in March 2019 after Trump Organization senior executive Michael Cohen testified before Congress, in February 2019, that the company had issued fraudulent financial statements. *See id.* at 626.[3] In its most recent opinion, Justice Moulton again confirmed that President Trump's claims of selective enforcement have "already been considered, and rejected, by this Court." *Trump VI*, 237 N.Y.S.3d at 446 (Moulton, J., concurring).

The Appellate Division had no occasion to reconsider its prior rulings rejecting the claims of selective enforcement because Mr. Trump never challenged them. In fact, no defendant raised *any* argument about selective enforcement on summary judgment, at trial, or during the appeal of the summary judgment and trial decisions. *Trump VI*, 237 N.Y.S.3d at 458 (Moulton, J., concurring). As Justice Moulton observed, "[i]f the constitutional arguments had any merit, defendants and their sophisticated counsel would have placed the issue squarely before us." *Id.* at 461.

Although *no* party pressed a claim of selective prosecution, and although the many courts that have considered the claim have unanimously rejected it, one dissenting Justice—Justice Friedman—raised concerns that the lawsuit "appears" to constitute selective enforcement. *Trump VI*, 237 N.Y.S.3d at 582 (Friedman, J., concurring in part and dissenting in part). Justice Friedman acknowledged, however, that Mr. Trump and his co-defendants had "unsuccessfully raise[d] such constitutional arguments" several times before, and that they were "not asserting an

---

[3] *See also Hearing with Michael Cohen, Former Attorney to President Donald Trump: Hearing Before the H. Comm. on Oversight & Reform*, 116th Cong. 13, 38-39, 160-61 (2019), https://www.congress.gov/116/chrg/CHRG-116hhrg35230/CHRG-116hhrg35230.pdf.

affirmative selective enforcement claim against the Attorney General" in that appeal.  *Id.* at 582, 584.  No other Justice joined Justice Friedman's separate opinion.

On the issues that were before the court, every other member of the panel affirmed President Trump and his co-defendants' liability.  *Trump VI*, 237 N.Y.S.3d at 447 (Moulton, J., concurring).  Justice Moulton, joined by Presiding Justice Renwick, wrote that OAG's evidence revealed "a decade-long pattern of financial fraud and illegality," whereby Mr. Trump and his co-defendants "fraudulently inflated President Trump's net worth by material amounts, ranging between $812 million and $2.2 billion."  *Id.* at 462, 467.  Similarly, Justice Higgitt, joined by Justice Rosado, acknowledged that Mr. Trump's financial statements may contain "a multitude of false statements certified as accurate" and noted the apparent "magnitude of disparities" between the reported and actual value of Mr. Trump's assets.  *Id.* at 542, 551 (Higgitt, J., concurring in part).

The Appellate Division also upheld the "broad injunctive relief" that the trial court issued.  *Trump VI*, 237 N.Y.S.3d at 507 (Moulton, J., concurring).  Among other measures, that relief bars President Trump from serving as an officer or director of any New York corporation for three years; prohibits him and his corporate co-defendants from applying for loans from New York financial institutions for three years; and permanently bans the former CFO and the Controller of the Trump Organization from serving as financial managers in New York.  *Id.*  As Justice Moulton wrote, these remedies were "well crafted to curb defendants' business culture."  *Id.* at 446.

The only points about which the Appellate Division disagreed with the trial court have nothing to do with selective enforcement: the Appellate Division vacated the trial court's

disgorgement award and its sanctions order, concluding that the disgorgement award was excessive. *Trump VI*, 237 N.Y.S.3d at 498, 509 (Moulton, J., concurring).

Further appellate proceedings are ongoing. President Trump and his co-defendants have filed a notice of appeal from the Appellate Division's judgment against them. Donald J. Trump's Notice of Appeal, *People v. Trump*, No. 452564/2022 (N.Y. Sup. Ct. Aug. 26, 2025), Dkt. No. 1806. In this latest appeal, President Trump and his co-defendants informed the Court of Appeals that they now intend to present arguments on selective enforcement. Chen Decl. Ex. 5. And, OAG has filed a notice of cross-appeal to challenge the vacatur of the disgorgement award. OAG's Notice of Cross-Appeal, *People v. Trump*, No. 42564/2022 (N.Y. Sup. Ct. Sept. 4, 2025), Dkt. No. 1810.[4]

## III.    ARGUMENT

### A.    The Subpoenas Were Issued in Retaliation and with an Intent to Harass.

DOJ completely ignores the vast record of retaliation and harassment that OAG has presented. Mot. to Quash ("Mot.") 11-14, 19-20; *see supra* pp. 3-5. Instead, with blinders on, DOJ falls back on the test for *relevance* challenges to grand jury subpoenas, contending that a challenge "on relevancy grounds" must be denied unless "there is no reasonable possibility" that the materials sought "will produce information relevant to the general subject of the grand jury's investigation." Opposition to Mot. to Quash ("Opp.") 7. But that standard does not apply where, as here, the motion seeks to quash a subpoena as an unreasonable abuse of process.

Under the proper standard set forth in *United States v. Calk*, 87 F.4th 164 (2d Cir. 2023),

---

[4] Proceedings are also ongoing in OAG's lawsuit against the NRA for violations of New York's not-for-profit laws. The NRA has withdrawn its appeal, but the appeal of the NRA's former CEO remains pending. *See* Withdrawal or Discontinuance of Appeal or Proceeding Letter, *People v. Nat'l Rifle Ass'n of Am., Inc.*, No. 2025-00347 (1st Dep't Sept. 30, 2025), Dkt. No. 10; Decl. of Hailyn Chen in Support of Mot. to Quash ("Chen Mot. to Quash Decl.") Ex. 17.

OAG has clearly met its burden to proffer "concrete allegations of Government misconduct," thereby shifting the burden to DOJ to "show that the subpoena was not motivated by an improper purpose." *Id.* at 186.  DOJ has not even attempted to make that showing here:  It fails to acknowledge *any* of the evidence presented in OAG's Motion, much less explain why this evidence does not show improper purpose.  On that basis alone, OAG's Motion should be granted.

### 1.    DOJ cannot invoke the presumption of regularity.

The extensive record of retaliation against OAG and Attorney General James—which DOJ simply ignores—rebuts the "presumption of regularity" that DOJ seeks to claim, Opp. 7-8; *see also Calk*, 87 F.4th at 186.  To overcome the presumption, OAG need only identify "concrete reasons for a court to question the Government's purpose for issuing a grand jury subpoena." *Calk*, 87 F.4th at 186.  OAG has furnished abundant concrete reasons to question whether the issuance of the subpoenas here was retaliatory.  Executive Branch officials across the Administration—from U.S. Attorney General Pam Bondi, to White House Deputy Chief of Staff Stephen Miller, to Habba, to Leavitt, to Martin, and to the President himself—have proclaimed their intention to punish OAG and the New York Attorney General precisely because they *successfully* investigated and proved massive fraud and malfeasance against the people of New York by Mr. Trump and his political ally, the NRA.  Mot. 11-14, 19-20; *see supra* pp. 3-5.

That vendetta was once again on full display during the recent indictment of Attorney General James after multiple career prosecutors concluded that there was insufficient evidence of a crime to proceed with the case and an interim U.S. Attorney resigned—or, as the President claims, was "fired"—over his decision *not* to seek an indictment.  Chen Decl. ¶¶ 11, 13-14, 18-19.  Comments from President Trump and other officials left no doubt that the indictment, like

the subpoenas here, was retribution for the Attorney General and OAG's enforcement of New

York's laws.  N. Smith Decl. Exs. 2-5.[5]

This case is not the first in which the Executive Branch has shown itself unworthy of the

deference it seeks to invoke here.  Many courts have recognized that retaliatory, disingenuous

conduct by this Administration has rebutted the presumption of regularity.  *See, e.g.*, *Fed. Educ.*

*Ass'n v. Trump*, 2025 WL 2355747, at *9 (D.D.C. Aug. 14, 2025) (concluding that "retaliatory

motive" and "Administration's surrounding statements" rebutted the presumption of regularity);

*President & Fellows of Harvard Coll. v. DHS*, 2025 WL 1737493, at *17 (D. Mass. June 23,

2025) ("[T]he Court will not apply any presumption of regularity to conduct that is so unusual

and therefore irregular on its face."); *Nat'l Council of Nonprofits v. OMB*, 763 F. Supp. 3d 36, 50

(D.D.C. 2025) ("Defendants' plea for a presumption of good faith rings hollow when their own

actions contradict their representations.").  Cataloging "instance after instance of departures from

this tradition" of public officials acting in "obedience to [their] duty," one court cautioned: "In

just six months, the President of the United States may have forfeited the right to such a

presumption of regularity."  *Fed. Educ. Ass'n*, 2025 WL 2355747, at *10-11.  Particularly on this

record, DOJ cannot resuscitate that presumption here.

In addition to ignoring all of the evidence of improper motive that OAG has presented,

DOJ fails to respond to any of the cases that OAG has cited rejecting retaliatory and abusive

grand jury subpoenas—none of which appear anywhere in DOJ's opposition.  *See* Mot. 20-22

---

[5] That the grand jury in the Northern District of New York was empaneled in November 2024, Opp. 42, does not mean that is when the investigation into OAG began.  As this Court knows, a grand jury may be empaneled for 18 months or longer.  United States District Court for the Northern District of New York, Jury Plan for the Random Selection of Grand and Petit Jurors—General Order 24 (2024), https://www.nynd.uscourts.gov/sites/nynd/files/general-orders/GO24.pdf.

(citing *Ealy v. Littlejohn*, 569 F.2d 219, 227-30 (5th Cir. 1978); *In re Grand Jury Subpoena Duces Tecum Dated Jan. 2, 1985 (Simels)*, 767 F.2d 26, 29 (2d Cir. 1985); *Brown v. United States*, 245 F.2d 549, 554-55 (8th Cir. 1957); *United States v. Am. Honda Motor Co.*, 273 F. Supp. 810, 815, 819-20 (N.D. Ill. 1967)).

In light of DOJ's silence, the Fifth Circuit's analysis in *Ealy* has become even more apt. With a record "barren" of any "plausible explanation" for the subpoenas, the court there concluded that the grand jury proceedings were conducted "in bad faith for the purpose of harassing" the government's critics. 569 F.2d at 230. Then, as now, this "abuse of the grand jury process cannot be tolerated in a free society." *Id.* DOJ identifies no case approving a grand jury subpoena on a record of retaliation that even remotely resembles this one.

> **2.  Numerous courts have rejected the theory of selective enforcement that DOJ purports to investigate now as a crime.**

In the face of this extensive evidence of bad faith, DOJ contends that it is legitimately investigating the possibility that OAG criminally engaged in selective enforcement. But DOJ's *sole* support for its theory of selective enforcement is Attorney General James's statements made about President Trump and the NRA. Opp. 3-4, 8-9. Relying on these statements, DOJ attempts to sidestep the indisputable fact that OAG's enforcement actions were well-founded by arguing that "a selective prosecution constitutional violation does not require proof that the prosecution was factually baseless." Opp. 9. This argument fails for multiple reasons.

*First*, DOJ once again misstates the applicable legal standard. When a retaliatory prosecution claim is based on a purported First Amendment violation, as DOJ claims here,[6] "[a]

---

[6] DOJ asserts that Attorney General James's "statements suggest the possibility that her primary motive was to punish her adversaries for their political views." Opp. 8; *see also* Decl. of Noelle Smith in Support of Mot. to Quash Ex. 20 (Trump Administration reportedly claimed OAG violated President Trump's First Amendment rights when it sued him). This is a clear attempt to articulate a First Amendment violation, and DOJ has identified no other conceivable basis for its

finding of probable cause will defeat a claim of retaliatory prosecution." *Alberty v. Hunter*, 144 F.4th 408, 419 (2d Cir. 2025).[7]  There was undoubtedly probable cause for OAG's investigations and suits against Mr. Trump and the NRA because judges and juries found in OAG's favor in both proceedings, and neither finding of liability has been overturned.  Chen Mot. to Quash Decl. Exs. 3, 13; *supra* pp. 7-8.  That fact marks the critical difference between President Trump's statements and those of Attorney General James.  It is no surprise that elected officials may at times make statements about their political adversaries, but such statements themselves *cannot* constitute a violation of law.  The misconduct in which the Executive Branch has engaged here is *not* making certain statements but rather targeting adversaries through criminal proceedings *in the absence of any evidence*, let alone probable cause.  The statements by President Trump and others are simply evidence of their retaliatory motive in pursuing such an abuse of process.

*Second*, the exact theory of selective enforcement that DOJ presents here has already been vigorously litigated and soundly rejected by numerous courts considering the theory in civil actions.  *James¸* 2022 WL 1718951, at *12-13; *People v. Trump Org., Inc.* (*Trump I*), 2022 WL 489625, at *5 (N.Y. Sup. Ct. Feb. 17, 2022); *Trump II*, 205 A.D.3d at 626-27; *People v. Trump Org., Inc.* (*Trump III*), 38 N.Y.3d 1053, 1054 (N.Y. 2022); *People v. Trump* (*Trump IV*), 2023 WL 128271, at *4 (N.Y. Sup. Ct. Jan. 6, 2023); *People v. Trump* (*Trump V*), 217 A.D.3d 609, 610 (1st Dep't 2023); *Trump v. Clinton*, 653 F. Supp. 3d 1198, 1223 (S.D. Fla. 2023); *People v. Nat'l Rifle Ass'n of Am., Inc.* (*NRA I*), 171 N.Y.S.3d 782, 786 (N.Y. Sup. Ct. 2022); *People v.*

---

selective prosecution theory, such as membership in any protected class by Mr. Trump or the NRA.  *See Cobb v. Pozzi*, 363 F.3d 89, 110 (2d Cir. 2004) ("[P]laintiffs' [Fourteenth Amendment] selective prosecution and [First Amendment] retaliation claims 'coalesce.'").

[7] If DOJ's articulation of the standard were correct, it would support OAG's Motion because the clear evidence of the Trump Administration's retaliatory motives would bar its criminal investigation of OAG regardless of whether there was any basis to support it.

*Nat'l Rifle Ass'n of Am., Inc.* (*NRA II*), 223 A.D.3d 84, 92 (1st Dep't 2023).  In rejecting these arguments, courts considered the exact same public statements by Attorney General James that DOJ offers here as the sole evidence of the subpoenas' legitimate purpose.

Every time Mr. Trump raised his argument of selective prosecution—during OAG's investigation, in his collateral attack on the investigation in this Court, and again in his motion to dismiss—he referred the courts to lists of Attorney General James's public statements that cover nearly every statement DOJ now urges in support of its investigation.[8]  Reviewing the same evidence, New York state and federal courts—including this one, in a decision by Chief Judge Sannes—have repeatedly held that such statements did not support Mr. Trump's claim of selective prosecution, as has a federal court in Florida.  *See James¸* 2022 WL 1718951, at *12-13; *Trump I*, 2022 WL 489625, at *5; *Trump II*, 205 A.D.3d at 626-27; *Trump III*, 38 N.Y.3d at 1054; *Trump IV*, 2023 WL 128271, at *4; *Trump V*, 217 A.D.3d at 610; *Clinton*, 653 F. Supp. 3d at 1223.  Indeed, in light of the evidence of Mr. Trump's misconduct, the New York Supreme Court stated that "[f]or OAG not to have investigated" Mr. Trump "would have been a blatant dereliction of duty."  *Trump I*, 2022 WL 489625, at *5.  The Appellate Division unanimously affirmed and concluded on this *same* record that "the investigation was lawfully initiated at its outset and well founded."  *Trump II*, 205 A.D.3d at 626.

In OAG's lawsuit against the NRA, courts similarly rejected arguments of selective enforcement based on public statements just like those DOJ presents here.  Specifically,

---

[8] The lists that Mr. Trump presented in these prior proceedings together included seven of the nine statements DOJ cites in its opposition brief.  *Compare* Opp. 3-4, *with* Chen Decl. Ex. 2 (citing seven out of nine statements), *and id.* Ex. 1 (citing six out of nine statements), *and id.* Ex. 3 (citing six out of nine statements).  The only two statements cited by DOJ that were not presented previously come from a Yahoo! News article and reiterate the same themes.  *See* Decl. of Kalee Smith in Support of DOJ's Opp. ("K. Smith Decl.") Ex. 9.

confronted with those same statements,[9] both the trial court and the Appellate Division

resoundingly rejected the selective enforcement argument.  *NRA II*, 223 A.D.3d at 92; *NRA I*,

171 N.Y.S.3d at 786.  As the Appellate Division held, OAG "showed as a matter of law that it

had probable cause to investigate and sue the NRA," and "public reports of malfeasance predated

the investigation."  *NRA II*, 223 A.D.3d at 89.

Apart from a brief aside about this Court's prior decision, DOJ does not even

acknowledge the many courts that have rejected its theory on records including statements nearly

identical to the ones DOJ presents here.  In responding to this Court's prior decision, DOJ argues

that the Court rejected a selective prosecution argument only "on this record."  Opp. 17 (quoting

*James¸* 2022 WL 1718951, at *13).  That record, however, included nearly every statement that

DOJ now presents (as well as others).  *Compare* Chen Decl. Ex. 1, *and James¸* 2022 WL

1718951, at *1-3, *with* Opp. 3-4.  DOJ does not and cannot explain why evidence that could not

support the civil claim of selective prosecution in this Court, and many others, can now justify a

criminal investigation on the very same theory of liability.  *Cf. United States v. Egan Marine*

*Corp.*, 843 F.3d 674, 678 (7th Cir. 2016) ("If [the government] fails to show some fact in the

civil suit by a preponderance of the evidence, it is precluded from trying to show the same thing

beyond a reasonable doubt.").

*Third*, DOJ cannot show any possibility that further investigation by the grand jury would

uncover evidence to support charges of selective enforcement or retaliatory prosecution by OAG.

The probable cause underlying OAG's actions precludes any such charge.  *See Hunter*, 144 F.4th

at 420.  Neither DOJ nor Mr. Trump has ever identified any supposedly similarly situated

---

[9] The counterclaims listed three of the six public statements that DOJ presents.  *Compare* Opp. 3,
*with* Chen Mot. to Quash Decl. Ex. 9 at 172, 178, 190.  The other three express similar
sentiments.  *See* K. Smith Decl. Exs. 2, 4, 5.

individuals or entities whom OAG did not sue.[10]  And Mr. Trump, then a private citizen, has

already tried and failed to find more evidence to support those arguments during the months-long

discovery period in the civil fraud lawsuit during which hundreds of thousands of documents

(and perhaps over a million documents) were produced.  Decl. of Andrew Amer in Support of

Mot. to Quash ("Amer Decl.") ¶ 6.  Having lost his selective enforcement arguments against

OAG at the pleadings stage in several lawsuits, Mr. Trump did not pursue a selective

enforcement or retaliation argument on summary judgment or at trial.  Chen Decl. Ex. 4; *Trump

VI*, 237 N.Y.S.3d at 458 (Moulton, J., concurring).  He did not amend his § 1983 lawsuit

challenging OAG's investigation, which this Court dismissed without prejudice, to provide

additional allegations supporting his claims.  *James¸* 2022 WL 1718951, at *20.  Nor did he file

an *Ex Parte Young* lawsuit against Attorney General James or a § 1983 lawsuit against OAG

challenging the civil fraud lawsuit.  One can only infer that Mr. Trump was unable to find any

evidence supporting those arguments, even after months of discovery from OAG and third

parties.  As Justice Moulton reasoned, if the selective enforcement arguments had any support,

Mr. Trump's "sophisticated counsel" would have pressed them.  *Trump VI*, 237 N.Y.S.3d at 461

(Moulton, J., concurring).

     *Finally*, DOJ places much weight on Justice Friedman's Appellate Division dissenting

opinion—which was issued *after* the subpoenas were served and is thus irrelevant to the claim

that they were motivated by malice and retaliation.  That opinion was a partial dissent that no

---

[10] Vague references to unspecified "businesspersons and entities" in Justice Friedman's
dissenting opinion, Opp. 10, are plainly insufficient to justify these sweeping grand jury
subpoenas.  Indeed, there are numerous examples in the public record of OAG pursuing cases
under the same statutes at issue in the *Trump* case against others, including in cases involving
transactions between sophisticated entities.  *See, e.g.*, *People v. Allen*, 198 A.D.3d 531 (1st Dep't
2021); *People v. Ernst & Young, LLP*, 114 A.D.3d 569, 569-70 (1st Dep't 2014); *People v.
Greenberg*, 21 N.Y.3d 439 (N.Y. 2013).

other Justice joined.  Beyond that, it was an advisory opinion on an issue that Mr. Trump did not

even present and that multiple courts—including the same Appellate Division—had rejected.

This outlier, unprompted view cannot suffice to authorize a retaliatory investigation based on a

theory rejected by every court—indeed every other judge—to consider it.  Justice Friedman's

dissent also has nothing to do with the NRA litigation, which DOJ casually omits.

Deference to the grand jury's broad investigatory powers does not permit a harassing and

retaliatory fishing expedition into a theory of criminal liability that was already rejected on the

exact same evidence based on the far less demanding civil liability standard.

### B.    The Subpoenas Offend New York's State Sovereignty.

DOJ has no response to the argument that these subpoenas unreasonably intrude on New

York's sovereign authority to enforce state law.  DOJ's primary tactic is repeatedly arguing that

states are not immune from federal grand jury proceedings.  *See, e.g.*, Opp. 11-13.  But OAG

does not contend that the federal government can never subpoena a state.  The point is that any

exercise of the subpoena power must show the "proper respect for state functions."  *Younger v.*

*Harris*, 401 U.S. 37, 44 (1971).  A subpoena that attempts to seize control over the enforcement

of state law, particularly while state court proceedings remain ongoing, does not pass that test.

*See* Mot. 23-24; *see Steffel v. Thompson*, 415 U.S. 452, 460-61 (1974) (interference with ongoing

state proceedings "entail[s] an unseemly failure to give effect to the principle that state courts

have the solemn responsibility" to "guard, enforce, and protect" federal constitutional rights).

Even the authority cited in the opposition endorses OAG's position.  DOJ places

substantial weight on *In re Special April 1977 Grand Jury*, 581 F.2d 589 (7th Cir. 1978), which,

it claims, "reflect[s] the baselessness" of OAG's sovereignty argument.  Opp. 11.  But, in reality,

the reasoning of that opinion supports quashing the subpoenas.  Although the court affirmed the

denial of a motion to quash, that case involved a grand jury investigation into the Illinois

Attorney General's "own affairs." *Apr. 1977 Grand Jury*, 581 F.2d at 592. And the court warned that if the grand jury had "embarked on a grandiose, brazen fishing expedition into the affairs of the State," enforcement might "impair the State['s] integrity or [its] ability to function effectively in a federal system." *Id.* (citation modified); *see also John Doe No. G.J.2005-2*, 478 F.3d at 586-87 (reading *Special April 1977 Grand Jury* to turn on this issue). That is the very situation that OAG faces here.

Rather than engaging with OAG's argument head-on, DOJ mechanically walks through the cases cited in the Motion, insisting that each involved a set of facts that differs from the instant dispute. That approach misses the forest for the trees. Of course there is no case addressing the precise problem before this Court. Since the day President Trump took office, his Administration has shown a single-minded focus on abusing the tools of the criminal justice system to punish the President's political and personal adversaries. That broad-based attack on the rule of law is without equal in the Nation's history. These subpoenas—this particular iteration of that anti-democratic campaign—are just as unprecedented. It is no surprise that the handful of cases that bear on this issue are not a precise factual match.

Each of DOJ's attempts at distinguishing the relevant case law either misstates the law, misses the point, or both. For example, it points out that in *In re Babin*, 2022 WL 1658701 (5th Cir. May 25, 2022), the court allowed discovery into state grand jury proceedings to proceed. Opp. 15-16. But DOJ entirely (and conveniently) ignores *Babin*'s reasoning, which is both compelling and instructive here. There, the court held, on mandamus, that the "district court did not need to abstain" from ordering discovery because its discovery order was "limit[ed]" and because the district attorney had raised his concerns about federal interference too late in the day. *Babin*, 2022 WL 1658701, at *4. And the court emphasized that even "the requirement simply

to provide information for *in camera* review" by a federal judge involved an "intrusion" into state affairs. *Id.* Here, of course, OAG has invoked its sovereign interests at the earliest opportunity. And the Executive Branch's demands for information are far from "limit[ed]." *Id.*

DOJ also tries to invoke a follow-on opinion in *Babin* to undermine New York's sovereign interests, stressing that a state has "no legitimate interest in a prosecution brought in bad faith or to harass." Opp. 16 (quoting *Netflix, Inc. v. Babin*, 88 F.4th 1080, 1085 (5th Cir. 2023)). True as that proposition may be, it has no bearing here. The Fifth Circuit made that particular statement in the context of discussing "exceptional" proceedings in which a "state prosecutor is *credibly* accused of bad faith and has *no reasonable hope* of obtaining a valid conviction." *Babin*, 88 F.4th at 1085 (emphasis added).

That could not be further from this case here. *Every* court to have considered the question has rejected the notion that OAG acted in bad faith. *See, e.g.*, *Trump VI*, 237 N.Y.S.3d at 446 (Moulton, J., concurring); *NRA II*, 223 A.D.3d at 90-91; *see supra* pp. 12-13. And OAG has already prevailed in its enforcement actions. *See Trump VI*, 237 N.Y.S.3d at 511 (Moulton, J., concurring) (upholding finding of liability and injunctive award in *Trump* case); Chen Mot. to Quash Decl. Ex. 14 at 3 (judgment in favor of New York in *NRA* case).

DOJ's effort to dispatch with *In re Grand Jury Subpoena for THCF Medical Clinic Records*, 504 F. Supp. 2d 1085 (E.D. Wash. 2007), is no more persuasive. It is true, as DOJ points out, that the records at issue there were largely attainable through other means. *Id.* at 1090. But the critical takeaway from that decision is a higher-level principle: heightened judicial scrutiny is warranted, indeed necessary, when a subpoena intrudes on sovereign interests. In the ordinary course, a court will not quash a subpoena simply because there are less intrusive ways of accessing the information. *John Doe No. G.J.2005-2*, 478 F.3d at 587. Yet, in

*THCF Medical Clinic Records*, the court found that the existence of alternative means provided sufficient reason to quash a subpoena that intruded on Oregon's sovereign interests.  504 F. Supp. 2d at 1091.  *That* principle—the notion that the federal government must make a more compelling showing when a subpoena intrudes on sovereign authority—is one that is essential in this case.

DOJ's attempt to distinguish *John Doe No. G.J.2005-2*, 478 F.3d 581, fails as well.  DOJ homes in on the facts of that case, stressing differences in the particular interests that were at play.  Opp. 14-15.  Again, though, notwithstanding some factual variation, the principles applied in *John Doe No. G.J.2005-2* are plainly relevant here.  That decision recognized that government entities—in that case, a city—have weighty interests that can prevail over the federal government's interest in enforcing a subpoena.  *John Doe No. G.J.2005-2*, 478 F.3d at 585 ("Rule 17(c) enables district courts to quash a subpoena that intrudes gravely on significant interests outside of the scope of a recognized privilege.").  It noted that "principles of federalism" require a measure of deference to local governments.  *Id.* at 586.  That is all the more important here, where the target of the subpoenas is not a local government, but the office of the top law enforcement officer of the State of New York.

In any event, DOJ is wrong to argue that *John Doe No. G.J.2005-2* is distinguishable because the subpoena there implicated confidentiality interests.  DOJ concedes that OAG "undoubtedly does much criminal and civil enforcement work for which it has a legitimate confidentiality interest."  Opp. 14.  Its only argument for why that confidentiality should not apply here is that Attorney General James has made "repeated, public statements about an intent to target certain people and entities."  *Id.* at 15.  That argument is self-defeating.  The whole reason the Executive Branch is seeking subpoenas is to obtain information that is *not* public.

After all, courts have repeatedly found that the Attorney General's statements do not substantiate the claim that OAG pursued these investigations for impermissible reasons. *See, e.g.*, *Trump VI*, 237 N.Y.S.3d at 446 (Moulton, J., concurring); *NRA II*, 223 A.D.3d at 90-91; *see supra* p. 13. It cannot simultaneously be the case that the Attorney General has already put the relevant information into the public record and that the Executive Branch needs to subpoena non-public information.

Finally, DOJ resists the relevance of this Court's decision in *James*, 2022 WL 1718951, but its objection is insubstantial. DOJ emphasizes that *James* arose in a distinct procedural posture. Opp. 16-17. That is true enough. But OAG cited *James* in its opening brief for a fundamental and uncontroversial proposition: that the State of New York has an "important" interest in "investigating and enforcing its laws." *James*, 2022 WL 1718951, at *11. That reality will not vary with the procedural posture of the case. And while DOJ states that *James* was limited to the "record before it," Opp. 17, that record included nearly all of the same statements by Attorney General James that DOJ cites here. *See supra* p. 14.

At the end of the day, nothing in DOJ's opposition undermines OAG's central submission: that permitting the federal government to indiscriminately demand a broad swath of material from a state civil enforcement action would endorse federal superintendence of state law enforcement and run roughshod over the state's authority to enforce its own laws. *See* Mot. 22-23. As OAG has explained, permitting such far-reaching subpoenas for any investigations with which the President disagrees would have a chilling effect on pending and future state enforcement actions, including the numerous pending lawsuits OAG is pursuing against the federal government. Mot. 24-26; Amer Decl. ¶ 12; Decl. of Emily Stern in Support of Mot. to Quash ("Stern Decl.") ¶ 11; Chen Mot. to Quash Decl. Exs. 31-62; Chen Decl. ¶¶ 21-32. This

Court cannot countenance such an intrusion into state sovereignty—especially where, as here, that intrusion is for purposes of retribution, not justice.

### C.    The Subpoenas Infringe on OAG's First Amendment Rights.

The bulk of DOJ's discussion of OAG's First Amendment rights is devoted to arguing that OAG has none. Opp. 18-20. That attempt at deflection fails. As the Second Circuit has indicated, the First Amendment protects a government entity's right to seek redress from the courts. *See* Mot. 28 n.14. For example, in *Miracle Mile Associates v. City of Rochester*, 617 F.2d 18 (2d Cir. 1980), the court found the City of Rochester's petitioning activity was protected from suit. *Id.* at 20-21. In the process, the court expressly rejected an argument that the City's "First Amendment protections" had been "eradicate[d]." *Id.* at 21. Implicit in that conclusion, of course, is that the City has a First Amendment right to petition. *See Mosdos Chofetz Chaim, Inc. v. Village of Wesley Hills*, 701 F. Supp. 2d 568, 601 (S.D.N.Y. 2010) (applying *Miracle Mile* to hold that "government actors are afforded some measure of protection under . . . the First Amendment"); *see also County of Suffolk v. Long Island Lighting Co.*, 710 F. Supp. 1387, 1390 (E.D.N.Y. 1989) (county's petitioning activities enjoy First Amendment protection).

DOJ's invocation of cases analyzing the Due Process Clause instead of the First Amendment is off point and unpersuasive. While the Supreme Court has found that a state is not a "person" within the meaning of the Due Process Clause, *South Carolina v. Katzenbach*, 383 U.S. 301, 323 (1966), that holding does not automatically extend to the entire Bill of Rights (or even to the entire Fifth Amendment). Indeed, the Supreme Court has found that the Fifth Amendment's Takings Clause protects the "property of state and local governments," reasoning that the loss from the condemnation of public land "may be no less acute than the loss in a taking of private property." *United States v. 50 Acres of Land*, 469 U.S. 24, 31 (1984). Here, as a matter of first principles, the Second Circuit has good reason to apply the First Amendment to

government entities.  "[T]he marketplace of ideas would be unduly curtailed" if state and local

governments "could not freely express themselves on matters of public concern."  *Creek v.*

*Village of Westhaven*, 80 F.3d 186, 193 (7th Cir. 1996).[11]

On the merits, DOJ fares no better.  It does not dispute that the OAG enforcement actions

at issue amount to petitioning activity.  Opp. 20-21.  It does not so much as mention the chilling

effect that responding to the subpoenas would have on OAG's ability to pursue other critical

cases against the federal government to protect the rights of New Yorkers.  Mot. 25-26, 28-29.

And it agrees with OAG that a subpoena that intrudes on First Amendment rights must survive

exacting scrutiny.  *See* Mot. 29-30; Opp. 20-21.

Those concessions are fatal because DOJ's attempt to argue that the subpoenas withstand

scrutiny fails at every step.  First, DOJ argues that it has a compelling interest in enforcing

federal civil rights laws.  Opp. 21.  But these subpoenas were not issued out of a good-faith

desire to prosecute a civil rights violation.  They are an unvarnished attempt to retaliate against

OAG and the State's Attorney General.  Mot. 16-19.  Accordingly, there is no compelling

interest at play.

Next, even if DOJ could identify some compelling interest (which it cannot), it entirely

fails to show a "substantial relation" between its purported interest in prosecuting civil rights

violations and the "information required to be disclosed."  *In re Grand Jury Proceedings*, 776

---

[11] DOJ also tries to draw on the Supreme Court's holding in *District of Columbia v. Heller*, 554 U.S. 570 (2008), "that the Second Amendment right to keep and bear arms is an individual right, not a right of a State."  Opp. 20.  Because both the First and Second Amendments contain the phrase "the people," DOJ argues that *Heller* "should apply to the First Amendment with equal force."  *Id.*  But *Heller* cannot be generalized so easily.  *Heller* analyzed the text of the Second Amendment as a whole, not just the phrase "the people."  *See* 554 U.S. at 577-603.  And it is grounded in the Second Amendment's unique "history" and "historical tradition."  *United States v. Rahimi*, 602 U.S. 680, 691 (2024) (citation modified).  To reduce *Heller* to a decision about the meaning of "the people" in the abstract is to ignore essentially all of its reasoning.

F.2d 1099, 1103 (2d Cir. 1985); *see also Bursey v. United States*, 466 F.2d 1059, 1083 (9th Cir. 1972), *superseded on other grounds by statute*, Organized Crime Control Act of 1970, Pub. L. No. 91-452, 84 Stat. 932 (when subpoena infringes on First Amendment rights, government "is obliged to show that there is a substantial possibility that the information sought will expose criminal activity within the compelling subject matter of the investigation").  Instead, as with its response to OAG's argument of bad faith, it announces that "a motion to quash on relevance grounds must be denied unless the movant shows that there is no 'reasonable possibility' that the records sought will 'produce information relevant to the general subject of the grand jury's investigation.'"  Opp. 21; *see supra* p. 8.  But, again, that standard is for a *relevance* challenge, not a challenge based on the First Amendment, as OAG has asserted here.

In the context of a First Amendment challenge, as DOJ recognizes just one page earlier, Opp. 20, the government must establish a "substantial relation," *In re Grand Jury Proceedings*, 776 F.2d at 1103, not a reasonable possibility.  DOJ cannot meet its burden to show that these subpoenas survive exacting scrutiny by arguing that they pass another, less demanding test.  DOJ does not even try to connect the dots between the information it seeks and a legitimate criminal investigation.  It asserts only that records related to OAG's motives for bringing its enforcement actions could be relevant to the grand jury investigation.  Opp. 22.  But that baseless contention does nothing to show that "any and all" documents related to OAG's enforcement actions, as sought by the subpoenas, Decl. of Roxanne Wild in Support of Mot. to Quash ("Wild Decl.") Exs. 1-2, have a "substantial relation" to the alleged investigation.

Nor are these subpoenas remotely tailored.  *Cf. In re Grand Jury Proceedings*, 776 F.2d at 1103 (government may not select an "unduly broad means" of investigation); Opp. 20 (same). DOJ's principal argument on that score appears to be that the subpoenas are narrowly drawn

because they do not seek privileged records and they demand materials from only two enforcement actions. Opp. 22. But that is just a thinly veiled argument that the subpoenas do not need to be tailored at all. DOJ scores no points for recognizing it cannot subpoena privileged materials. *United States v. Roberts*, 852 F.2d 671, 676 (2d Cir. 1988) (noting "invalid[ity]" of a subpoena that "calls for privileged documents"). And while it is true that the subpoenas seek records from "just two of the many cases brought by [OAG] over the past seven years," Opp. 22, that is not enough. "[W]hen First Amendment interests are at stake, the Government must use a scalpel, not an ax." *Bursey*, 466 F.2d at 1088. The observation that the Executive Branch conceivably could have demanded records from *more* enforcement actions does not satisfy its burden to show these particular subpoenas are tailored to any meaningful degree.

### D. Sarcone's Improper Appointment Invalidates the Subpoenas.

As OAG has explained, Sarcone lacked legitimate authority to authorize the subpoenas. Mot. 31-34. Two other courts have since embraced OAG's position and rejected the same arguments DOJ presses here. *See United States v. Garcia*, 2025 WL 2784640 (D. Nev. Sept. 30, 2025), *appeal docketed*, No. 25-6229 (9th Cir. Oct. 3, 2025); *United States v. Giraud*, 2025 WL 2416737 (D.N.J. Aug. 21, 2025), *appeal docketed*, No. 25-2635 (3d Cir. Aug. 25, 2025).

That should come as no surprise. The Executive Branch has repeatedly endeavored to give handpicked lawyers the vast powers of U.S. Attorneys without the inconvenience of Senate confirmation. But Congress did not craft such a carefully constructed vacancy scheme only to allow the Attorney General to choose whomever she wants, whenever she wants, to serve as an acting or *de facto* U.S. Attorney. *See L.M.-M. v. Cuccinelli*, 442 F. Supp. 3d 1, 28-29 (D.D.C. 2020). Because Sarcone was acting *ultra vires* when he requested the subpoenas, the subpoenas must be quashed, and Sarcone must be disqualified from this investigation.

Because U.S. Attorneys are subject to Senate confirmation, *see* 28 U.S.C. § 541(a), Congress has specified the circumstances in which other individuals may perform the duties of a U.S. Attorney on a temporary basis.  As relevant here, the Federal Vacancies Reform Act ("FVRA") provides that when a Senate-confirmed officer is "unable to perform the functions and duties" of their office, "the first assistant to the office of such officer shall" serve "in an acting capacity."  5 U.S.C. § 3345(a).  The President may "override that default," *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 293 (2017), by selecting either a person who already serves in a Senate-confirmed position, 5 U.S.C. § 3345(a)(2), or a person who served in a high-level position in the same agency for at least 90 days during the year preceding the vacancy, *id.* § 3345(a)(3).

DOJ principally asserts that once a vacancy arises, the Attorney General may appoint anyone she likes as first assistant, at any time, and that person automatically becomes the acting U.S. Attorney under § 3345(a)(1).  Opp. 31-35.  But, as the other courts to consider that argument have made clear, subsection (a)(1) applies only to the first assistant in place *when the vacancy arises*—not to a purported first assistant (subordinate to no one) designated months later.  *See Garcia*, 2025 WL 2784640, at *4-11; *Giraud*, 2025 WL 2416737, at *13-19.

That is clear from the statutory text, which refers to "the" (not "a") first assistant and, unlike subsections (a)(2) and (a)(3), does not contemplate the intervention of the "President," much less the Attorney General.  5 U.S.C. §§ 3345(a)(1)-(3); *see SW Gen.*, 580 U.S. at 303 (describing subsection (a)(1) as "mandatory and self-executing").  It is likewise clear from the structure of § 3345(a) because DOJ's theory would undermine any incentive for the President to comply with the strictures of subsections (a)(2) and (a)(3).  *See Garcia*, 2025 WL 2784640, at *5-6; *Giraud*, 2025 WL 2416737, at *16; *L.M.-M.*, 442 F. Supp. 3d at 29.  And it is clear from the legislative record, which reveals not only that Congress enacted the FVRA in response to the

Executive Branch's long history of circumventing the Senate's "advice and consent power," *SW Gen.*, 580 U.S. at 295, but also Congress's clear expectation that only the then-serving first assistant would assume "acting" duty under subsection (a)(1), *see Garcia*, 2025 WL 2784640, at *11 (citing S. Rep. No. 105-250, at 12 (1998)); *Giraud*, 2025 WL 2416737, at *17-18 (same).

 In response, DOJ offers nothing new.  It retreads a series of arguments, Opp. 32-35, that have been conclusively rejected by the other courts to consider them.  *See, e.g.*, *Garcia*, 2025 WL 2784640, at *5-8 (rejecting arguments on the "present tense" of subsection (a)(1); the phrase "to the office of such officer"; "backward-looking" eligibility requirements; Executive Branch practice; and alternate roles for subsections (a)(2) and (a)(3)); *Giraud*, 2025 WL 2416737, at *14-19 & n.175 (same).  DOJ cannot explain why a different result is warranted here.

 Nor can DOJ defend its fallback delegation theory.  *See* Opp. 35-38.  Under that theory, Sarcone was delegated the power to conduct grand jury investigations when the Attorney General designated him a "Special Attorney" under 28 U.S.C. § 515.  The Attorney General did purport to delegate Sarcone all the powers of a U.S. Attorney, *see* Govt. Ex. 14 at 1, and that is the broad authority he invokes here, *see* Wild Decl. Exs. 1-2.  But as other courts have recognized, Congress expressly prohibited that gambit, which would gut the FVRA and allow the Executive Branch to install any attorney, indefinitely, as *de facto* U.S. Attorney.  *See Garcia*, 2025 WL 2784640, at *11-14; *Giraud*, 2025 WL 2416737, at *19-28.  The FVRA states that it is the "exclusive means for temporarily authorizing an acting official to perform the functions and duties" of an office requiring Senate confirmation.  5 U.S.C. § 3347(a).  Although the FVRA makes an exception for agency-specific appointment statutes, it also provides—in a provision DOJ simply ignores—that a statute "providing general authority to the head of an Executive agency . . . to delegate duties" is *not* the kind of agency-specific statute that supersedes the

FVRA.  *Id.* § 3347(a)(1), (b).  The Executive Branch's effort to use § 515 to circumvent the

FVRA "crashes headlong into [the FVRA's] unambiguous barring provision."  *Giraud*, 2025

WL 2416737, at *22-25; *accord Garcia*, 2025 WL 2784640, at *12-14.

Finding no support in the case law, DOJ argues that Rule 17 does not permit quashing a

subpoena on the basis that it was requested by an illegitimately-appointed Acting U.S. Attorney.

Opp. 26.  But the "reasonableness" standard in Rule 17 is heavily context-dependent, *United*

*States v. R. Enters., Inc.*, 498 U.S. 292, 299-300 (1991), and courts have authority to quash

subpoenas as unreasonable to prevent "abuse of the grand jury process," *Simels*, 767 F.2d at 30.

That authority is essential to the rule of law.  Although a grand jury may request evidence

under its own investigative authority, *see* Opp. 27, in practice, it is no secret that federal

prosecutors issue grand jury subpoenas with no involvement from the grand jury at all.  *See First*

*Nat'l Bank of Tulsa v. DOJ*, 865 F.2d 217, 220 (10th Cir. 1989); *Doe v. DiGenova*, 779 F.2d 74,

80 & n.11 (D.C. Cir. 1985).  That is why, in reviewing a motion to quash under Rule 17, courts

must ensure that "the grand jury, a body operating peculiarly under court supervision, is not

misused by the prosecutor."  *Simels*, 767 F.2d at 29 (citation omitted).  DOJ's rule, by contrast,

would invite obvious abuse, authorizing an invalidly appointed U.S. Attorney to subpoena

whomever he pleases, at whatever cost to respondents, with no judicial review or checks through

the Senate's "advice and consent" power.

The case for relief is even stronger here than in *Garcia* and *Giraud*.  The courts in those

cases declined to dismiss indictments because, according to DOJ, the purported Acting U.S.

Attorneys were "not involved" in securing them.  *Garcia*, 2025 WL 2784640, at *15; *see*

*Giraud*, 2025 WL 2416737, at *29-30.  That is not the situation here: Sarcone actually signed the

cover letters himself, requested the subpoenas, and directed OAG to produce documents directly

to him.  Wild Decl. Exs. 1-2.  Because Sarcone "has been exercising power that he did not lawfully possess," and his purported authority to authorize the subpoenas "flowed from his defective appointment," "the appropriate remedy is invalidation of [his] *ultra vires* acts."  *United States v. Trump*, 740 F. Supp. 3d 1245, 1303 (S.D. Fla. 2024) (citation modified).[12]

      **E.**      **The Subpoenas Are Overbroad and Unduly Burdensome.**

DOJ fails to refute OAG's argument that the subpoenas are unreasonably broad and impose an undue burden.  DOJ makes much of the fact that the subpoenas purportedly seek only non-privileged information.  Opp. 23.  But that is irrelevant to the burden that responding to the subpoenas would impose.  OAG would need to review millions of documents related to the two cases to identify and segregate those that are privileged, and doing so would effectively bring important parts of OAG's operations to a halt.  Stern Decl. ¶¶ 10-11; Amer Decl. ¶¶ 11-12; *see also In re Horn*, 976 F.2d 1314, 1315-16, 1318-19 (9th Cir. 1992) (quashing grand jury subpoena that encompassed privileged materials, even though it stated it "did not intend to request" them, as requiring the witness to identify and explain such materials would be unduly burdensome).

Likewise, DOJ's suggestion that responding to the subpoenas would not impose an undue burden because OAG has the capacity to conduct complex litigations is nonsensical.  Opp. 23.  It is precisely because OAG—as the office of the top law enforcement officer of the State of New York—is responsible for litigating complex matters to enforce the State's laws and protect the people of New York that diverting substantial and critical resources from OAG's core mission would be unduly burdensome.  *See* Stern Decl. ¶ 11; Amer Decl. ¶ 12.

---

[12] At minimum, the Court should disqualify Sarcone from this investigation, as the courts did in *Garcia* and *Giraud*.  *See* 2025 WL 2784640, at *18; 2025 WL 2416737, at *30.

Even the authorities DOJ cites, Opp. 25, support OAG's argument.  In *In re Grand Jury Subpoena, JK-15-029*, 828 F.3d 1083 (9th Cir. 2016), the Ninth Circuit quashed a subpoena as unreasonably broad when it sought six years of e-mails from a single person.  *Id.* at 1087.  In *In re Grand Jury Investigation (Oshkosh Truck Corp.)*, 746 F. Supp. 866 (E.D. Wis. 1990), the court struck down an "expansive" subpoena demanding "over 9,000 linear feet of documentation," noting that it was "certainly arguable that the government [was] on a fishing expedition."  *Id.* at 867.  The subpoenas here are equally, if not more, overbroad.  They seek four to six years of "any and all" documents related to two complex enforcement actions, Wild Decl. Exs. 1-2, which would require searching the files of approximately 100 individuals and millions of records.  Stern Decl. ¶ 10; Amer Decl. ¶ 11.  If subpoenaing e-mails of one person can be overbroad, subpoenaing millions of all types of records from 100 people is unquestionably so.

DOJ's offer to meet and confer, Opp. 23, cannot cure the subpoenas' fundamental defects.  Because the subpoenas lack any legitimate purpose, *see supra* pp. 11-16, *none* of the materials sought have any conceivable relevance to any proper investigative objective.  *R. Enters.*, 498 U.S. at 301 (grand jury subpoena must be quashed when "there is no reasonable possibility that the category of materials the Government seeks will produce information relevant to the general subject of the grand jury's investigation").  The subpoenas should be quashed in their entirety.

### F.    The Motion to Quash Should Be Unsealed.

DOJ's opposition offers no justification for keeping OAG's Motion and the accompanying materials under seal.  DOJ concedes that the existence of the subpoenas and the underlying grand jury investigation is "known to the public."  Opp. 43.  Although DOJ argues that other "key details" (such as the grand jury's investigative theories or what records or testimony have been presented to the grand jury) are not public, *id.*, OAG *does not seek to unseal*

*any of these details*.  OAG's Motion to Unseal is limited to unsealing the Motion to Quash and

its accompanying materials, Mot. to Unseal 1, 11 n.9—all of which indisputably contain only

publicly-available information.  It is a "common-sense proposition" that when the information at

issue has "become public," "secrecy is no longer 'necessary.'"  *In re Grand Jury Subpoena,*

*Judith Miller*, 438 F.3d 1138, 1140 (D.C. Cir. 2006).[13]

The public interest in OAG's Motion has only grown since it was filed, as President

Trump's campaign of political "retribution," N. Smith Decl. Ex. 5, has intensified in the past

several weeks, culminating in his push to indict Attorney General James, *see supra* pp. 3-5.  The

recently expanded news coverage regarding President Trump's use of DOJ to target his political

enemies has included coverage of these grand jury subpoenas to OAG.  *See, e.g*, Chen Decl.

¶¶ 12, 17.  This strong public interest warrants unsealing OAG's Motion.

## IV.    CONCLUSION

DOJ's reliance on a presumption of regularity and a sole dissenting opinion in a New

York appellate decision in the face of a mountain of evidence of malice and bad faith cannot

save the Executive Branch's attempt to wield the immense power of the grand jury as part of the

President's personal retribution campaign.  This Court should quash both subpoenas in their

entirety and unseal the Motion to Quash and all accompanying materials.

---

[13] Recognizing that OAG does not seek disclosure of any nonpublic "evidence," DOJ argues that
only the unsealing of grand jury evidence can implicate the public interest.  Opp. 41-42.  DOJ
does not cite a single case in support of that argument.  And at least one court has ordered the
disclosure of "judicial records ancillary to the grand jury investigation," such as briefs and
hearing transcripts, where the existence of a grand jury subpoena was already public.  *In re Press
Application for Access to Judicial Records*, 678 F. Supp. 3d 135, 139, 143 (D.D.C. 2023).

DATED: October 15, 2025

OFFICE OF THE NEW YORK STATE
ATTORNEY GENERAL

By: _____

Kumiki Gibson*
(New York Bar #2261063)
Michael Jaffe*
(New York Bar #5357330)
28 Liberty Street
New York, New York 10005
Telephone:    (212) 416-8965
E-mail:  kumiki.gibson@ag.ny.gov
E-mail:  michael.jaffe@ag.ny.gov

DATED: October 15, 2025

MUNGER, TOLLES & OLSON LLP

By: _____

Brad D. Brian*
Hailyn J. Chen*
E. Martin Estrada*
Victoria A. Degtyareva*
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071-3426
Telephone:    (213) 683-9100
Facsimile:    (213) 687-3702
E-mail:  brad.brian@mto.com
E-mail:  hailyn.chen@mto.com
E-mail:  martin.estrada@mto.com
E-mail:  victoria.degtyareva@mto.com

Donald B. Verrilli, Jr.
(Bar Roll #105107)
601 Massachusetts Avenue NW, Suite 500 E
Washington, D.C. 20001
Telephone:    (202) 220-1100
Facsimile:    (202) 220-2300
E-mail:  donald.verrilli@mto.com

*Admitted pro hac vice

DATED: October 15, 2025

CAPEZZA HILL, LLP

By: _____

Benjamin W. Hill (Bar Roll #514953)
30 South Pearl Street, Suite P-110
Albany, New York 12207
Telephone:     (518) 478-6065
Facsimile:      (518) 407-5661
E-mail:  ben@capezzahill.com

*Attorneys for the Office of the New York State*
*Attorney General*

## **CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for the Office of the New York State Attorney General ("OAG"), certifies that this brief contains 10,023 words, which complies with the Court's September 30, 2025, order granting OAG's request to file an omnibus reply brief not to exceed 30 pages and limiting the supporting exhibits to 10 exhibits; Rule 7.1(c) of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York; and the Court's Individual Rules and Procedures for Civil Cases.

DATED: October 15, 2025                    MUNGER, TOLLES & OLSON LLP

By: _____
Hailyn J. Chen

*Attorneys for the Office of the New York State Attorney General*

33