IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | | | |
|---|---|---|---|
| **IN RE GRAND JURY SUBPOENAS AS** | ) | No. | 1:25-mc-00019-LGS |
| **TO THE OFFICE OF THE NEW** | ) | | **SEALED** |
| **YORK STATE ATTORNEY** | ) | | |
| **GENERAL** | ) | | |

**Government's Omnibus Opposition to the Office of the New York State Attorney General's
Motion to Quash Grand Jury Subpoenas and Motion to Unseal Motion to Quash**

**Table of Contents**

I.    Introduction ...........................................................................................................1

II.   The Quash Motion Should be Denied ...................................................................2

    A.    Background .................................................................................................2

    B.    The Grand Jury Has Authority to Investigate Matters Within the Scope of the Subpoenas ...............................................................................................6

    C.    New York has No Sovereignty Interest Greater than the Grand Jury's Interest.11

    D.    The Subpoenas Do Not Infringe on the NYOAG's First Amendment Rights ...18

        1. There is Compelling Federal Interest for the Subpoenas .............................21

        2. There is a Substantial Relation Between the Government's Interest in Identifying Potential Crimes and the Records Sought ...................................21

        3. The Grand Jury's Subpoenas and The Records They Seek Are Not an Unduly Broad Means of Investigation ...................................................................22

    E.    The Subpoenas are Not Overbroad, Unduly Burdensome, and Seek Only Non-Privileged Records ...................................................................................22

    F.    The Grand Jury Had the Authority to Issue the Subpoenas, and Mr. Sarcone Had the Authority to Sign the Accompanying Cover Letter .....................................26

        1. Rule 17 Does Not Permit a Quash Motion Based on the Acting United States Attorney's Purported Lack of Authority .........................................................26

        2. Mr. Sarcone is Authorized to Supervise the Grand Jury Investigation in this Case .......................................................................................................27

            a. Factual Background ...........................................................................27

            b. Analytical Framework .......................................................................28

            c. Mr. Sarcone Properly Holds the Acting United States Attorney Position .............................................................................................................31

            d. Regardless, as a Special Attorney, Mr. Sarcone is Empowered to Conduct Grand Jury Proceedings ........................................................35

III.  The Motion to Unseal Should be Denied ..............................................................39

    A.    Factors #1 & #2: The Identity of the Party Seeking Disclosure and the Position of the Parties Regarding Disclosure ..........................................................41

    B.    Factors #3 & #4: The NYOAG's Grounds for Disclosure and the Specific Information it Seeks to Have Unsealed ...........................................................41

    C.    Factors #5 & #6: The Age of the Underlying Grand Jury Proceeding and the Current Status of any Principals or Their Families ...........................................42

    D.    Factor #7: The Extent to Which the Desired Materials to be Made Public – Either Permissibly or Impermissibly – Have Been Previously Made Public ...............43

E.    Factors #8 & #9: Whether Witnesses to the Grand Jury Proceedings Who  Might be Affected by Disclosure Are Still Alive, and Any Additional Needs for  Secrecy Particular to the Grand Jury Investigation in Question........................................44

IV.    Conclusion .................................................................................................................44

## Table of Authorities

**Cases**

*A Witness Before Special Grand Jury 2000-2*, 288 F.3d 289 (7th Cir. 2002) ............................ 12

*Bates v. City of Little Rock*, 361 U.S. 516 (1960) ........................................................................ 20

*Blair v. United States*, 250 U.S. 273 (1919) ................................................................................ 26

*Branzburg v. Hayes*, 408 U.S. 655 (1972) ................................................................. 7, 18, 20, 24

*Buckley v. Valeo*, 424 U.S. 1, 64 (1976) ....................................................................................... 20

*Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508 (1972) ......................................... 18

*Carlson v. United States*, 837 F.3d 753 (7th Cir. 2016) ............................................................... 42

*Craig v. United States (In re Craig)*, 131 F.3d 99 (2d Cir. 1997) ............................. 39, 40, 42, 44

*Cullen v. Fliegner*, 18 F.3d 96 (2d Cir. 1994) ....................................................................... 16, 17

*Designation of Acting Associate Attorney Genera,* 25 Op. OLC. 177 (2001) .............................. 34

*Designating an Acting Attorney General*, 42 Op. O.L.C. 182 (2018) .......................................... 35

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ................................................................... 20

*Douglas Oil Co. v. Petrol Stops Northwest*, 441 U.S. 211 (1979) ............................................... 39

*Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*, 582 F.3d 393 (2d Cir. 2009) ........................................................................................................................................... 19

*Gater Assets Ltd. v. Moldovagaz*, 2 F.4th 42 (2d Cir. 2021) ....................................................... 20

*Gibson v. Florida Legislative Committee*, 372 U.S. 539 (1963) .................................................. 20

*Grand Jury, John Doe No. G.J.2005-2*, 478 F.3d 581 (4th Cir. 2007) ........................... 12, 14, 15

*Haaland v. Brackeen*, 599 U.S. 255 (2023) ................................................................................. 19

*Hooks v. Kitsap Tenant Support Servs., Inc.*, 816 F.3d 550 (9th Cir. 2016) ............................... 30

*Imbler v. Pachtman*, 424 U.S. 409 (1976) .................................................................................... 21

*In re: A Witness Before Special Grand Jury 2000-2*, 288 F.3d 289 (7th Cir. 2002) ................... 12

*In re August, 1993 Regular Grand Jury*, 854 F. Supp. 1392 (S.D. Ind. 1993) ........................... 25

*In re Babin*, No. 22-40306, 2022 WL 1658701 (5th Cir. May 25, 2022) .............................. 15, 16

*In re Biaggi*, 478 F.2d 489 (2d Cir. 1973) ............................................................................. 40, 44

*In re Grand Jury Investigation (Oshkosh Truck Corp.)*, 746 F. Supp. 866 (E.D. Wis. 1990) ...... 25

*In re Grand Jury Investigation*, 399 F.3d 527 (2d Cir. 2005) ..................................................... 13

*In re Grand Jury, John Doe No. G.J.2005-2*, 478 F.3d 581 (4th Cir. 2007) .................... 12, 14, 15

*In re Grand Jury Matters*, 751 F.2d 13 (1st Cir. 1984) ............................................................... 11

*In re Grand Jury Proceedings*, 616 F.3d 1186 (10th Cir. 2010) ................................................. 24

*In re Grand Jury Proceedings*, 776 F.2d 1099 (2d Cir. 1985) .............................................. 20, 21

*In re Grand Jury Proceeding*, 971 F.3d 40 (2d Cir. 2020) ........................................................ 27

*In re Grand Jury Subpoena Dated August 14, 2019*, 964 F.3d 768 ............................................ 14

*In re Grand Jury Subpoena, JK-15-029*, 828 F.3d 1083 (9th Cir. 2016) ............................... 13, 25

*In re: Grand Jury Subpoena for THCF Medical Clinic Records*, 504 F. Supp. 2d 1085 (E.D. Wash. 2007) ............................................................................................................................ 13

*In re Motions of Dow Jones & Co.*, 142 F.3d 496 (D.C. Cir. 1998) ........................................... 39

*In re Persico*, 522 F.2d 41 (2d Cir. 1975) ..................................................................... 36, 37, 38

*In re Petition for Order Directing Release of Records*, 27 F.4th 84 (1st Cir. 2022) ................... 40

*In re Sealed Petitioner*, 106 F.4th 397 (5th Cir. 2024) ............................................................ 13

*In re Subpoena Duces Tecum (Bailey)*, 228 F.3d 341 (4th Cir. 2000) ....................................... 24

*In re Subpoena Duces Tecum (Local 627)*, 203 F. Supp. 575 (S.D.N.Y. 1961) .......................... 25

*In re U.S., 791 F. 3d 945 (9th Cir. 2015)* ................................................................................ 37

*Lugosch v. Pyramid Co.*, 435 F.3d 110 (2d Cir. 2006) ............................................................. 39

*Matter of Grand Jury Impaneled January 21, 1975*, 541 F.2d 373 (3d Cir. 1976) .................... 12

*Matter of Special April 1977 Grand Jury*, 581 F.2d 589 (7th Cir. 1978) ............................ 11, 12

*Miller v. Mitchell*, 598 F.3d 139 (3d Cir. 2010) ..................................................................... 10

*Miracle Mile Assocs. v. City of Rochester*, 617 F.2d 18 (2d Cir. 1980) ..................................... 20

*Netflix, Incorporated v. Babin*, 88 F.4th 1080 (5th Cir. 2023) ................................................. 16

*NLRB v. SW Gen., Inc.*, 580 U.S. 288 (2017) ........................................................................... 29

*Pitch v. United States*, 953 F.3d 1226 (11th Cir. 2020) ...................................................... 40, 42

*Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395 (1959) ............................................ 44

*Printz v. United States*, 521 U.S. 898 (1997) .......................................................................... 25

*Russello v. United States*, 464 U.S. 16 (1983) ......................................................................... 33

*South Carolina v. Katzenbach*, 383 U.S. 301, 323 (1966) ....................................................... 18

*Trump v. James*, 1:21-cv-1352 (BKS/CFH), 2022 WL 1718951 (N.D.N.Y. May. 27, 2022) ..... 16

*United States v. Armstrong*, 517 U.S. 456 (1996) ..................................................................... 9

*United States v. Baldwin,* 541 F. Supp. 2d 1184 (D.N.M. 2008) ............................................... 36

*United States v. Bryan*, 339 U.S. 331 (1950) ............................................................................ 8

*United States v. Calk*, 87 F.4th 164 (2d Cir. 2023) ................................................................... 8

*United States v. Garcia*, 2025 WL 2784640 (D. Nv. Sept. 30, 2025) ........................................ 39

*United States v. Giraud*, -- F. Supp. 3d --, 2025 WL 2416737 (D.N.J. Aug. 21, 2025) .............. 38

iv

*United States v. Goodwin*, 457 U.S. 368 (1982) ............................................................. 10

*United States v. Hilario*, 218 F.3d 19 (1st Cir. 2000) .................................................... 36

*United States v. Index Newspapers LLC*, 766 F.3d 1072 (9th Cir. 2014) ..................... 42

*United States v. Lanier*, 520 U.S. 259 (1997) ............................................................... 15

*United States v. McDougal*, 559 F.3d 837 (8th Cir. 2009) ........................................... 42

*United States v. Morton Salt Co.*, 338 U.S. 632 (1950) ................................................ 21

*United States v. R. Enters., Inc.*, 498 U.S. 292 (1991) ............................................ *passim*

*United States v. Ruiz Rijo*, 87 F. Supp. 2d 69 (D.P.R. 2000) ................................... 37, 39

*United States v. Triumph Capital Group*, 544 F.3d 149 (2d Cir. 2008) ........................ 24

*United States v. Valdez-Santana*, 279 F.3d 143 (1st Cir. 2002) .................................... 37

*United States v. Weyhrauch*, 544 F.3d 969 (9th Cir. 2008) .......................................... 37

*United States v. Williams*, 504 U.S. 36 (1992) ............................................................. 21

*United States v. Young*, 541 F. Supp. 2d 1226, 1235 (D.N.M. 2008) ..................... 37, 39

*Younger v. Harris,* 401 U.S. 37, 12 (1971) .................................................................... 17

## Statutes

U.S. Const. art. I, § 2 ...................................................................................................... 18

U.S. Const. amend. I. ...................................................................................................... 18

U.S. Const. amend. V ..................................................................................................... 19

U.S. Const. amend. X ..................................................................................................... 18

5 U.S.C. § 3345(a) .................................................................................................... *passim*

5 U.S.C. § 3345(b) .......................................................................................................... 33

5 U.S.C. § 3349(b) .......................................................................................................... 33

5 U.S.C. § 101 ................................................................................................................. 31

5 U.S.C. § 105 ................................................................................................................. 31

18 U.S.C. § 241 ....................................................................................................... 2, 9, 22

18 U.S.C. § 242 ................................................................................................... 2, 9, 21, 22

18 U.S.C. § 3731 ............................................................................................................. 37

22 U.S.C. § 2651a(a)(2) .................................................................................................. 35

28 U.S.C. § 3347(a) ........................................................................................................ 30

28 U.S.C. § 503 ............................................................................................................... 30

28 U.S.C. § 515 ............................................................................................................... 36

28 U.S.C. § 541 ............................................................................................................... 31

28 U.S.C. § 546 ........................................................................................................ *passim*

28 U.S.C. § 547 ............................................................................................................... 28

28 U.S.C. § 509 .......................................................................................................... 28, 31

28 U.S.C. § 510 .......................................................................................................... 28, 31

28 U.S.C. § 515 .......................................................................................................... 28, 31

28 U.S.C. § 542 ................................................................................................38
28 U.S.C. § 543 ................................................................................................38
28 U.S.C. § 533(1) ...........................................................................................38
42 U.S.C. § 1983 ........................................................................................17, 21
Fed. R. Crim. P. 17(c)(2) ................................................................................26

## I.        Introduction

On August 5, 2025, a grand jury sitting in the Northern District of New York issued two grand jury subpoenas to the New York Office of the Attorney General ("NYOAG"). The subpoenas request documents and records regarding two civil enforcement actions investigated and pursued by the NYOAG: (i) *People of the State of New York v. The National Rifle Association of America, et al.*, Index No. 451625/2020 (the "NRA Lawsuit"); and (ii) *People of the State of New York v. Donald J. Trump, et al.*, Index No. 452564/2022 (the "Trump Lawsuit," and together with the NRA Lawsuit, the "NYOAG Lawsuits"). The Federal Bureau of Investigation served the subpoenas the same day. On August 19, 2025, the NYOAG moved to quash the subpoenas (the "Quash Motion") and to unseal the litigation (the "Unseal Motion"). Both motions should be denied.

A grand jury's investigative powers are expansive: "the grand jury 'can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not.'" *United States v. R. Enters., Inc.*, 498 U.S. 292, 297 (1991) (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 642–643 (1950)). The challenged subpoenas fit comfortably within those powers. They were issued by a validly empaneled grand jury in the Northern District of New York, which is entitled to investigate whether Attorney General Letitia James—alone or in concert with others—violated federal law by selectively pursuing the NYOAG Lawsuits against the NRA and President Trump when other similarly situated entities and individuals went unpursued.

There is ample evidence in the public record indicating that is what occurred. Before even taking office, Attorney General James repeatedly promised to investigate, prosecute, and sue the

NRA and President Trump, with her stated goal being to "take down" that organization and "take on" Trump's "illegitimate" presidency. *See* Exs. 4, 7, 8. The NYOAG Lawsuits fulfilled those promises. As recognized by a New York State Appellate Division Judge in discussing the Trump Lawsuit, "the words of the Attorney General herself establish, beyond a reasonable doubt, that . . . this action was commenced not to vindicate the public interest . . . but out of partisan political motives." Ex. 1 at 248. Those "partisan political motives," which may well reveal the commission of a federal crime (including the deprivation of civil rights under 18 U.S.C. §§ 241 and/or 242), are a proper subject of inquiry by the grand jury.

The NYOAG has no sovereignty interest that outweighs the interest of a federal grand jury in investigating potential crimes. To the contrary, courts have consistently upheld the broad authority of the grand jury to investigate state agencies and state actors over sovereignty objections. Nor are the NYOAG's First Amendment rights—if it has any—infringed by the subpoenas. There is a compelling interest in the NYOAG's compliance with the subpoenas, an appropriate relationship between that interest and the records sought, and the subpoenas do not unduly burden the NYOAG. Finally, Acting United States Attorney John A. Sarcone III's status in that role is irrelevant. The grand jury can issue subpoenas, and AUSAs and special attorneys (like Mr. Sarcone) can conduct grand jury investigations, regardless of the status of the United States Attorney. In any event, Mr. Sarcone is validly serving as Acting United States Attorney for the Northern District of New York.

## II.     The Quash Motion Should be Denied.

### A.     Background

In her successful campaign for Attorney General, *before* taking office on January 1, 2019, Letitia James repeatedly promised to use the NYOAG to go after her political enemies, including

the National Rifle Association ("NRA") and President Trump. These threats of targeted and selective prosecution included:

- "Today, I'm announcing my plans as Attorney General to stop gun violence & **take on the NRA** . . . ." Ex. 2 (emphasis added).

- "I will use the constitutional power as an attorney general to regulate charities, that includes the **NRA, to investigate their legitimacy**." Ex. 3 (emphasis added).

- "**The NRA has an office here in New York State and what we want to do is investigate** to see whether or not they have in fact complied with the not-for-profit law in the state of New York." Ex. 3 (emphasis added).

- "The US has one of the highest gun-related death rates. Kids shouldn't go to school afraid today might be the day. Parents shouldn't worry about sending their kids to school. This CAN change & **we CAN take down the @NRA**. . . ." Ex. 4 (emphasis added).

- "When I'm Attorney General **I'll take on the @NRA** and investigate their status as a non-profit." Ex. 5 (emphasis added).

- "**The NRA** holds [itself] out as a charitable organization, but in fact, [it] really **[is] a terrorist organization**." Ex. 6 (emphasis added).

As to President Trump, Attorney General James's threats of targeted and selective prosecution were more of the same:

- "No one is above the law, including **this illegitimate president. And so, I look forward . . . to going into the Office of Attorney General every day suing him**, defending your rights and then going home." Ex. 7 (emphasis added).

- "Congrats @Ocasio2018 on your victory. **Looking forward to working with you to help Democrats take on Donald Trump** and build a society that works for all people." Ex. 8 (emphasis added).

- "The president of the United States has to worry about three things; Mueller, Cohen, and Tish James. **We're all closing in on him**." Ex. 9 (emphasis added).

- "Yes, we open the paper . . . every day wanting to know what Mueller is doing, but **there are things the New York State attorney general can do to take on the threat of Donald Trump that nobody else can do**." Ex. 9 (emphasis added).

- "**There's a lot of property here in New York state that I believe the president of the United States has basically inured to his benefit**, and I do believe that he's engaged in self-enrichment." Ex. 9 (emphasis added).

3

- "**We need an Attorney General who has experience to take on @realDonaldTrump & his business in New York**. I won't miss a beat. There's a reason he has been asking about me." Ex. 10 (emphasis added).

- "I believe that this president is incompetent. I believe that this president is ill-equipped to serve in the highest office of this land. And I believe that he is an embarrassment to all that we stand for. He should be charged with obstructing justice. **I believe that the president of these United States can be indicted for criminal offenses,** and we would join with law enforcement and other attorney generals across this nation in removing this president from office. **In addition to that, the office of attorney general will continue to follow the money because we believe that he's engaged in a pattern and practice of money laundering**. Laundering the money from foreign governments here in New York State and particularly related to his real estate holdings. **It's important that everyone understand that the days of Donald Trump are coming to an end,** but we can only do it if all of you exercise the most fundamental right. A right which is basic to democracy. And that is the right to vote." Ex. 11 (emphasis added).

- "Today's plea deal with Manafort demonstrates how critical it is to close New York's double jeopardy loophole and **continue investigating @realDonaldTrump. As New York's next Attorney General, that's exactly what I'll do**." Ex. 12 (emphasis added).

- "**Oh, we're going to definitely sue [Donald Trump]. We're going to be a real pain in the ass.** He's going to know my name personally." Ex. 13 (emphasis added).

Following her election victory, Attorney General James made good on her campaign promises to single out the NRA and President Trump. On August 6, 2020, the NYOAG filed the NRA Lawsuit against the NRA and affiliated individuals, including Executive Vice-President Wayne LaPierre, seeking to dissolve the NRA itself and demanding restitution from current and former employees. *See* Ex. 21. In announcing the NRA Lawsuit, the NYOAG revealed that its investigation began in February 2019, the second month of Attorney General James's tenure as Attorney General. *See id.*

On September 21, 2022, the NYOAG filed the Trump Lawsuit against President Trump and others, including Eric Trump, Ivanka Trump, and the Trump Organization, claiming in the over-200-page complaint that they made false statements, falsified business records, and engaged in insurance fraud. *See* Ex. 22. The NYOAG sought an estimated $250 million in damages under

New York Executive Law 63(12), which the NYOAG claimed "gives the Office of the Attorney General . . . special and broad powers to go after persistent and repeated fraud and illegality." *Id.*

Following years of litigation, the NYOAG initially found some success at the trial court level. In February 2024, a trial jury found LaPierre and the NRA's former Treasurer and Chief Financial Officer Wilson "Woody" Phillips "liable for financial misconduct and corruption in managing the [NRA]," and ordered them to pay millions in damages. *See* Ex. 23. Final judgment issued December 11, 2024. *See* Ex. 24.

Also in February 2024, New York State Supreme Court Justice Arthur F. Engoron ruled for the NYOAG in the Trump Lawsuit following a bench trial and ordered Trump and the other defendants to pay more than $450 million in disgorgement and pre-judgment interest. *See* Ex. 25.

But just two days after the NYOAG filed its Quash Motion, the Supreme Court of the State of New York, Appellate Division, First Judicial Department, vacated the damages award in the Trump Lawsuit in a series of opinions spanning 323 pages. *See* Ex. 1. Although the liability judgment was nominally affirmed to enable the Court of Appeals to review the case, a majority of the judges would have either set the entire judgment aside or at least remanded for a new trial. Ex. 1 at 225 ("[A]lthough a three-justice majority of this five-justice panel believe that the judgment in favor of the Attorney General should not stand . . . the result of the appeal is the affirmance of the judgment, albeit as modified to eliminate the disgorgement award.").

In an opinion concurring in part and dissenting in part, Justice Friedman criticized the Trump Lawsuit, describing it as "manifestly" an "arbitrary, politically selective prosecution by the Attorney General." Ex. 1 at 241 n.17. According to Justice Friedman, "the record makes plain that in this matter, we see an attempt to use section 63(12) and the judicial system for political ends. The proof of this is found . . . in the words of the Attorney General herself." Ex. 1 at 242.

5

Justice Friedman further observed that "the Attorney General, in her 2018 election campaign for her current office, repeatedly promised the voters that her top priority, upon being sworn in, would be to bring down President Trump and his real estate empire." Ex. 1 at 243. After recounting many of these statements by then-candidate James, Justice Friedman observed:

> [T]he words of the Attorney General herself establish, beyond a reasonable doubt, that contrary to the view of my colleagues, *this action was commenced* not to vindicate the public interest . . . but *out of partisan political motives*. Whatever one may think of President Trump's character and policies, section 63(12) was not enacted for the Attorney General to use as a stick with which to beat the opponents of her political party. But this is the way section 63(12) is being used here – arbitrarily, selectively, and politically . . . .

Ex. 1 at 248 (emphasis added).

That is not all. Justice Friedman explained that the Trump Lawsuit "certainly appears to constitute an instance of selective enforcement of section 63(12) in retaliation for President Trump's exercise of his First Amendment right to participate in the political process," Ex. 1 at 251, and that NYOAG's "ultimate goal was not 'market hygiene,' as posited by Justice Moulton, but political hygiene, ending with the derailment of President Trump's political career and the destruction of his real estate business," Ex. 1 at 323.

**B.    The Grand Jury Has Authority to Investigate Matters Within the Scope of the Subpoenas**

The Supreme Court has described the grand jury's important and expansive function as follows:

> The grand jury occupies a unique role in our criminal justice system. It is an investigatory body charged with the responsibility of determining whether or not a crime has been committed. Unlike this Court, whose jurisdiction is predicated on a specific case or controversy, the grand jury "can investigate *merely on suspicion that*

6

> *the law is being violated, or even just because it wants assurance*
> *that it is not.*"

*R. Enters., Inc.*, 498 U.S. at 297 (quoting *Morton Salt Co.,* 338 U.S. at 642-43) (emphasis added).

The Supreme Court further explained:

> Any holding that would saddle a grand jury with minitrials and
> preliminary showings would assuredly impede its investigation and
> frustrate the public's interest in the fair and expeditious
> administration of the criminal laws. . . . Requiring the Government
> to explain in too much detail the particular reasons underlying a
> subpoena threatens to compromise the indispensable secrecy of
> grand jury proceedings. Broad disclosure also affords the targets of
> investigation far more information about the grand jury's internal
> workings than the Federal Rules of Criminal Procedure appear to
> contemplate.

*Id*. at 298-99 (cleaned up).

The starting point for reviewing a motion to quash is that "a grand jury subpoena issued

through normal channels is presumed to be reasonable, and the burden of showing

unreasonableness must be on the recipient who seeks to avoid compliance." *Id.* at 301. When "a

subpoena is challenged on relevancy grounds, the motion to quash must be denied unless the

district court determines that there is no reasonable possibility that the category of materials the

Government seeks will produce information relevant to the general subject of the grand jury's

investigation." *Id.*

The Supreme Court has also held that, "[a]lthough the powers of the grand jury are not

unlimited and are subject to the supervision of a judge, the longstanding principle that 'the public

. . . has a right to every man's evidence,' except for those persons protected by a constitutional,

common-law, or statutory privilege . . . is particularly applicable to grand jury proceedings."

*Branzburg v. Hayes*, 408 U.S. 665, 688 (1972) (quoting *United States v. Bryan*, 339 U.S. 323, 331

(1950)). Indeed, "concrete allegations of Government misconduct" are needed to overcome the

presumption of regularity. *See United States v. Calk*, 87 F.4th 164, 186 (2d Cir. 2023) (quoting *United States v. Leung*, 40 F.3d 577, 582 (2d Cir. 1994)).

Instead of "concrete allegations," the NYOAG wrongly asserts that "there is plainly no legitimate basis for the government's investigation" and that "[e]very single court presented with these issues held that [the NYOAG] acted lawfully and responsibly." Quash Mot. at 17. As to the Trump Lawsuit, the recent vacatur of the damages award and accompanying opinions by the Appellate Division gut these assertions. Justice Friedman had the benefit of an appellate record totaling 49,280 pages, including over 7,000 pages of transcripts from the 11-week bench trial, Ex. 1 at 14, 17, and he emphatically rejected the notion that James acted lawfully and responsibly, *see id.* at 241-48. Further, as he pointed out, "[t]he Attorney General's campaign promises to pursue President Trump are matters of public record." *Id.* at 244.

The public records establish that then-candidate James promised to target President Trump and the NRA for adverse legal action, and her statements suggest the possibility that her primary motive was to punish her adversaries for their political views. Once in office, she made good on her promises, suing both the NRA and President Trump in short order. Under the circumstances, nothing more is needed to justify a grand jury inquiry. *See R. Enters., Inc.*, 498 U.S. at 297.

The government is not required at this juncture to settle on a specific theory of criminal liability or a comprehensive set of facts that would support a criminal charge. *See Bryan*, 339 U.S. at 331 ("A subpoena has never been treated as an invitation to a game of hare and hounds, in which the witness must testify only if cornered at the end of the chase. If that were the case, then, indeed, the great power of testimonial compulsion, so necessary to the effective functioning of courts and legislatures, would be a nullity.").

Without limiting the grand jury's inquiry or the government's right to investigate any potential crimes, Attorney General James's statements and the concerns articulated in Justice Friedman's opinion, at a minimum, raise the specter of unconstitutional selective prosecution. Such suspected abuses of power suffice to justify an investigation into potential violations of 18 U.S.C. § 241, which prohibits conspiring to injure or oppress "any person . . . in the free exercise or enjoyment of any right or privileged secured to him by the Constitution or laws of the United States, or because of his having so exercise the same," and/or of 18 U.S.C. § 242, which prohibits, "under color of any law . . . willfully subject[ing] any person . . . to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States." The Supreme Court has long recognized that selective prosecution can infringe on a protected constitutional right. In *United States v. Armstrong*, 517 U.S. 456, 465-66 (1996), it explained (albeit not in the context of a civil rights case) that selective prosecution claims require showing that a prosecution is based on an improper characteristic and that similarly situated people or groups were not prosecuted.

The grand jury is entitled to investigate whether Attorney General James or others chose targets and pursued the NYOAG Lawsuits for unlawful reasons, ignoring other similarly situated people and entities engaged in similar or more egregious conduct. It is not enough for the NYOAG to argue that its lawsuits were successful (although the ultimate success of the Trump Lawsuit remains unsettled) because a selective prosecution constitutional violation does not require proof that the prosecution was factually baseless. *See id.* at 463 (explaining in the criminal context that "[a] selective-prosecution claim is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution."). Rather, the question is whether the prosecutor chose to take the enforcement action

for improper reasons, such as to punish a political rival, ignoring similarly situated people. *See id.*; *see also Miller v. Mitchell*, 598 F.3d 139, 155 (3d Cir. 2010) (affirming preliminary injunction against district attorney in § 1983 case and explaining that "'[w]hile the Government retains broad discretion as to whom to prosecute,' 'the decision to prosecute may not be deliberately based on . . . arbitrary classification, including the exercise of protected statutory and constitutional rights.'" (quoting *Wayte v. United States*, 470 U.S. 598, 607-08 (1985))); *see also United States v. Goodwin*, 457 U.S. 368, 372 (1982) ("For while an individual certainly may be penalized for violating the law, he just as certainly may not be punished for exercising a protected statutory or constitutional right.")).

Justice Friedman from the Appellate Division believes Attorney General James did exactly that, explaining his view that the appellate record showed "beyond a reasonable doubt" that she commenced the Trump Lawsuit "out of partisan political motives," and he coupled that conclusion with evidence that Attorney General James also used section 63(12) "arbitrarily, selectively, and politically." Ex. 1 at 248 (Friedman, J., concurring in part and dissenting in part).

- "[E]very day on which appeals are argued before this Court, at least one of the appeals (and frequently more than one) involves allegations of fraud in business transactions between sophisticated persons or entities – *allegations frequently more serious than those made by the Attorney General in this case*." *Id.* at 242 (emphasis added).

- "*Why did the Attorney General choose to start investigating President Trump* – who timely made every payment required of him in the subject transactions, and whose conduct in these matters had not elicited a complaint from any counterparty to whom he had provided the [Statements of Financial Condition] – *rather than any of the hundreds of businesspersons and entities actually being sued for misrepresentation in the courts of this state? The question answers itself.*" *Id.* at 247 (emphasis added).

The Quash Motion would short-circuit the grand jury's investigatory process by seeking precisely the type of "minitrials and preliminary showings" the Supreme Court has warned against

because such inquiries "impede [grand jury] investigation[s] and frustrate the public's interest in the fair and expeditious administration of the criminal laws." *R. Enters., Inc.*, 498 U.S. at 297 (quoting *United States v. Dionisio*, 410 U.S. 1, 17 (1991)).

### C.    New York has No Sovereignty Interest Greater than the Grand Jury's Interest

The NYOAG argues that the subpoenas "implicate the most essential of New York's interests – that is, the State's interest in enforcing its law." Quash Mot. at 24. But the subpoenas also necessarily implicate "the most essential of" the United States' interests for the same reason.

In *Matter of Special April 1977 Grand Jury*, 581 F.2d 589 (7th Cir. 1978), quoted in passing by the NYOAG in its motion, *see* Quash Mot. at 26, the Seventh Circuit laid out important principles reflecting the baselessness of the NYOAG's argument that state sovereignty provides a reason to quash the subpoenas. There, a grand jury subpoenaed the Attorney General of the State of Illinois ("ILOAG") "for the production of his campaign records, employee rosters, his travel records and long distance telephone bills." *Id.* at 591. In declining to quash those subpoenas, the Seventh Circuit rejected several arguments that the NYOAG either makes or recasts here.

First, the ILOAG argued that the grand jury subpoenas "represent[ed] an unconstitutional federal 'excursion' into the territory of exclusive state sovereignty . . . ." *Id.* at 592. In rejecting that argument, the Seventh Circuit explained that "[n]othing in the United States Constitution immunizes any 'exclusive domain of the state' from the reach of a federal grand jury." *Id.*; *In re Grand Jury Matters*, 751 F.2d 13, 18 (1st Cir. 1984) ("[T]he grand jury's substantive right to evidence is restricted only by recognized constitutional, common law or statutory privileges."). At most, a state's sovereign interest can be satisfied by considering whether some records might be privileged. *Id.* Further, although the grand jury's inquiry in *Special April 1977 Grand Jury* was focused on the actions of the ILAG himself, rather than lawsuits he pursued through his office, *see*

11

581 F.2d at 591, investigating whether the NYOAG acted under color of law to selectively punish political rivals is an equally weighty justification for the subpoenas.

Second, the subpoenas require the NYOAG to produce only unprivileged materials (*e.g.*, communications between Attorney General James herself and/or the NYOAG and third parties). Such unprivileged communications would likely be relevant to a grand jury's investigation of potential civil rights offenses, as liability under civil rights laws may turn on *why* a prosecutor pursued certain defendants but not others similarly situated. Even assuming that some of the subpoenaed records are available through means such as freedom of information requests, there is no requirement that the government first exhaust those avenues. *Matter of Special April 1977 Grand Jury*, 581 F.2d at 595; *Matter of Grand Jury Impaneled January 21, 1975*, 541 F.2d 373, 377-78 (3d Cir. 1976) (not an abuse of discretion to hold that grand jury's investigative interest outweigh a state comity concern); *In re Grand Jury, John Doe No. G.J.2005-2*, 478 F.3d 581, 587 (4th Cir. 2007) ("[T]he existence of an alternative means of obtaining information is insufficient to render a subpoena unreasonable or subpoenaed material irrelevant to a grand jury investigation.").

The Seventh Circuit reiterated these basic principles that support denying the Quash Motion in *In re: A Witness Before Special Grand Jury 2000-2*, 288 F.3d 289 (7th Cir. 2002). In that case, the Court framed the "central question" as "whether a state government lawyer may refuse, on the basis of the attorney-client privilege, to disclose communications with a state officeholder when faced with a grand jury subpoena." *Id.* at 290. In addition to rejecting the attorney-client privilege assertion in that context, the Court brushed aside a "federalism" argument for quashing

the subpoena, explaining that "officials, including state lawyers, [] enjoy no immunity from disclosing relevant information to a federal grand jury."[1] *Id.* at 295.

The NYOAG's citation to *In re: Grand Jury Subpoena for THCF Medical Clinic Records*, 504 F. Supp. 2d 1085, 1090 (E.D. Wash. 2007), proves the opposite point for which the NYOAG cites it. In *THCF*, a district court quashed grand jury subpoenas seeking address and dosage information for medical marijuana patients. "The government's professed need for the requested information is that it has been investigating three individuals and it wants to obtain this information to establish distribution amounts." *Id.* at 1089. Important to the district court's decision was that the federal government had or could readily obtain essentially *all* the information in less intrusive ways not implicating important state interests. *Id.* at 1090-91. Notably, though, the district court explained that "[i]t is clear that the State's sovereignty can be trumped by a federal subpoena . . . ." *Id.* at 1091. Here, the government has no similar means to obtain *all* the records likely to contain

---

[1] The government assumes for purposes of this brief that the NYOAG might be able to assert attorney-client privilege over certain responsive records, subject to the potential application of the crime-fraud exception. *See In re Grand Jury Investigation*, 399 F.3d 527 (2d Cir. 2005). But that is no basis for granting the Quash Motion both because: (1) the subpoenas seek non-privileged records; and (2) the NYOAG has neither created a privilege log nor explained meaningfully what class or classes of records it believes are privileged and why. On privilege and crime-fraud questions, the details are likely to matter. *See generally In re Grand Jury Subpoena, JK-15-029*, 828 F.3d 1083, 1092 (9th Cir. 2016) ("In no instance, as far as we are aware, has a former officeholder successfully claimed that a government staff lawyer discussing a matter relating to official business was representing the officeholder personally during a conversation had while both were government employees."); *In re Sealed Petitioner*, 106 F.4th 397, 404 (5th Cir. 2024) (describing district court's "sound alternate holding that the crime-fraud exception to the attorney-client privilege operates to nullify the Agency's assertion of the privilege as to 'actions or communications contemplated or undertaken . . . to interfere in or obstruct the current [f]ederal investigation'" because "'it is the purpose of the crime-fraud exception to the attorney-client privilege to assure that the 'seal of secrecy' between lawyer and client does not extend to communications 'made for the purpose of getting advice for the commission of a fraud' or crime.'") (quoting *United States v. Zolin*, 491 U.S. 554, 563 (1989)) (alterations in *In re Sealed Petitioner*).

the information it needs to determine whether the NYOAG selectively and unconstitutionally pursued the NYOAG Lawsuits, and courts have made clear that the availability of freedom of information requests does not support quashing a grand jury subpoena. *In re Grand Jury, John Doe No. G.J.2005-2*, 478 F.3d at 581.

The Fourth Circuit's decision in *John Doe No. G.J.2005-2*, 478 F.3d at 581, likewise supports denying the NYOAG's motion. In that case, the Fourth Circuit affirmed an order quashing a grand jury subpoena issued to a city police department "to obtain the records of the Department's internal investigation into a complaint filed against an officer." *Id.* at 582. Several factors were important to the Fourth Circuit's decision, all of which cut against quashing the subpoenas here. First, "[i]n the absence of the City's assertion of an interest in the confidentiality of its own investigative procedures, this may well have been a different case." *Id.* at 587. Second, "[t]he district court . . . was not required to ignore the fact that counsel for the United States repeatedly suggested that the information sought was of negligible value to the government." *Id.*; *see also In re Grand Jury Subpoena Dated August 14, 2019*, 964 F.3d 768, 774 (8th Cir. 2020) (no abuse of discretion in denying Iowa Department of Public Safety's motion to quash grand jury subpoena for investigative file concerning police misconduct because materials were likely to have significant value in the grand jury's investigation and compliance would not intrude gravely on its ability to deal with "blue wall" encountered during internal investigation).

In contrast, the NYOAG does not have a valid confidentiality interest in protecting the reasons it pursued the NYOAG Lawsuits (at least insofar as it talked about those reasons in non-privileged or protected settings). Nor has any government attorney suggested that the information sought is of negligible value. As to confidentiality, the NYOAG undoubtedly does much criminal and civil enforcement work for which it has a legitimate confidentiality interest. But where the

14

Attorney General herself makes repeated, public statements about an intent to target certain people and entities and then pursues those people and entities in unprecedented ways, the NYOAG has no fair claim to "confidentiality" about its motivations. *See* Ex. 1 at 145 ("[W]e are confronted with an unprecedented use of the statutory power") (Higgitt, J. concurring in part and dissenting in part); *id.* at 233 (noting "constitutional concerns raised by the Attorney General['s] unprecedented use of the statute in this case") (Freidman, J. concurring in part and dissenting in part). Unlike in *John Doe No. G.J.2005-2*, where the police department maintained confidentiality concerning the results of an internal investigation, the NYOAG's office did and has done the opposite. Of course, the NYOAG cannot claim any right of confidentiality over any non-privileged or work-product protected records that are responsive to the subpoenas.

As to the importance of the records, no attorney for the government has said or implied that the records are unimportant. To the contrary, they are potentially pivotal. Civil rights investigations routinely turn on a state actor's motivations, and in the context of potential selective prosecution motivation can make otherwise lawful action unlawful. *See generally United States v. Lanier*, 520 U.S. 259, 264 (1997). For example, a state prosecutor might justifiably prioritize charging vagrancy crimes in a public park, but if that prosecutor charges only minorities when there are similarly situated non-minority vagrants who engaged in the same conduct, that prosecutor could be investigated for violating civil rights laws. Thus, records regarding a prosecutor's motivations could establish an essential element of the crime.

The NYOAG also cites to *In re Babin*, No. 22-40306, 2022 WL 1658701 (5th Cir. May 25, 2022), for the proposition that merely a demand to provide information about a state's enforcement activities for *in camara* review would represent a significant intrusion on state interests. Quash Mot. at 25. But again, the actual holding of *In re Babin* shows why the Quash Motion should be

15

denied. In *In re Babin*, a district attorney sought a writ of mandamus to stop a private party, Netflix, from obtaining state grand jury information in support of its claim that it was being improperly targeted. The Fifth Circuit recognized that "there can be a need for discovery of grand jury proceedings in a lawsuit asserting that a prosecution is being brought in violation of federal rights." *Id.* at 5. If a private party pursuing a civil rights lawsuit can investigate the motivations of a state prosecutor's office, a federal grand jury has at least the same right, particularly where it does not seek otherwise protected records (like grand jury information).

What followed *In re Babin* further shows that the NYOAG's Quash Motion should be denied. In *Netflix, Incorporated v. Babin*, 88 F.4th 1080 (5th Cir. 2023), essentially a continuation of the same litigation, the Fifth Circuit affirmed the district court's decisions that, among other things: (1) the district attorney's prosecution was in bad faith, supporting application of the bad-faith exception to *Younger* abstention; and (2) the existence of probable cause – two grand juries returning indictments – did not break the causal chain for the bad faith exception. In reaching those conclusions, the Fifth Circuit noted a basic principle that applies here: "[a] state has no legitimate interest [] in a prosecution brought in bad faith or to harass. Nor, for that matter, does a defendant have an adequate opportunity to assert constitutional violations in the state proceeding when the prosecution *itself* is the constitutional violation." *Id.* at 1085; *Cullen v. Fliegner*, 18 F.3d 96, 104 (2d Cir. 1994) (noting that "a state cannot have a legitimate interest in discouraging the exercise of constitutional rights").

The district court's decision in *Trump v. James*, 1:21-cv-1352 (BKS/CFH), 2022 WL 1718951 (N.D.N.Y. May. 27, 2022), where the plaintiff sought unsuccessfully to enjoin the NYOAG's investigation in connection with the Trump Lawsuit, also fails to support the Quash Motion. *Trump v. James* stands fundamentally for the broad authority of a law enforcement agency

16

to investigate potential wrongdoing, notwithstanding claims by the recipient of a subpoena that the investigation is politically motivated. Moreover, *Trump v. James* did not uphold the validity of the Trump Lawsuit against a claim of selective prosecution or suggest that such a claim could never be established. It merely dismissed the plaintiff's effort under 28 U.S.C. § 1983 to enjoin NYOAG's subpoena enforcement action on the basis of the *Younger* abstention doctrine and *res judicata*. *Id*. at *12-13, 16-20; *see also Younger v. Harris,* 401 U.S. 37 (19717). In doing so, the Court found that plaintiff failed to establish that the bad faith exception to *Younger* applied. *Id*. at *12-13. But the district court emphasized that its holding was limited to the procedural posture and record before it: "*[O]n this record* the Court finds that Plaintiffs have not established that the subpoena enforcement proceeding was commenced for the purpose of retaliation." *Id.* at *13 (emphasis added) (citing *Phelps v. Hamilton*, 59 F.3d 1058, 1065 (10th Cir. 1995); *Cullen*, 18 F.3d at 104). Obviously, this limited holding does not preclude a federal grand jury from further developing the factual record and determining whether there is a sufficient basis for federal criminal charges.

The broad authority of the grand jury to investigate potential criminal violations would be enough to deny the Quash Motion given Attorney General James's public statements about targeting the NRA and President Trump and the apparently unprecedented use of the authority of the NYOAG. But, as discussed above, since *Trump v. James* was decided, the Appellate Division's decisions show that there is more than sufficient basis for the grand jury to investigate whether the NRA and President Trump were the victims of selective prosecution.

Finally, insofar as the NYOAG argues that it is too burdensome to respond the subpoenas as a matter of state sovereignty, the government addresses that argument below in the section discussing the NYOAG's related arguments concerning purported overbreadth and burden.

17

**D.      The Subpoenas Do Not Infringe on the NYOAG's First Amendment Rights**

Federal courts not only have oversight over grand juries and motions to quash grand jury subpoenas, but they also ensure that grand juries do not run afoul of the First Amendment. *Branzburg*, 408 U.S. at 707-08. The right to petition, specifically the right to access the courts, is a well-recognized First Amendment right for individuals. *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972).

The First Amendment provides, in relevant part, that "Congress shall make no law . . . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I.  The phrase used to refer to the holder of these rights is "the people," not "the States."   The Constitution clearly refers to States and the people as different things, and it uses the word "States," not "the people," when the Framers intended to refer to States of the Union.  *See, e.g.*, U.S. Const. art. I, § 2 ("The House of Representatives shall be composed of Members chosen every second Year by the People of the several States[.] . . ."); U.S. Const. amend. X ("The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.").  The Tenth Amendment is also notable for another reason.  The so-called "States' rights amendment" does not even use the word "rights"; it refers to the "powers" of States.  It thus recognizes what most judges should know since at least 1215 – that "rights" are restraints that the people place upon the power of the King (e.g., through the Magna Carta) or, as here, the government.

Consistent with that understanding, the Supreme Court has repeatedly held that States cannot properly invoke rights in the Bill of Rights or in the Fourteenth Amendment.  In *South Carolina v. Katzenbach*, 383 U.S. 301, 323-24 (1966), the State of South Carolina challenged

18

provisions of the Voting Rights Act of 1965 on various constitutional grounds.  The State argued that the Act denied due process in various ways and constituted a forbidden bill of attainder.  Before considering other arguments, the Supreme Court rejected all those rights-based claims as follows:

> Some of these contentions may be dismissed at the outset.  The word 'person' in the context of the Due Process Clause of the Fifth Amendment cannot, by any reasonable mode of interpretation, be expanded to encompass the States of the Union, and to our knowledge this has never been done by ny court.  (Citations omitted.)  Likewise, courts have consistently regarded the Bill of Attainder Clause of Article I and the principle of the separation of powers only as protections for individual persons and private groups, those who are peculiarly vulnerable to non-judicial determinations of guilt.  *Id*. at 323-34.

Based on *Katzenbach*, the Supreme Court similarly held that States have no equal protection rights of their own.  *See Haaland v. Brackeen*, 599 U.S. 255, 295 (2023) ("It [(*i.e.*, the State of Texas)] has no equal protection rights of its own.").  Thus, in *Haaland*, the Court held that Texas lacked standing to challenge the ICWA's racially discriminatory provision under the Equal Protection Clause.

Consistent with *Katzenbach and Haaland*, the Second Circuit has also held that foreign states do not enjoy due process protections from the exercise of the judicial power because foreign states, like U.S. states, are not "persons" for the purposes of the Due Process Clause.  *See Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*, 582 F.3d 393, 399 (2d Cir. 2009) ("If the States, as sovereigns that are part of the Union, cannot 'avail themselves of the fundamental safeguards of the Due Process Clause,' we do not see why foreign states, as sovereigns wholly outside the Union, should be in a more favored position" (citation omitted)); *see also* U.S. Const. amend. V ("[N]or shall any person ... be deprived of life, liberty, or property, without due process

19

of law."); *see also Gater Assets Ltd. v. Moldovagaz*, 2 F.4th 42, 55 (2d Cir. 2021) ("Sovereign states may not invoke the protection of the Fifth Amendment's Due Process Clause because that clause protects only "person[s]," and our precedent considers foreign states, like U.S. states, not to be "persons" under the Fifth Amendment.  [*Frontera*] (citing *South Carolina v. Katzenbach*, 383 U.S. 301, 323-24 (1966))."

More recently, in *District of Columbia v. Heller*, 554 U.S. 570, 579-81 (2008), the Supreme Court held that the Second Amendment right to keep and bear arms is an individual right, not a right of a State or its militia.  It based that holding on the Second Amendment's use of the phrase "the people" when identifying the holder of the subject right.  In so doing, the Court noted that the same phrase is used "in the First Amendment's Assembly–and–Petition Clause and in the Fourth Amendment's Search–and–Seizure Clause."  *Id*. at 579.  Thus, *Heller*'s reasoning should apply to the First Amendment with equal force.

Assuming *arguendo* that a government agency, such as the NYOAG, also has a First Amendment right to petition (*see Miracle Mile Assocs. v. City of Rochester*, 617 F.2d 18, 21 (2d Cir. 1980)), a court tasked with analyzing whether there has been a First Amendment violation must consider three factors. *In re Grand Jury Proceedings*, 776 F.2d 1099, 1102-03 (2d Cir. 1985). The three factors are:

> First, the interests of the state must be 'compelling,' *Bates v. City of Little Rock*, 361 U.S. 516, 524 (1960), and able to survive 'exacting scrutiny,' *Buckley v. Valeo*, 424 U.S. 1, 64 (1976), as to whether they are 'sufficiently important to outweigh the possibility of infringement.' *Id*. at 66.  Second, there must be some 'substantial relation' between the governmental interest and the information required to be disclosed.  *Id*. at 64; *Gibson v. Florida Legislative Committee*, 372 U.S. 539, 546 (1963). Third, 'justifiable governmental goals may not be achieved by unduly broad means having an unnecessary impact on protected rights . . ." *Branzburg v. Hayes*, 408 U.S. 665, 680-81 (1972).

20

*In re Grand Jury Proceedings*, 776 F.2d at 1102-03. As described below, a balancing of these factors shows that the subpoenas do not infringe upon the NYOAG's right to access the courts.

### 1.    There is a Compelling Federal Interest for the Subpoenas

Grand juries play a vital role in the federal criminal justice system in determining "whether there is an adequate basis for bringing a criminal charge," and accordingly have broad powers to conduct investigations. *See United States v. Williams*, 504 U.S. 36, 47 (1992). Grand juries may "investigate merely on suspicion that the law is being violated, or even because it wants assurance that it is not," *Morton Salt Co.*, 338 U.S. at 642-43, and enforcing civil rights laws is a compelling federal interest. The Supreme Court, for example, has observed that prosecutors may be criminally prosecuted for willfully depriving an individual's constitutional rights in violation of 18 U.S.C. § 242. *Imbler v. Pachtman*, 424 U.S. 409, 429 (1976). Indeed, the *Imbler* Court stated:

> We emphasize that the immunity of prosecutors from [civil] liability in suits under § 1983 does not leave the public powerless to deter misconduct or to punish that which occurs. This Court has never suggested that the policy considerations which compel civil immunity for certain governmental officials also place them beyond the reach of the criminal law. Even judges, cloaked with absolute civil immunity for centuries, could be punished criminally for willful deprivations of constitutional rights on the strength of 18 U.S.C. § 242, the criminal analog of § 1983. The prosecutor would fare no better for his willful acts.

*Id.* at 428-29 (citations omitted).

### 2.    There is a Substantial Relation Between the Government's Interest in Identifying Potential Crimes and the Records Sought

As argued *supra*, a motion to quash on relevance grounds must be denied unless the movant shows that there is no "reasonable possibility" that the records sought will "produce information relevant to the general subject of the grand jury's investigation." *R. Enters., Inc.*, 498 U.S. at 301. The NYOAG has not and cannot meet that burden. The records sought by the subpoenas have a

21

"reasonable possibility" of producing information relevant to the subject of the grand jury's investigation because such records could show whether the NYOAG Lawsuits were brought for nefarious and potentially illegal reasons.  Attorney General James's public statements reflect a plan to selectively target the NRA and President Trump. The records sought, particularly any that discuss, reveal, or reflect the Attorney General's decision making in a non-privileged and non-work product protected setting, are classically relevant where the government would have to prove a bad purpose in a prosecution under 18 U.S.C. §§ 241 or 242.

### 3. The Grand Jury's Subpoenas and The Records They Seek Are Not an Unduly Broad Means of Investigation

As noted above, the subpoenas relate to whether any federal crimes have been committed in connection with just two of the many cases brought by the NYOAG over the past several years. The subpoenas seek copies of case files and a *select* subset of communications surrounding the cases (*i.e.*, those that are not privileged). The NYOAG Lawsuits are beyond the trial phase. Thus, compliance with the subpoenas will not impact the NYOAG's ability to continue to litigate nor prevent the NYOAG from continuing or initiating other investigations and cases. Further, it makes sense for a grand jury investigation to focus on the NYOAG Lawsuits because Attorney General James went to great lengths to express her desire to initiate and pursue those matters, even where (at least in the case of the Trump Lawsuit) her actions appear to be unprecedented under New York State law and ignored the myriad commercial cases filed in New York every year where one sophisticated party accuses another of fraud (which none of the purportedly defrauded lenders in the Trump Lawsuit even alleged). *See* Ex. 1 at 242 (Friedman, J., concurring in part and dissenting in part).

### E. The Subpoenas are Not Overbroad, Unduly Burdensome, and Seek Only Non-Privileged Records

22

The NYOAG argues that "both [subpoenas] seek privileged information," Quash Mot. at 34, but that is simply not true. The subpoenas make clear that they do *not* seek privileged information. The NYOAG also argues that the subpoenas are overbroad because they seek information "which would have no conceivable relevance to supposed civil rights violations by [NYOAG]." Quash Mot. at 34-35. As described *supra*, however, the NYOAG is not entitled to discovery about the grand jury's investigative theory. Broadly speaking, however, documents related to allegedly abusive and potentially illegal selective prosecutions are relevant to whether a crime has been committed, such as whether the NYOAG, acting under color of law, deprived anyone connected to the Trump Lawsuit or the NRA Lawsuit of rights protected by the United States Constitution.

The NYOAG next argues that it would be too difficult to produce evidence that "at least 100 lawyers, paralegals, and other [NYOAG] employees" worked on over a period of years. Quash Mot. at 35. Ironically, NYOAG claims that it has the resources to litigate matters involving 100 staff members but cannot possibly marshal the resources to produce documents upon which these lawsuits were based. This, despite its ability to use those documents to successfully prosecute a six-week jury trial against the NRA, Quash Mot. at 2, followed by a two-week bench trial on remedies, Quash Mot. at 3, and an eleven-week bench trial against President Trump, Quash Mot. at 7, the latter of which resulted in an appellate record of more than 49,000 pages, *see* Ex. 1 at 17 (Moulton, J., concurring). Even this, apparently, is too burdensome for the NYOAG to produce, as they have neither produced nor offered to produce records already sent to courts. The government stands ready to meet and confer regarding the scope of the subpoenas and to accept documents in phases to ease the production burden on the NYOAG.

23

At the early stages of investigation, grand jury subpoenas are necessarily broad, as the grand jury does not know what it does not know. As explained by the Supreme Court:

> The function of the grand jury is to inquire into all information that might possibly bear on its investigation until it has identified an offense or has satisfied itself that none has occurred. As a necessary consequence of its investigatory function, the grand jury paints with a broad brush. "A grand jury investigation is not fully carried out until every available clue has been run down and all witnesses examined in every proper way to find if a crime has been committed."

*Branzburg*, 408 U.S. at 701 (quoting *United States v. Stone*, 429 F.2d 138, 140 (2d Cir. 1970)).

The Second Circuit has similarly explained that "subpoenas duces tecum are often drawn broadly, sweeping up both documents that may prove decisive and documents that turn out not to be. This practice is designed to make it unlikely that a relevant document will escape the grand jury's notice, and it is generally effective." *United States v. Triumph Capital Group*, 544 F.3d 149, 169 (2d Cir. 2008); *see also In re Grand Jury Proceedings*, 616 F.3d 1186, 1203 (10th Cir. 2010) ("Such a process necessarily involves a fishing expedition by the grand jury, but such fishing is permissible so long as it is not an *arbitrary* fishing expedition and satisfies the *R. Enterprises* relevancy standard." (citing 489 U.S. at 299) (emphasis in original)).

The Fourth Circuit addressed a reasonableness challenge to the scope of grand jury subpoenas served on four related health care providers that involved the production of "more than 15,000 patient files alone, consisting of between 750,000 and 1.25 million pages of material." *In re Subpoena Duces Tecum (Bailey)*, 228 F.3d 341, 345 (4th Cir. 2000). The Fourth Circuit ruled that the subpoenas were not unreasonable:

> Thus, if Bailey had treated 15,000 patients over a period of seven years and all of them were reimbursed on claims he submitted, a suspicion of fraud on these claims would justify a review of Bailey's documentation of services to these patients, of the claims submitted

24

> on their behalf, and of the reimbursements collected. Even though
> these documents might be numerous, they would reasonably relate
> to and further the government's legitimate inquiry.

*Id.* at 350; *see also In re Subpoena Duces Tecum (Local 627)*, 203 F. Supp. 575, 578-79 (S.D.N.Y.

1961) (denying motion to quash subpoena calling for 18 years' worth of records); *In re August,

1993 Regular Grand Jury*, 854 F. Supp. 1392, 1401 (S.D. Ind. 1993) (explaining that a subpoena

for "every record of the corporation" for three years would not be unreasonable if the records relate

to the investigation).

Some subpoenas are inherently unduly burdensome, such as when a subpoena "is

repetitive" of a prior one resulting in the production of 4 million pages of documentation, as the

recipient "should not be burdened with the task of insuring against duplication," *In re Grand Jury

Investigation (Oshkosh Truck Corp.*), 746 F. Supp. 866, 867 (E.D. Wis. 1990), or when a subpoena

to a state agency seeks six years' worth of emails from a former governor with "no limitation on

the content, senders, or recipients of the emails," *In re Grand Jury subpoena*, *JK-15-029*, 828 F.3d

1083, 1088-89 (9th Cir. 2016).

Here, by contrast, the subpoenas focus on just two of the scores of investigations and

lawsuits the NYOAG has pursued over the past several years. These are not just any lawsuits –

they are ones appearing to fulfill repeated and public campaign promises by Attorney General

James to target the NRA and Donald Trump, and the resulting Trump Lawsuit was concerning

enough to a sitting Appellate Division Judge that he claimed it was beyond a reasonable doubt that

it "was commenced not to vindicate the public interest . . . but out of partisan political motives."

Ex. 1 at 248 (Friedman, J., concurring in part and dissenting in part).

In the state sovereignty portion of its brief, the NYOAG argues that under *Printz v. United

States*, 521 U.S. 898 (1997), the subpoenas should be quashed because they infringe the state's

sovereignty given the extent of the effort it would take the NYOAG to respond. *See* Quash Mot. at 27. *Printz* concerned a wholly inapplicable scenario where federal legislation imposed affirmative burdens on state and local governments to implement federal gun control legislation by requiring the chief law enforcement officer of each jurisdiction to perform background checks. *Id.* at 904 ("[I]t is apparent that the Brady Act purports to direct state law enforcement officers to participate, albeit only temporarily, in the administration of a federally enacted regulatory scheme."). In *Printz*, "the whole *object* of the law is to direct the functioning of the state executive, and hence to compromise the structural framework of dual sovereignty." *Id.* at 900. The NYOAG's protestations about the burdens of complying with the subpoenas notwithstanding, nothing about them requires the NYOAG to take or not take any state law enforcement action or to implement or assist in the implementation of any federal legislation.

### F. The Grand Jury Had the Authority to Issue the Subpoenas, and Mr. Sarcone Had the Authority to Sign the Accompanying Cover Letter

The NYOAG contends that the subpoenas should be quashed because Acting United States Attorney John A. Sarcone III is not duly occupying that position. The NYOAG's argument is irrelevant for two reasons and wrong in any event.

#### 1. Rule 17 Does Not Permit a Quash Motion Based on the Acting United States Attorney's Purported Lack of Authority

The only enumerated bases for a recipient of a grand jury subpoena to seek to quash or modify are "if compliance would be unreasonable or oppressive." Fed. R. Crim. P. 17(c)(2). Rule 17 does not permit a recipient of a grand jury subpoena to seek to quash it simply because the person acting as United States Attorney is purportedly not properly occupying that role. *Cf. Blair v. United States*, 250 U.S. 273, 282-83 (1919) ("Witnesses are not entitled to take exception to the jurisdiction of the grand jury or the court over the particular subject-matter that is under

26

investigation. In truth it is in the ordinary case no concern of one summoned as a witness whether the offense is within the jurisdiction of the court or not."). This makes sense, because the grand jury does not derive its authority from the United States Attorney. Rather, it has its own authority to investigate as part of its distinct Constitutional role. *R. Enters., Inc.*, 498 U.S. at 297; *cf. In re Grand Jury Proceeding*, 971 F.3d 40, 50 (2d Cir. 2020) (grand jury subpoena served by government in name of expired grand jury was "invalid from its inception" because grand jury was no longer empaneled). As far as the government's research has revealed, no court has held that a grand jury subpoena may be quashed because of a purported defect in the structure of the United States Attorney's Office in the federal district where the grand jury is duly empaneled.

## 2. Mr. Sarcone is Authorized to Supervise the Grand Jury Investigation in this Case

### a. Factual Background

On February 17, 2025, Carla B. Freedman, the United States Attorney for the Northern District of New York appointed by the previous president and confirmed by the Senate, left office. *See* https://www.justice.gov/usao-ndny/pr/carla-freedman-concludes-her-service-united-states-attorney (last visited Oct. 8, 2025). By virtue of the default provisions of the Federal Vacancies Reform Act ("FVRA"), 5 U.S.C. § 3345(a)(1), Daniel Hanlon, who was then First Assistant United States Attorney ("FAUSA") for the district, became Acting United States Attorney. On February 28, 2025, the Attorney General appointed Mr. Sarcone as United States Attorney pursuant to 28 U.S.C. § 546, effective March 17, 2025. *See* Ex. 15. Pursuant to that statute, Mr. Sarcone was authorized to serve as United States Attorney on an interim basis for 120 days. *See* 28 U.S.C. § 546(c)(2).

On July 14, 2025 – the last day of Mr. Sarcone's interim period and after the Board of Judges declined to exercise its authority pursuant to 28 U.S.C. § 546(d) to appoint a United States Attorney – then FAUSA Daniel Hanlon was reassigned to Deputy United States Attorney. *See* Exs. 16, 17. The Attorney General directed that, effective the following day, July 15, 2025, Mr. Sarcone be appointed as a Special Attorney under authority including 28 U.S.C. §§ 509, 510, and 515. *See* Exs. 14, 19, & 20. Mr. Sarcone also was designated as FAUSA. *See* Exs. 19 & 20. He therefore began serving as Acting United States Attorney under the default provision of the FVRA, 5 U.S.C. § 3345(a)(1), on July 15, 2025. He continues to serve in that role today.[2]

### b.    Analytical Framework

United States Attorneys are authorized to represent the United States in all litigation occurring within their district "[e]xcept as otherwise provided by law," 28 U.S.C. § 547. By statute, however, United States Attorneys are appointed by the President, subject to the advice and consent of the Senate, *id.* § 541(a), for a "term of four years," plus continuing service until a successor is appointed and takes office, *id.* § 541(b). United States Attorneys are subject to the "direct[ion]" of the Attorney General in the discharge of their duties, *id.* § 519, and are "subject to removal by the President," *id.* § 541(c).

---

[2] On July 14, 2025, Mr. Sarcone sent a letter to the United States District Court for the Northern District of York dated that day and regarding his status as Acting United States Attorney. *See* Ex. 18. Mr. Sarcone's appointment as Special Attorney and designation as FAUSA were effective July 15, 2025, not July 14, 2025. On October 8, 2025, the Attorney General confirmed that EOUSA's appointments were at her "direction and with" her "approval" and "[f]or the avoidance of doubt . . . ratif[ied] Mr. Sarcone's appointment as Special Attorney and designation as First Assistant United States Attorney for the Northern District of New York, as of July 15, 2025." *See* Ex. 20. The discrepancy in the initial letter has no impact on Mr. Sarcone's status as Acting United States Attorney.

When a United States Attorney resigns or otherwise vacates his office, Congress has provided three methods for allowing someone to perform the duties of that office on a temporary basis—and ensuring the uninterrupted functioning of the United States Attorney's Office—until a new Senate-confirmed United States Attorney takes office. Each of those methods has specific rules, benefits, and drawbacks. It is typically up to the President, or principal officers acting on his behalf, to decide which method is best suited to the circumstances, and those methods generally supplement each other.

First, in 28 U.S.C. § 546, Congress authorized the Attorney General to "appoint a United States attorney for the district in which the office of United States attorney is vacant" to serve on an interim basis for 120 days or until a Senate-confirmed United States Attorney takes office. *Id.* § 546(a), (c). The Attorney General may not appoint someone whose nomination has been rejected by the Senate, but a pending nominee may serve as interim U.S. Attorney. *Id.* § 546(b). If an interim appointment expires, and the vacancy has not otherwise been filled, the district court may appoint an interim United States Attorney. *Id.* § 546(d).

Second, in the generally applicable FVRA, Congress authorized certain individuals to temporarily perform the duties of a vacant office "in an acting capacity," 5 U.S.C. § 3345(a)(1), subject to specified time limitations, *id.* § 3346. The default rule is that the "first assistant" to the vacant office serves as the "acting officer," *id.* § 3345(a)(1), unless the President designates a Senate-confirmed officer or a senior agency employee to serve in that role, *id.* § 3345(a)(2)–(3). The FVRA generally prohibits current nominees for an office from filling the vacancy on an acting basis, unless they served as the first assistant for at least 90 days within the year preceding the vacancy. *Id.* § 3345(b)(1); *see NLRB v. SW Gen., Inc.*, 580 U.S. 288, 305 (2017). The FVRA is the "exclusive means" for authorizing an "acting official" to temporarily perform the duties of a vacant

29

office, "unless" Congress has expressly provided otherwise or the President makes a recess appointment. 28 U.S.C. § 3347(a). Where Congress has enacted an agency-specific statute that provides a means for acting service, both that statute and the FVRA are available. 28 U.S.C. § 3347(a); *see also Hooks v. Kitsap Tenant Support Servs., Inc.*, 816 F.3d 550, 556 (9th Cir. 2016).

Third, Congress has authorized the Attorney General to delegate authority, including the nonexclusive duties of a United States Attorney, to other Department officers or employees. The Attorney General is the "head of the Department of Justice," 28 U.S.C. § 503, and is vested with "[a]ll functions" of the Department's officers, agencies, and employees, subject to narrow exceptions not relevant here, *id.* § 509. That includes the United States Attorneys' functions to conduct litigation in their districts. Indeed, § 515(a) specifies that the Attorney General may "conduct any kind of legal proceeding, civil or criminal, . . . which United States attorneys are authorized by law to conduct." Congress also independently vested the Attorney General with plenary authority to conduct and supervise litigation on behalf of the United States. *See id.* §§ 516– 19.

The Attorney General has unquestioned authority to appoint various attorneys within the Department and to delegate her functions to those attorneys. Congress has specifically empowered the Attorney General to appoint other attorneys to carry out the Department's functions, including special attorneys and special assistants to the Attorney General, *id.* § 515(a), Assistant United States Attorneys, *id.* § 542(a), special attorneys to assist United States Attorneys, *id.* § 543, and other "officials" to "detect and prosecute crimes against the United States," *id.* § 533(1). And the Attorney General may delegate "any function of the Attorney General" to "any other officer, employee, or agency of the Department of Justice," *id.* § 510, and may direct any Department officer "or attorney specially appointed by the Attorney General under law" to "conduct any kind

30

of legal proceeding, civil or criminal, . . . which United States attorneys are authorized by law to conduct," *id*. § 515(a); *see also id.* § 518(b).

> **c.**    **Mr. Sarcone Properly Holds the Acting United States Attorney Position**

Under the FVRA, when an Executive Branch office subject to Presidential appointment and Senate confirmation (a "PAS" office) becomes vacant due to the resignation of the incumbent officeholder, another official may perform all the functions of that office on an acting basis. *See* 5 U.S.C. § 3345(a). There is no dispute that the office of the United States Attorney for the Northern District of New York is a PAS office in the Executive branch subject to the FVRA, *see* 28 U.S.C. § 541; 5 U.S.C. §§ 101, 105, and that it is vacant. Accordingly, the FVRA permits the Executive Branch to appoint an acting officer to temporarily exercise the functions and duties of that office.

As explained, § 3345(a) identifies three categories of individuals who may perform the functions of a vacant office on an acting basis. The President may designate another PAS officer, or certain other agency officers or employees, to serve as the acting official. 5 U.S.C. § 3345(a)(2)– (3). If the President does not make such a selection, the "first assistant to the office" shall, by default, "perform the functions and duties of the office temporarily in an acting capacity," subject to statutory time limits. *Id.* § 3345(a)(1).

That default provision is at issue here. As explained above, the last day of Mr. Sarcone's term as Interim United States Attorney was July 14, 2025. Effective the following day, pursuant to authority including 28 U.S.C. §§ 509, 510, and 515, Mr. Sarcone was designated a Special Attorney and the FAUSA. *See* Exs. 14, 19, & 20. Accordingly, under the default provision of the FVRA, as of July 15, 2025, Mr. Sarcone "shall perform the functions and duties of the office" of

United States Attorney "in an acting capacity," subject to the time limits of the FVRA. 5 U.S.C. § 3345(a)(1).

Notwithstanding that statutory authorization, movants argue that Mr. Sarcone cannot perform the duties of the United States Attorney in an acting capacity because he was not the FAUSA when the last Senate-confirmed United States Attorney resigned and the vacancy first arose. *See* Quash Mot. at 32. That contention lacks merit. The FVRA does not require a first assistant to be an incumbent *at the moment* the vacancy arose in order to serve as an acting PAS officer under the default provision in § 3345(a)(1).

There is no basis for such a requirement in the statutory text. A "vacant office" under § 3345(a) is a continuing state. The statute provides that "[i]f" a PAS officer "dies, resigns, or *is* otherwise unable to perform" the functions of the office—present tense—then the first assistant "shall perform" those functions in an acting capacity. 5 U.S.C. § 3345(a) (emphasis added). Mr. Sarcone's appointment complies with the plain meaning of that provision: the office of United States Attorney was vacant when he was designated as FAUSA and remains vacant, so Mr. Sarcone "shall perform" the duties of the office of United States Attorney on an acting basis (subject to statutory time limits). *Id.* The NYOAG's contrary interpretation ignores the present-tense phrasing of the statute and the ongoing nature of a vacancy. Moreover, the FVRA provides that, if a vacancy exists, "the first assistant *to the office* of such officer shall perform the functions and duties of the office temporarily in an acting capacity." *Id.* (emphasis added). The statute does not require the individual to have been serving as the first assistant to any particular PAS officeholder, much less at any particular time. The upshot is that whoever is the first assistant to a vacant office, at any time during the period of the vacancy, automatically becomes the acting officer, subject to the FVRA time limits—as one would expect. Contrary to the NYOAG's

argument, the FVRA does not impose a counterintuitive limitation that restricts acting service only to the individual (assuming there was one) who happened to be serving as the first assistant to the PAS officeholder when the vacancy initially arose.

Indeed, Congress knew how to impose an "already-in-place" requirement. Elsewhere in the same section, Congress explicitly imposed backward-looking eligibility requirements that turn on a person's status during the time preceding the vacancy. When "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (cleaned up). Two paragraphs later, in § 3345(a)(3), Congress made ineligible for a presidential acting-officer designation any official who had not served in the agency for at least 90 days in the year before the vacancy arose. In the next subsection of the statute, as well, Congress prohibited having an acting official also be the nominee for the vacant office unless the nominee had served as the first assistant for at least 90 days before the vacancy arose. *See id*. § 3345(b)(1)(A). Both provisions turn on the state of affairs during the time period immediately preceding the vacancy. No such backward-looking eligibility requirement, however, applies to an official who is appointed first assistant under § 3345(a)(1) and is not the nominee for the position in question. To the contrary, the general prohibition on a nominee serving as an "acting officer" expressly contemplates that a first assistant may serve as an acting officer even if he "did not serve in the position of first assistant" prior to the vacancy, § 3345(b)(1)(A)(i), so long as he is not also the nominee, *id.* § 3345(b)(1)(B).

That plain-text interpretation of the FVRA is both straightforward and longstanding. Indeed, the Government Accountability Office ("GAO")—a component of the Legislative Branch statutorily charged with monitoring FVRA compliance, *see* 5 U.S.C. § 3349(b)—has long agreed

that a first assistant may serve as an acting officer under the FVRA even if he does not become first assistant until after the vacancy first arose. *See* Letter from Victor S. Rezendes, Managing Director, Strategic Issues, GAO to U.S. Senators Joseph I. Lieberman and Dan Burton (Dec. 7, 2001), *available at* https://www.gao.gov/assets/gao-02-272r.pdf. The Department of Justice's Office of Legal Counsel ("OLC"), which provides controlling advice to Executive Branch officials on questions of law concerning FVRA compliance, has taken the same position. *See* Designation of Acting Associate Attorney General, 25 Op. O.L.C. 177, 179-81 (2001).

That interpretation makes sense. The default nature of the provision does not suggest that it "only triggered at the moment the Senate-confirmed U.S. Attorney departs from the role[.]" *See* Quash Mot. at 32. A vacancy is a continuing thing, and the automatic and present-tense nature of § 3345(a)(1)'s default rule means that whoever is serving as the first assistant at a particular moment in time during the vacancy automatically becomes the acting official for the specified period, unless the President instead invokes (a)(2) or (a)(3). If only the "already-in-place" first assistant were eligible to serve, then § 3345(a)(1) would be less useful as an automatic default rule. There are approximately 1,000 PAS officials in the Executive Branch,[3] and § 3345(a)(1) applies to first assistants precisely because an agency head can often ensure that there is a first assistant in place, so the President does not have to personally fill every PAS vacancy that arises.

This interpretation of the first-assistant provision in 5 U.S.C. § 3345(a)(1) does not, as the NYOAG argues, permit an "end-run around the carefully crafted statutory scheme of the FVRA."

---

[3] *See* Center for Presidential Transition, Presidential Transition Guide 93 (2023), *available at* https://presidentialtransition.org/wp-content/uploads/sites/6/2023/11/2023-Presidential-Transition-Guide.pdf (compiling data from the 2016 United States Government Policy and Supporting Positions (Plum Book)).

*See* Quash Mot. at 33. There are at least two significant circumstances where the President cannot rely on subsection (a)(1) to select an acting officer and thus subsections (a)(2) and (a)(3) continue to play an important role. When the first assistant position is itself a PAS office, (a)(1) is unavailable because the Executive Branch cannot appoint a first assistant without Senate confirmation. Instead, the President must use (a)(2) or (a)(3). That is often the case for the highest positions in agencies. *See, e.g.*, 22 U.S.C. § 2651a(a)(2) (both Secretary of State and Deputy Secretary are PAS offices). Subsections (a)(2) and (a)(3) also play a distinct role when the President wants to leave the current first assistant in place and appoint someone else to be the acting officer—*e.g.*, because the individual serving as first assistant is the best suited to perform the important second-in-command functions of a first assistant. *See generally, e.g.*, *Designating an Acting Attorney General*, 42 Op. O.L.C. 182 (2018) (discussing the designation of Matthew Whitaker as Acting Attorney General under § 3345(a)(3)). Those provisions are far from superfluous, and do not require reading into § 3345(a)(1) a limitation that does not exist.

Accordingly, upon assuming the position of FAUSA, Mr. Sarcone automatically began serving as the Acting United States Attorney, subject to the time limits set forth in the FVRA.

> ### d.    Regardless, as a Special Attorney, Mr. Sarcone is Empowered to Conduct Grand Jury Proceedings

Regardless of whether Mr. Sarcone is properly serving as the Acting United States Attorney (he is), at a minimum Mr. Sarcone can conduct grand jury proceedings in his capacity as Special Attorney and FAUSA based on the Attorney General's delegation of authority to him. His appointment as a Special Attorney under § 515 vests him with at least the same authority of a line Assistant United States Attorney in the Northern District of New York. As the Second Circuit held 45 years ago:

> [T]he Attorney General has authority to assign other officers of the
> Department of Justice, not only under 28 U.S.C. § 515, but also
> under the other statutes giving [her] power over criminal litigation.
> If it were otherwise, [her] broad power to enforce the criminal laws
> of the United States would be seriously hampered at its inception –
> the initiation of a criminal case by presenting evidence before grand
> juries.

*In re Persico*, 522 F.2d 41, 55 (2d Cir. 1975).

Moreover, courts have repeatedly recognized that:

> Assistant United States Attorneys derive their power to prosecute
> directly from the Attorney General, not from a United States
> Attorney. While United States Attorneys supervise and direct the
> Assistant United States Attorneys assigned to their offices, it does
> not follow that Assistant United States Attorneys lack the power to
> prosecute in the absence of a duly-appointed United States Attorney.
> Indeed, in the event of a vacancy in the office of the United States
> Attorney, Assistant United States Attorneys retain prosecutorial
> authority, as originally delegated to them by the Attorney General,
> subject to the supervision of the Attorney General and the
> Department of Justice.

*United States v. Baldwin,* 541 F. Supp. 2d 1184, 1196 (D.N.M. 2008) (citing 28 U.S.C. §§ 519,

542(a)). The First Circuit likewise has concluded that Assistant U.S. Attorneys' "ability to act does

not hinge on the authority of the local United States Attorney, but derives from the Attorney

General's plenary power over litigation to which the United States is a party." *United States v.*

*Hilario*, 218 F.3d 19, 22 (1st Cir. 2000) (citing 28 U.S.C. § 516).

Pursuant to that authority, Mr. Sarcone as special attorney under § 515, and any assigned

Assistant United States Attorneys, can initiate and continue a grand jury investigation under their

delegated authority from the Attorney General, subject to supervision by Senate-confirmed

officials in Main Justice, including the Attorney General and the Deputy Attorney General.

Therefore, even were a grand jury to return an indictment presented by a United States Attorney's

Office without a properly acting United States Attorney, "this Court could not dismiss the

36

indictment on that basis." *United States v. Young*, 541 F. Supp. 2d 1226, 1235 (D.N.M. 2008); *see United States v. Ruiz Rijo*, 87 F. Supp. 2d 69, 71 (D.P.R. 2000) ("Even assuming that the United States Attorney's appointment is invalid, defendant's remedy would not be the dismissal of his indictment, for the appointment does not affect defendant's basic constitutional rights."), *aff'd sub nom. United States v. Valdez-Santana*, 279 F.3d 143 (1st Cir. 2002).

Further, "[t]he Attorney General's power to assign attorneys for a grand jury inquiry is of necessity as broad as the inquiry itself or, in other words, as broad an inquiry as 'United States attorneys are authorized by law to conduct.'" *In re Persico*, 522 F.2d at 56 (quoting 28 U.S.C. § 515); *see also generally In re U.S.*, 791 F.3d 945, 957-58 (9th Cir. 2015) ("The Attorney General has clear statutory authority to choose which attorneys will represent the United States in litigation. . . . . [A]rbitrary interference with the government's choice of counsel risks burdening the executive branch in the discharge of its duties."); *United States v. Weyhrauch*, 544 F.3d 969, 975 (9th Cir. 2008) (section 515 allows the Attorney General to delegate authority otherwise restricted to United States Attorneys to certain others, but by itself does not vest such individuals with the powers exclusive to the United States Attorney, such as personally certifying a government interlocutory appeal under 18 U.S.C. § 3731).

The NYOAG's contrary argument is that § 515 permits a Special Attorney to conduct grand jury proceedings "only 'when specifically directed by the Attorney General'" and "cannot be used to appoint a *de facto* U.S. Attorney through the expedient of a different title[.]" *See* Quash Mot. at 33. The only case the NYOAG points to, *In re Persico*, does not support its argument. In *In re Persico* the Second Circuit explained that the "[p]lain meaning [of § 515] arguably permits the Attorney General to give the assigned attorney a specific direction to conduct grand jury proceedings to the same extent as the United States Attorney. Upon this basis, then, the letter of

37

authorization might be deemed sufficient." 522 F.2d at 56-57. In any case, "a specific direction" "need not be embodied in a single written authorization, but may be implied from other writings, guidelines, practices and oral directions transmitted through a chain of command within the department." *Id.* at 66 (noting foregoing in context of an attorney regularly employed on a full-time basis by the Department of Justice). Here, Mr. Sarcone was employed full-time to act within the Northern District of New York and specifically "authorized to conduct in the Northern District of New York, any kind of legal proceedings . . . including Grand Jury proceedings . . . which United States Attorneys are authorized to conduct," reporting to and under the direction of the Attorney General or her delegee. *See* Ex. 14. The NYOAG provides no evidence that Mr. Sarcone's actions were outside the scope of the initial § 515 authorization or the implications from the writings, guidelines, practices, and oral directions transmitted within the Department of Justice. Furthermore, even putting § 515 aside, the Attorney General has unquestioned authority to appoint attorneys within the Department of Justice and to delegate her functions to those attorneys, *see* 28 U.S.C. §§ 542, 543, 533(1), and her order appointing Mr. Sarcone as a Special Attorney and designating him FAUSA was based on authority "including" § 515. *See* Ex. 20.

The district court's decision in *United States v. Giraud*, -- F. Supp. 3d --, 2025 WL 2416737 (D.N.J. Aug. 21, 2025), disqualifying Acting United States Attorney Alina Habba of the United States Attorney's Office for the District of New Jersey from prosecuting defendants and supervising the prosecution of their cases, does not support quashing the subpoenas.[4] *Giraud* declined to dismiss an indictment presented to a grand jury while Ms. Habba's as Acting United

---

[4] The government's appeal of this decision to the United States Court of Appeals for the Third Circuit is pending. *See* 25-2635.

States Attorney. More recently, in *United States v. Garcia*, 2025 WL 2784640 (D. Nv. Sept. 30, 2025), another district court denied a defendants' motion to dismiss an indictment on the ground that the Acting United States Attorney lacked authority. The district court reasoned that "Assistant U.S. Attorneys also have the power to prosecute offenses against the United States, and their power derives not from the U.S. Attorney but from the Attorney General." *Id.* at *16. The remedy the NYAOG seeks here – quashing the subpoenas – is simply not available even if Mr. Sarcone is not properly holding the office of Acting United States Attorney because, as a Special Attorney, he had authority to conduct grand jury proceedings. *See also Ruiz Rijo*, 87 F. Supp. 2d at 71 (remedy not dismissal of indictment even if United States Attorney appointment invalid); *Young*, 541 F. Supp. 2d at 1235 (same).

### III.    The Motion to Unseal Should be Denied

So as not to compromise the ongoing investigative work of an active grand jury sitting in the Northern District of New York, this Court should deny the NYOAG's Unseal Motion.

Allowing the public access to the courts ensures a measure of accountability and fosters public confidence, but there are good reasons for courts to keep parts of some proceedings confidential. *Lugosch v. Pyramid Co.*, 435 F.3d 110, 119, 124 (2d Cir. 2006). This is one such occasion. Grand jury investigations are, by their nature, conducted in secret. As a result, judicial proceedings about grand jury matters are often conducted under seal to protect the broader secrecy interest both in preindictment investigation and for people who might be called to appear before a grand jury. Fed. R. Crim. P. 6(e); *see Douglas Oil Co. v. Petrol Stops Northwest*, 441 U.S. 211, 218 (1979); *In re Motions of Dow Jones & Co.*, 142 F.3d 496, 500, 504 (D.C. Cir. 1998); *Craig v. United States (In re Craig)*, 131 F.3d 99, 101-02 (2d Cir. 1997). Despite the strong presumptive need for secrecy in a grand jury's work, Rule 6(e)'s secrecy requirement is not absolute, and, at

least in the Second Circuit, district courts have discretion in evaluating whether there are "special circumstances" for giving the public access to some, or all, of a matter surrounding a grand jury's action. *In re Biaggi*, 478 F.2d 489, 492, 494 (2d Cir. 1973); *In re Craig*, 131 F.3d at 106.[5]

The *In re Craig* Court recommended that district courts consider nine non-exhaustive factors in assessing whether there are "special circumstances" warranting full or partial public disclosure. 131 F.3d at 106-07. The nine factors are:

(i)     the identity of the party seeking disclosure;

(ii)    whether the defendant to the grand jury proceeding or the government opposes the disclosure;

(iii)   why disclosure is being sought in the particular case;

(iv)    what specific information is being sought for disclosure;

(v)     how long ago the grand jury proceedings took place;

(vi)    the current status of the principals of the grand jury proceedings and that of their families;

(vii)   the extent to which the desired material – either permissibly or impermissibly – has been previously made public;

(viii)  whether witnesses to the grand jury proceedings who might be affected by disclosure are still alive; and

(ix)    the additional need for maintaining secrecy in the particular case in question. *Id*.

---

[5] The Second Circuit's *In re Craig* decision – holding that district courts have inherent authority to go beyond the exception categories in Rule 6(e) concerning disclosure of otherwise secret information – is inconsistent with the Eleventh Circuit's decision in *Pitch v. United States*, 953 F.3d 1226 (11th Cir. 2020) and the First Circuit's decision in *In re Petition for Order Directing Release of Records*, 27 F.4th 84 (1st Cir. 2022) (discussing circuit split on this issue). But even assuming district courts within the Second Circuit have inherent authority beyond the scope of Rule 6(e), they ought to be very reluctant to unseal litigation involving an active grand jury investigation, as the *In re Craig* decision reflects and as is discussed further.

A balancing of these nine factors shows that there are not "special circumstances" here, and the NYOAG's Motion should be denied.

### A. Factors #1 & #2: The Identity of the Party Seeking Disclosure and the Position of the Parties Regarding Disclosure

The NYOAG claims that, as the recipient of the subpoenas, its interest in unsealing ought to be given extra weight because a primary reason for secrecy is to protect subpoena recipients from public disclosure of their involvement in a criminal investigation. But the interest of the grand jury investigation more broadly, including the government's interest in keeping grand jury matters sealed, outweighs any one subpoena recipient's interest in disclosure, particularly where the grand jury's investigation is in its preliminary stages and lifting the seal would not remove the government's Rule 6(e) obligations or provide the public a full picture of the scope of the grand jury's investigation. At best, this factor is neutral.

### B. Factors #3 & #4: The NYOAG's Grounds for Disclosure and the Specific Information it Seeks to Have Unsealed

The NYOAG argues that there is a "public interest" in disclosing its Quash Motion and the ensuing litigation because it contends that the subpoenas were issued in bad faith and unduly infringe upon the State of New York's sovereignty. But that begs the question. As discussed *supra*, the NYOAG's arguments are wrong. At a minimum, this argument counsels the Court to defer a ruling on unsealing until it resolves the Quash Motion and any ensuing appeals. In the interim, nothing prevents the NYAOG from speaking publicly about its receipt of the subpoenas, and it has spoken.

None of the cases the NYOAG cites where courts have held that certain grand jury materials should be unsealed to serve the public's interest apply here. *See* Unseal Mot. at 7-8. Rather, they all involve courts ordering the unsealing of *evidence* gathered pursuant to a grand

jury's investigation. In this case, the NYOAG has yet to produce any records (and presumably is not offering to publicly disclose any responsive records) not already in the public purview.

Until the NYOAG seeks the disclosure of *evidence* gathered by the grand jury, or the grand jury completes its investigation, the NYOAG's reasons for disclosure do not warrant unsealing of its Quash Motion.

### C.     Factors #5 & #6: The Age of the Underlying Grand Jury Proceeding and the Current Status of any Principals or Their Families

The Northern District of New York grand jury was empaneled on ███████████, and is still actively sitting. This is not a situation where the matter was resolved in the past, and an interested entity seeks publication of historical grand jury documents. Even then, courts are rightly reluctant to release grand jury materials. *See In re Craig*, 131 F.3d at 101, 107; *United States v. Index Newspapers LLC*, 766 F.3d 1072, 1086 (9th Cir. 2014) (district court appropriately declined to unseal transcripts and filings related to witness's motion to quash because newspaper filed its motion when investigation was still ongoing, it was predictable that briefs and oral argument concerning motion would contain information about matters occurring or anticipated to occur before grand jury, and that would risk revealing where investigation was heading and thwarting it); *United States v. McDougal*, 559 F.3d 837, 841 (8th Cir. 2009) (contemnor's sealed records from civil contempt proceeding charging refusal to testify before Whitewater grand jury did not warrant disclosure); *Carlson v. United States*, 837 F.3d 753, 764-67 (7th Cir. 2016) (affirming on abuse of discretion standard, over a dissent, release of grand jury transcripts in Espionage Act investigation 70 years later); *Pitch v. United States*, 953 F.3d 1226, 1229 (11th Cir. 2020) (reversing district court's order releasing grand jury transcripts related to the "Moore's Ford Lynching – a horrific event involving the murders of two African American couples for which no

42

one has ever been charged" because "Rule 6(e) is exhaustive" and because "district courts do not possess inherent, supervisory power to authorize the disclosure of grand jury records outside of Rule 6(e)(3)'s enumerated exceptions").

Also, the subpoenas were issued to the NYOAG itself rather than to any individuals. Although Attorney General James served as the Attorney General for the State of New York during the relevant timeframe, no individual, including Attorney General James, have been identified as targets of the investigation. These two factors weigh in favor of the government.

### D.    Factor #7: The Extent to Which the Desired Materials to be Made Public – Either Permissibly or Impermissibly – Have Been Previously Made Public

The existence of the subpoenas is known to the public. *See* Decl. of Hailyn J. Chen. Many of the news reports cited by the NYOAG also opine about the likely nature of the grand jury's investigation. *See id*. However, many key details are not public, including whether and what records the grand jury may have already obtained; whether any individual(s) have testified before the grand jury or will testify (and, if so, information about such individual(s)); which potential violation(s) of federal criminal law under investigation; and, of course, what records the NYOAG would actually produce in response to the subpoenas if not quashed.

The NYOAG accuses the government of violating Rule 6(e) because certain reporting cited anonymous well-placed sources as claiming that the grand jury's investigation concerned potential violations of civil rights laws, arguing that this purported violation essentially estops the government from seeking to keep this litigation sealed. But the NYOAG's claims about a Rule 6(e) violation are complete speculation. Indeed, some or all the well-placed sources cited in news reports could work for the NYOAG. In any event, an unsealing order cannot be based on guesswork regarding the identity of anonymous sources. Further, when the fact of a grand jury

subpoena or a grand jury investigation becomes public (which happens routinely whenever a witness without Rule 6(e) obligations makes a disclosure), that disclosure does not render everything about the grand jury's investigation public, nor remove the requirements of Rule 6(e). This factor weights in favor of the government.

E.     **Factors #8 & #9: Whether Witnesses to the Grand Jury Proceedings Who Might be Affected by Disclosure Are Still Alive, and Any Additional Needs for Secrecy Particular to the Grand Jury Investigation in Question**

As the Court held in *In re Biaggi*, "[i]t is a tradition of our law that proceedings before a grand jury shall generally remain secret. The Supreme Court has referred to this as a long established policy 'older than our Nation itself.'" 478 F.2d at 491, quoting *Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395, 399 (1959). Grand juries operate in secrecy for a variety of reasons, including ensuring that (i) the grand jurors have the utmost freedom in their deliberations; (ii) future grand jury witnesses will speak freely and are insulated from reprisals; (iii) grand jury witnesses who end up having to testify at trial are not tampered with; and (iv) the grand jurors themselves are protected. *Id.*; *In re Craig*, 131 F.3d at 101-02.

Not only are individuals who could conceivably be targets or subjects of the ongoing grand jury investigation likely still alive, but so are the numerous potential individuals who were witnesses to the decisions to investigate and litigate the NYOAG Lawsuits. The current investigation is undoubtedly significant, which the NYAOG itself argues. Secrecy will help the grand jury successfully operate and protect those who appear before the grand jury. These final two factors weigh in favor of the government.

IV.    **Conclusion**

For the reasons described above, the government respectfully urges this Court to deny the Quash Motion and the Unseal Motion.

44

Dated: October 8, 2025

                                                 JOHN A. SARCONE III
                                                 Acting United States Attorney

                                                 /s/ Richard D. Belliss
By:               _____
                                               Richard D. Belliss
                                             Assistant United States Attorney
                                             Bar Roll No. 515295

45