UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
                                         :

                                         :

IN RE GRAND JURY SUBPOENAS TO THE  :      25 Misc. 19 (LGS)
OFFICE OF THE NEW YORK STATE      :
ATTORNEY GENERAL                  :      **OPINION & ORDER**

                                         :

                                         :
-----------------------------------------------------------X

LORNA G. SCHOFIELD, District Judge, sitting by designation:

On August 5, 2025, a federal prosecutor, on behalf of the United States (the "Federal Government"), requested that grand jury subpoenas be issued to a state prosecutor -- the office of New York's Attorney General, Letitia James (the "State Government"). The subpoenas signaled an ongoing federal criminal investigation into two civil cases brought by the State of New York against President Donald J. Trump and the National Rifle Association ("NRA"). John A. Sarcone III, the recently installed Acting U.S. Attorney for the Northern District of New York ("NDNY") personally directed the issuance of both subpoenas; his is the only name on the subpoenas and the documents sought are returnable to him personally.

The State Government moves to quash the subpoenas. It argues, among other things, that the subpoenas intrude on New York's sovereignty and that they were issued in retaliation for the State's civil cases against President Trump and his political allies. The U.S. Attorney's Office for the NDNY opposes the motion on behalf of the Federal Government. The State Government's federalism and retaliation arguments need not be addressed at this stage. The subpoenas are unenforceable due to a threshold defect: Mr. Sarcone was not lawfully serving as Acting U.S. Attorney when the subpoenas were issued.

Mr. Sarcone's service was and is unlawful because it bypassed the statutory requirements that govern who may exercise the powers of a U.S. Attorney. U.S. Attorneys must be nominated by the President and confirmed by the Senate. When a vacancy arises, federal law provides limited alternatives to fill the position temporarily. None authorized Mr. Sarcone to serve as Acting U.S. Attorney on August 5, 2025, when he relied on the authority of the office to request the subpoenas.

The U.S. Attorney General initially appointed Mr. Sarcone as Interim U.S. Attorney for 120 days. When that term expired, this District's judges declined to use their statutory authority to extend his tenure. Federal law then required the use of other statutory procedures to fill the position. The Department of Justice did not follow those procedures. Instead, on the same day that the judges declined to extend Mr. Sarcone's appointment, the Department took coordinated steps -- through personnel moves and shifting titles -- to install Mr. Sarcone as Acting U.S. Attorney. Federal law does not permit such a workaround.

A growing body of persuasive authority reinforces this conclusion. Since August 2025, courts in New Jersey, Nevada and California have held that similarly installed Acting U.S. Attorneys lacked lawful authority. Most recently, in November 2025, the Third Circuit affirmed the New Jersey decision. The Eastern District of Virginia also reached a comparable result in a slightly different procedural posture. The analysis below follows the approach taken by these courts and reaches the same conclusion.

When the Executive branch of government skirts restraints put in place by Congress and then uses that power to subject political adversaries to criminal investigations, it acts without lawful authority. Subpoenas issued under that authority are invalid. The subpoenas are quashed, and Mr. Sarcone is disqualified from further participation in the underlying investigations. If the

Federal Government chooses to reissue substantially similar subpoenas through a lawfully authorized official, the State Government may renew its motion to quash on grounds not addressed in this decision.

## I.     BACKGROUND

The Office of the New York State Attorney General represents New York State and its agencies in legal matters, including by conducting civil and criminal investigations and bringing enforcement actions under state law.  Attorney General Letitia James currently heads the office. James has served as New York's Attorney General at all times relevant to this action.

### A.  Mr. Sarcone's Appointment

The previous, Senate-confirmed, U.S. Attorney for the NDNY, Carla B. Freedman, resigned on February 17, 2025.  When she resigned, her top deputy, First Assistant U.S. Attorney Daniel Hanlon, automatically began serving as Acting U.S. Attorney under the default provisions of the Federal Vacancies Reform Act ("FVRA"), 5 U.S.C. § 3345(a)(1).

On February 28, 2025, the U.S. Attorney General appointed Mr. Sarcone as Interim U.S. Attorney for the NDNY under 28 U.S.C. § 546.  The appointment order stated that Mr. Sarcone's term would take effect March 17, 2025, and expire after 120 days.  Section 546(c) permits an appointee to serve until the earlier of (1) 120 days after the interim appointment or (2) the appointment of a U.S. Attorney under § 541, which requires nomination by the President and confirmation by the Senate.  *See* 28 U.S.C. § 546(c)(1)-(2).  The White House never formally nominated Mr. Sarcone (or anyone else) as U.S. Attorney.  Accordingly, the Senate did not confirm a presidential nominee before Mr. Sarcone's interim appointment expired.

By statute, if no successor is in place when the 120-day period expires, a district court's Board of Judges may appoint a U.S. Attorney for the district.  *See* 28 U.S.C. § 546(d).  On

July 14, 2025, which the parties contend was the last day of Mr. Sarcone's 120-day interim period, the Board of Judges for the U.S. District Court for the NDNY "decline[d] to exercise the authority granted pursuant to 28 U.S. Code § 546(d)" to appoint a U.S. Attorney.

The same day, July 14, 2025, Mr. Sarcone sent a letter to the NDNY Chief Judge Brenda Sannes stating that (1) he had been appointed as a "Special Attorney" under 28 U.S.C. § 515; (2) he had been designated as the "First Assistant" for the NDNY and (3) by operation of the FVRA, he was "now serving as Acting U.S. Attorney for the Northern District of New York indefinitely." Mr. Sarcone enclosed the appointment letter from the Executive Office for United States Attorneys reflecting the Special Attorney appointment. The appointment letter states that Mr. Sarcone's appointment is indefinite, that he is authorized to conduct in the NDNY "any kind of legal proceedings, civil or criminal, including Grand Jury proceedings . . . which United States Attorneys are authorized to conduct," and that he will report to the "Attorney General or her delegee."

Also on July 14, 2025, the General Counsel for the Executive Office for United States Attorneys received and approved a written request to appoint Mr. Sarcone as First Assistant for a period of one year. Another government form states that the reason for the appointment as First Assistant is "Serving as Acting U.S. Attorney for a 210-day period (5 U.S.C. § 3346(a)(1))" and provides an effective date of July 15, 2025. The Department of Justice also reassigned then-First Assistant, Daniel Hanlon, to the role of "Deputy U.S. Attorney," or "Supervisory Assistant U.S. Attorney," stating as "the reason for the change" that "incumbent will be returned back to a line AUSA [Assistant U.S. Attorney]."

The Federal Government conceded both in its briefing and at oral argument that Mr. Sarcone's appointment as Acting U.S. Attorney is not indefinite. His appointment expires after

210 days, on February 10, 2026.  Since July 15, 2025, Mr. Sarcone has purported to serve as Acting U.S. Attorney due to his Special Attorney appointment and First Assistant designation.

On October 8, 2025, the U.S. Attorney General confirmed in writing that the Executive Office for United States Attorneys' appointment was at her "direction" and under her general delegation authority (28 U.S.C. §§ 509, 510 and 515).  The confirmation states that, "[f]or the avoidance of doubt . . . [the Attorney General] ratif[ies] Mr. Sarcone's appointment as Special Attorney and his designation as First Assistant United States Attorney for the Northern District of New York, as of July 15, 2025 . . . ."

### B.  The Grand Jury Subpoenas

On August 5, 2025, a few weeks after Mr. Sarcone began serving as Acting U.S. Attorney, the State Government received two grand jury subpoenas related to State Government enforcement actions.  Both subpoenas identify "Acting United States Attorney" Sarcone as the Federal Government attorney requesting the subpoena.  No line prosecutor is named in connection with the subpoenas.

The first subpoena pertains to *New York v. Trump*, Index No. 452564/2022 (Sup. Ct. N.Y. Cnty.), a civil case the State Government brought against President Trump and his associates alleging financial fraud (the "Trump Subpoena").  The Trump Subpoena spans January 1, 2022, to the present.  The second subpoena pertains to *New York v. National Rifle Association*, Index No. 451625/2020 (Sup. Ct. N.Y. Cnty.), a separate civil action brought by the State Government against the NRA, and two of its senior executives, alleging violations of New York charities laws (the "NRA Subpoena").  The NRA Subpoena spans January 1, 2020, to the present.

Mr. Sarcone also sent cover letters dated August 5, 2025, with the subpoenas.  The cover letters confirm that each subpoena "relates to an ongoing [federal] criminal investigation."  The

subpoenas request all documents and records, including communications, relating to the two state cases.  Notably, the cover letters direct the State Government to send responsive documents to Mr. Sarcone personally.  While the subpoenas themselves do not specify the federal crimes under investigation, contemporaneous media reporting stated that federal prosecutors had opened "a civil rights investigation" into the New York State Attorney General, and that, according to several sources, "the new subpoenas were part of a broader investigation to determine whether the office had violated the rights of Mr. Trump or others."

On August 19, 2025, the State Government moved to quash the subpoenas on various grounds.  In relevant part, the motion argues that Mr. Sarcone was improperly serving as Acting U.S. Attorney and that the subpoenas are unenforceable as a result.  The NDNY District Court Judges recused themselves from deciding the motion, having declined to exercise their authority to appoint a U.S. Attorney when Mr. Sarcone's 120-day term as Interim U.S. Attorney expired.  On September 4, 2025, Second Circuit Chief Judge Debra Livingston designated the undersigned judge to hear the instant motion.

### C.  Parallel Challenges to U.S. Attorney Appointments

This case arises against a backdrop of recent decisions addressing similar challenges to Acting or Interim U.S. Attorney appointments.  Since August 2025, federal courts have uniformly held that these appointments are invalid.  These out-of-circuit decisions are persuasive, even though they are not binding here.  They apply the same statutory text to the same or similar appointment maneuvers, and their reasoning is consistent.

In New Jersey, the district court disqualified Acting U.S. Attorney Alina Habba from prosecuting criminal defendants.  *United States v. Giraud*, 795 F. Supp. 3d 560, 606 (D.N.J. 2025) ("*Giraud (NJ)*"), *aff'd*, 160 F.4th 390 (3d Cir. 2025) ("*Giraud (NJ Appeal)*").  The Third

Circuit affirmed that decision, holding that a contrary reading of the FVRA would undermine Congress's intent to preserve Senate confirmation of presidential appointees. *Giraud (NJ Appeal)*, 160 F.4th at 402, 407.

In Nevada and California, district courts likewise disqualified Acting U.S. Attorneys Sigal Chattah and Bilal Essayli. *United States v. Garcia*, No. 25 Cr. 230, 2025 WL 2784640, at *18 (D. Nev. Sept. 30, 2025) ("*Garcia (NV)*"), *appeal docketed*, No. 25-6468 (9th Cir. Oct. 14, 2025); *United States v. Ramirez*, No. 25 Cr. 264, 2025 WL 3019248, at *20 (C.D. Cal. Oct. 28, 2025) ("*Ramirez (CA)*").[1]  And in Virginia, another district court dismissed indictments of two high-profile defendants -- former FBI Director James Comey and New York Attorney General Letitia James -- after concluding that the Interim U.S. Attorney who brought the indictments was unlawfully appointed because the statute does not permit successive 120-day Attorney General interim appointments for the same vacancy. *United States v. Comey*, No. 25 Cr. 272, 2025 WL 3266932, at *6 (E.D. Va. Nov. 24, 2025) ("*Comey (VA)*"); *United States v. James*, No. 25 Cr. 122, 2025 WL 3266931, at *5 (E.D. Va. Nov. 24, 2025) ("*James (VA)*").  This Opinion is the seventh to consider a challenge to the recent appointment of an official effectively serving as a U.S. Attorney without Senate confirmation.

## II.    PRINCIPLES OF STATUTORY CONSTRUCTION

This case requires interpretation of the FVRA and 28 U.S.C. § 546, the statutes governing the designation of Acting U.S. Attorneys and appointment of Interim U.S. Attorneys, pending Senate confirmation of a U.S. Attorney nominated by the President.  Courts are required to apply

---

[1]  The court disqualified Essayli from performing the functions and duties of an Acting U.S. Attorney but permitted continued service as First Assistant and declined to dismiss indictments signed by Assistant U.S. Attorneys where Essayli had no personal involvement in the prosecutions.

certain established principles when interpreting statutes.  Recent decisions addressing similar

U.S. Attorney appointment challenges have applied these principles.[2]

Courts "presume that the legislature says in a statute what it means and means in a statute

what it says."[3]  *BedRoc Ltd. v. United States*, 541 U.S. 176, 183 (2004).  Statutory interpretation

therefore begins and ends with the text, if the text is unambiguous.  *Robinson v. Shell Oil Co.*,

519 U.S. 337, 340 (1997).  Courts examine the text "in context" -- both "the specific context in

which that language is used" and "the broader context of the statute as a whole."  *Id*.

Courts avoid interpretations that make statutory provisions "superfluous, void, or

insignificant."  *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001).  Doing so "runs afoul of the

cardinal principle of interpretation that courts must give effect, if possible, to every clause and

word of a statute."  *Loughrin v. United States*, 573 U.S. 351, 358 (2014); *Fischer v. United

States*, 603 U.S. 480, 486 (2024).  This principle applies not only when a provision would be

entirely useless, but also when that result would follow "in all but the most unusual

circumstances."  *TRW Inc.*, 534 U.S. at 29.  Where one provision would leave another to "lie

dormant in all but the most unlikely situations," courts reject such a reading.  *Id*. at 31.

Statutory history and structure can "reinforce[]" textual analysis.  *Snyder v. United States*,

603 U.S. 1, 12-13 (2024).  "Statutory history is an important part of [a statute's] context."

*United States v. Hansen*, 599 U.S. 762, 775 (2023).  Statutory history means "the enacted lineage

of a statute, including prior laws, amendments, codifications, and repeals."  Antonin Scalia &

Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 327 (2012); *see BNSF Ry. Co.*

---

[2] *See, e.g.*, *Giraud (NJ Appeal)*, 160 F.4th at 397; *Giraud (NJ)*, 795 F. Supp. 3d at 577; *Ramirez (CA)*, 2025 WL 3019248, at *4; *Garcia (NV)*, 2025 WL 2784640, at *4-8; *Comey (VA)*, 2025 WL 3266932, at *6-9; *James (VA)*, 2025 WL 3266931, at *5-8.
[3] Unless otherwise indicated, in quoting cases, all internal quotation marks, footnotes and citations are omitted, and all alterations are adopted.

*v. Loos*, 586 U.S. 310, 329 (2019) (Gorsuch, J., dissenting) (explaining statutory history as "the record of enacted changes Congress made to the relevant statutory text over time").  This type of evidence, "everyone agrees[,] can sometimes shed light on meaning," *Loos*, 586 U.S. at 329 (Gorsuch, J., dissenting), for when Congress amends a statute, courts presume Congress intends the change "to have real and substantial effect," *Ross v. Blake*, 578 U.S. 632, 641-42 (2016).

## III.    DISCUSSION

Mr. Sarcone is not lawfully serving as Acting U.S. Attorney for the NDNY.  His appointment violates the FVRA and the statutes governing U.S. Attorney appointments.  Several courts, including the Third Circuit, have recently addressed similar appointment maneuvers and reached the same conclusion.[4]  Because Mr. Sarcone used authority he did not lawfully possess to direct the issuance of the subpoenas, the subpoenas are quashed.  Mr. Sarcone is also disqualified from further participation in the underlying criminal investigations.

### A.  Mr. Sarcone is Unlawfully Serving as Acting U.S. Attorney

The Federal Government contends that Mr. Sarcone may serve as Acting U.S. Attorney based on two alternative theories: (1) his designation as First Assistant made him Acting U.S. Attorney under the FVRA's automatic succession provision and (2) regardless of the First Assistant designation, the Attorney General granted Mr. Sarcone the full powers of a U.S. Attorney through general delegation.  Both theories fail as a matter of statutory interpretation.

---

[4] *See Giraud (NJ Appeal)*, 160 F.4th at 406-07; *Garcia (NV)*, 2025 WL 2784640, at *14; *Ramirez (CA)*, 2025 WL 3019248, at *1; *see also Comey (VA)*, 2025 WL 3266932, at *1(addressing improper appointment under § 546); *James (VA)*, 2025 WL 3266931, at *1 (same).

### 1.  Statutory Framework for Filling U.S. Attorney Vacancies

A U.S. Attorney must be nominated by the President and confirmed by the Senate.  28 U.S.C. § 541(a).  This requirement ensures that the Senate has a say in who fills the position.  The Constitution gives the Senate this "advice and consent" role as a check on Executive power and a guard against "a spirit of favoritism" in federal appointments.  *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 293 (2017).  Concerns of cronyism go back to this Country's founding.  As Alexander Hamilton wrote in 1788, the "advice and consent" process prevents the President from unilaterally installing "candidates who ha[ve] no other merit than that . . . of being, in some way or other, personally allied to [the President], or of possessing the necessary insignificance and pliancy to render them the obsequious instruments of his pleasure."  The Federalist No. 76, at 394-95 (Alexander Hamilton) (George W. Carey & James McClellan eds., 2001); *accord Giraud (NJ)*, 795 F. Supp. 3d at 573-74 (quoting the same).  "The Framers envisioned [the "advice and consent" safeguard] as an excellent . . . guard against the appointment of unfit characters from family connection, from personal attachment, or from a view to popularity."  *SW Gen.*, 580 U.S. at 293.

When a U.S. Attorney vacancy arises, the office need not sit vacant until the Senate confirms a Presidential nominee.  Instead, Congress authorized four means of temporarily filling the position:

- <u>first</u>, by operation of statute -- the FVRA automatically designates the First Assistant to serve as Acting U.S. Attorney for up to 210 days.  5 U.S.C. §§ 3345(a)(1), 3346;

- <u>second</u>, by the Attorney General -- § 546 permits the Attorney General to appoint an Interim U.S. Attorney for up to 120 days.  28 U.S.C. § 546(a), (c)(2);

- third, by the President -- the FVRA allows the President to select either another Senate-confirmed officer or a senior official with at least 90 days of service in the agency to serve as Acting U.S. Attorney for up to 210 days.  5 U.S.C. § 3345(a)(2)-(3) and

- fourth, by the district court -- if the 120-day § 546 period expires without a Senate-confirmed appointee, the district court may appoint a U.S. Attorney to serve until the vacancy is filled.  28 U.S.C. § 546(c)(2), (d).

The first three methods -- operation of statute, the President and the Attorney General -- are expressly time-limited, operating as stopgaps rather than substitutes for Presidential nomination and Senate confirmation.  By contrast, the district court may appoint a U.S. Attorney to serve without a fixed statutory clock, but only as a backstop once the Attorney General's 120-day interim appointment expires, and only until a Senate-confirmed U.S. Attorney fills the vacancy.  Id. § 546(c)(2), (d).  Eligibility requirements also distinguish the four methods.  Only the first and third methods impose eligibility requirements.  The first, "operation of statute," selects the First Assistant as Acting U.S. Attorney.  The third permits the President to designate only a person who has been confirmed by the Senate for another position or who has substantial agency experience as Acting U.S. Attorney.

Congress made the FVRA and § 546 the only statutory routes for temporarily filling U.S. Attorney vacancies.  The FVRA states that it provides "the exclusive means for temporarily authorizing an acting official to perform the functions and duties of" a Senate-confirmed position, unless another statute expressly authorizes acting or interim service in a specified office (as § 546 does for U.S. Attorneys).  5 U.S.C. § 3347(a)(1)-(2); 28 U.S.C. § 546(a).

Congress also made explicit that general delegation statutes cannot circumvent the FVRA. General delegation statutes permit agency heads to assign their own duties to subordinates. For example, 28 U.S.C. §§ 509, 510 and 515 allow the Attorney General to delegate Department of Justice functions to other officials. The FVRA expressly states that such statutes are not exceptions to the FVRA's exclusivity. 5 U.S.C. § 3347(b). This provision responded directly to the Department of Justice's practice of using general delegation statutes to install preferred officials in positions requiring Senate confirmation. *See Giraud (NJ Appeal)*, 160 F.4th at 400 (describing the FVRA as "a compromise" that gave the Executive additional flexibility while preventing the use of general delegation statutes "to contravene the Senate's advice-and-consent power"). Courts applying these statutes in the U.S. Attorney context consistently hold that § 546 and the FVRA operate as the only alternatives for temporarily filling a vacancy, and that neither method permits using general delegation authority to bypass the FVRA's requirements.[5]

Here, upon the resignation of the Senate-confirmed U.S. Attorney, former First Assistant Hanlon became Acting U.S. Attorney under the first method. U.S. Attorney General Bondi then appointed Mr. Sarcone as Interim U.S. Attorney under the second method. President Trump did not appoint anyone under the third method. And the District Court for the NDNY declined to appoint anyone under the fourth method. None of these actions are problematic or otherwise challenged. At issue is the Attorney General's subsequent attempt to install Mr. Sarcone under the first method, after his term as Interim U.S. Attorney expired.

---

[5] *See Giraud (NJ Appeal)*, 160 F.4th at 397-400, 403; *Garcia (NV)*, 2025 WL 2784640, at *10-14; *Ramirez (CA)*, 2025 WL 3019248, at *11-12.

### 2. Only the First Assistant in Place When the Vacancy Arises Becomes Acting U.S. Attorney

The Federal Government's first theory is that the FVRA automatically made Mr. Sarcone the Acting U.S. Attorney when the Attorney General designated him as First Assistant on July 14, 2025 -- five months after the vacancy first arose. That interpretation is rejected. As explained below, such an interpretation conflicts with the FVRA's text, structure and context; is inconsistent with the statute's history; and has been repeatedly dismissed by courts across the country.[6]

### a. Statutory Text, Structure and Context

The Federal Government's interpretation of § 3345(a)(1) contradicts the statute's text, structure and context. The Federal Government argues that the FVRA permitted the Attorney General to wait until the last day of Mr. Sarcone's 120-day term as Interim U.S. Attorney to demote Mr. Hanlon from First Assistant, designate Mr. Sarcone as the new First Assistant and then claim that Mr. Sarcone "automatically" became Acting U.S. Attorney. The Federal Government supports this reading by noting that a vacancy is a "continuing state," so § 3345(a)(1) should apply at any point during the vacancy to whomever holds the First Assistant title at that time. That argument is incorrect.

As a textual matter, § 3345(a)(1) ties automatic succession to a single point in time: the moment the vacancy arises. The provision states that when a Senate-confirmed officer "dies, resigns, or is otherwise unable to perform the functions and duties of the office," "the first assistant to the office of such officer shall perform the functions and duties of the office temporarily in an acting capacity." 5 U.S.C. § 3345(a)(1). This works as a simple if-then rule.

---

[6] *See, e.g.*, *Giraud (NJ Appeal)*, 160 F.4th at 397-400; *Giraud (NJ)*, 795 F. Supp. 3d at 584-92; *Garcia (NV)*, 2025 WL 2784640, at *11; *Ramirez (CA)*, 2025 WL 3019248, at *5-7.

If a vacancy occurs, then the First Assistant serves as acting officer.[7]  As the Supreme Court observed, this provision is "mandatory and self-executing." *SW Gen.*, 580 U.S. at 303.  First Assistants "automatically assume acting duties under (a)(1)," *id.* at 305, and that path is fixed to the moment the vacancy arises.  Applied here, § 3345(a)(1) took effect when U.S. Attorney Freedman resigned in February 2025.  At that moment, First Assistant Hanlon automatically became Acting U.S. Attorney.  The Federal Government's interpretation breaks this causal chain and converts a mandatory, self-executing rule into something the Attorney General (a part of the Executive branch) can trigger at will -- allowing repeated designation of Acting U.S. Attorneys and defeating the statute's time limitations.  *Id.* at 303.

The FVRA's structure reinforces this "if-then" reading.  "[S]tatutory language . . . cannot be construed in a vacuum," and "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."  *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012).  Subsection (a)(1) performs a narrow function.  It ensures continuity of leadership by identifying the incumbent First Assistant as the acting officer at the moment a vacancy first arises.  Subsections (a)(2) and (a)(3) then give "the President (and only the President)" discretion to override that default by selecting either another Senate-confirmed officer or a senior agency official who meets express tenure requirements to serve for up to 210 days.  *See* 5 U.S.C. § 3345(a)(2)-(3); *SW Gen.*, 580 U.S. at 293.  Under the Federal Government's interpretation, the Attorney General can obtain the same result by redesignating the First Assistant months into a vacancy.  That collapses the statutory structure by shifting the President's selection authority to the Attorney General -- without the tenure or confirmation

---

[7] Other courts recently considering the issue concur with this interpretation.  *See, e.g.*, *Giraud (NJ Appeal)*, 160 F.4th at 400; *Giraud (NJ)*, 795 F. Supp. 3d at 586; *Ramirez (CA)*, 2025 WL 3019248, at *4.

requirements that subsections (a)(2) and (a)(3) require.  *See Giraud (NJ Appeal)*, 160 F.4th at

399.  Courts avoid interpretations that render statutory provisions superfluous.  *TRW Inc.*, 534

U.S. at 29.  The Federal Government's interpretation would do exactly that, leaving subsections

(a)(2) and (a)(3) functionally inert "in all but the most unusual circumstances."[8]  *Id*.

The Federal Government's reliance on *Russello v. United States* does not cure this

problem.  464 U.S. 16 (1983).  The Federal Government argues that because § 3345(a)(1) does

not include the "backward-looking eligibility" requirements that appear in § 3345(a)(3) and

(b)(1)(A), § 3345(a)(1) permits the Attorney General to change the First Assistant during a

vacancy and treat that change as triggering automatic acting service.  When "Congress includes

particular language in one section of a statute but omits it in another section of the same Act, it is

generally presumed that Congress acts intentionally and purposely in the disparate inclusion or

exclusion."  *Id*. at 23.  But the Federal Government's argument does not override the statutory

structure discussed above, and "should not be elevated to the level of interpretive trump card,"

particularly where "common sense would balk" at the result.  *Field v. Mans*, 516 U.S. 59, 67-68

(1995).  The better explanation for the omission is that § 3345(a)(1) is a self-executing default

---

[8] The Federal Government's opposition identifies two situations that would require the President to invoke subsections (a)(2) or (a)(3) instead of proceeding under the default rule in (a)(1): first, where the first-assistant position is itself an office requiring presidential appointment and Senate confirmation and, second, where the President wishes to keep the first assistant in place and designate someone else as Acting U.S. Attorney.  Even accepting those examples, they do not address the argument's core defect.  Under the Federal Government's interpretation, the Attorney General could effectively select the acting officer during an ongoing vacancy by changing who qualifies as "first assistant," reducing (a)(2) and (a)(3) to occasional workarounds rather than equal statutory alternatives. The Federal Government also invokes an internal Office of Legal Counsel opinion to support its reading.  *See Designating an Acting Attorney General*, 42 Op. O.L.C. 182 (2018).  But whatever persuasive force such views may have, they cannot expand § 3345(a)(1) beyond its text and statutory context.

that applies when the vacancy arises, so it does not include the screening requirements that Congress used to cabin discretionary selections under sections 3345(a)(2), (a)(3) and (b)(1)(A).

The Federal Government's interpretation fails for the additional reason that it conflicts with the statutory alternative to the FVRA.  Section 546 gives the Attorney General authority to appoint an Interim U.S. Attorney for up to 120 days.  28 U.S.C. § 546(a), (c)(2).  Under the Federal Government's interpretation, the Attorney General can use the FVRA to install anyone as Acting U.S. Attorney for up to 210 days simply by designating that person as First Assistant. Carried to its logical extreme, such a reading would allow the Attorney General to install repeatedly the same or different people as First Assistant each time an Interim U.S. Attorney's term expires -- keeping the office continuously filled without Senate confirmation.  Whether done once or multiple times, this renders § 546's 120-day limit meaningless and provides another reason to reject the Federal Government's interpretation.  *See Giraud (NJ Appeal)*, 160 F.4th at 399.

### b.  Statutory History

The circumstances that led Congress to adopt the FVRA confirm the statutory analysis above.  Congress enacted the FVRA to address "the Executive branch's widespread practice -- dating back through several administrations -- of appointing temporary designees in contravention of existing law and the Appointments Clause."  *Id.* at 400.  Before the FVRA, acting officials sometimes exceeded statutory time limits, serving without Senate confirmation and occasionally in the face of Senate opposition.  *See SW Gen.*, 580 U.S. at 295; *Giraud (NJ Appeal)*, 160 F.4th at 400.  In response, Congress enacted the FVRA to protect the Senate's "advice and consent" role while still giving the Executive branch room to fill vacancies temporarily.  *See SW Gen.*, 580 U.S. at 295, 307; *Giraud (NJ Appeal)*, 160 F.4th at 400.  When

Congress amends a statute, courts presume Congress intends the change "to have real and substantial effect." *Ross*, 578 U.S. at 641-42. The Federal Government's interpretation contradicts that principle. Reading the FVRA to permit the Attorney General to designate First Assistants who then automatically ascend to the Acting U.S. Attorney position erodes the statute's intended effect. *See Garcia (NV)*, 2025 WL 2784640, at *9-11.

### c.  Application in Similar Cases

Courts addressing this issue have consistently rejected the Federal Government's approach for these same reasons. Most recently, the Third Circuit held that only "the first assistant in place at the time of the vacancy automatically assumes acting status under the FVRA" because that reading "'better harmonizes the various provisions in the FVRA and § 546 and avoids the oddities that the [Federal] Government's interpretation would create.'" *Giraud (NJ Appeal)*, 160 F.4th at 400 (quoting *Rep. of Sudan v. Harrison,* 587 U.S. 1, 8, 15 (2019)). The District of Nevada and the Central District of California reached the same conclusion. *Garcia (NV)*, 2025 WL 2784640, at *5-11; *Ramirez (CA)*, 2025 WL 3019248, at *5-7.

In sum, § 3345(a)(1) designates whomever is First Assistant when the vacancy first arose to the position of Acting U.S. Attorney for a period of up to 210 days. That avenue of designating someone to act temporarily as U.S. Attorney is now foreclosed. Mr. Sarcone did not lawfully assume the position of Acting U.S. Attorney under the FVRA's default provision, because he was not the First Assistant when the vacancy first arose.

### 3.  Delegation Statutes Cannot Create a De Facto Acting U.S. Attorney

The Federal Government's second theory is that, even if the FVRA does not make Mr. Sarcone Acting U.S. Attorney, the Attorney General can use her general delegation authority to accomplish the same result -- here, by empowering Mr. Sarcone to issue grand jury subpoenas.

This second theory fails because Congress enacted a statute that expressly bars this approach, as courts in New Jersey, Nevada and California have also concluded.[9]

The FVRA states that "Sections 3345 and 3346 are the exclusive means for temporarily authorizing an acting official to perform the functions and duties of any office of an Executive agency, unless" another statutory provision authorizes otherwise, or a recess appointment is made.  5 U.S.C. § 3347(a); *accord NLRB v. Newark Elec. Corp*., 14 F.4th 152, 160-61 (2d Cir. 2021).  The statute also states that general delegation statutes do not qualify as exceptions to the FVRA's exclusive procedures.  5 U.S.C. § 3347(b).[10]  Congress added this provision specifically to prevent agencies from using general delegation authority to bypass the FVRA.  *See SW Gen.*, 580 U.S. at 294-95 (describing Congress's response to the Department of Justice's use of purported "independent authority" to fill vacancies).[11]

The Federal Government responds that the Attorney General may delegate the "nonexclusive duties" of a U.S. Attorney (i.e., not duties reserved for the U.S. Attorney such as requesting ex parte orders for personal tax information under 28 U.S.C. § 6103(i)(1)[12]) through

---

[9] *See Giraud (NJ Appeal)*, 160 F.4th at 402-03; *Garcia (NV)*, 2025 WL 2784640, at *12; *Ramirez (CA)*, 2025 WL 3019248, at *12.

[10] "Any statutory provision providing general authority to the head of an Executive agency . . . to delegate duties statutorily vested in that agency head . . . is not a statutory provision to which subsection (a)(1) applies."  5 U.S.C. § 3347(b).

[11] While this Opinion need not rely on it, the legislative history underscores this critical context. *See* S. Rep. No. 105-250, at 17 (1998); 144 Cong. Rec. 22,511 (1998) (statement of Sen. Byrd) (explaining that "very broad, very general provisions [(28 U.S.C. §§ 509-510)] . . . are being used to justify what amounts to an end run around the Vacancies Act" and that accepting Department of Justice's position would mean Congress had "systematically divested itself of its constitutional responsibility to advise and consent"); *id.* at 22,508 (statement of Sen. Thompson) ("The Justice Department relies on its organic statute's 'vesting and delegation' provision, which states that the Attorney General can designate certain other powers to whomever she chooses in the Department . . . ."); *id*. at 22,515 (statement of Sen. Durbin) ("I wholeheartedly concur that this law needs clarification so that moves to end-run its application are halted.")

[12] *See In re An Application for an Ex Parte Order to Authorize Disclosure of Tax Returns and Tax Return Information*, No. 25 Misc. 22 (N.D.N.Y. Jan. 8, 2026).

authorities including sections 510 and 515, and that delegation of those duties is commonplace. That is true but does not apply here. Neither the documentation for Mr. Sarcone's appointment as Special Attorney nor his correspondence with the Chief Judge draws any distinction between his performing exclusive and nonexclusive duties. The U.S. Attorney General's delegation purports to authorize Mr. Sarcone to conduct any proceedings that U.S. Attorneys may conduct -- the full range of the office's powers. At oral argument, the Federal Government acknowledged that the appointment letter conveys "a broad delegation of authority, which includes criminal cases" with "all of the non-exclusive powers of the U.S. Attorney's Office for [the NDNY]." The Federal Government further conceded that nothing in the record supports Mr. Sarcone's appointment being "limited . . . to some discrete set of matters or some subset of all of the U.S. Attorney's powers." That is not a delegation of specific, nonexclusive duties. It is an attempt to use general delegation to create an Acting U.S. Attorney outside the FVRA's statutory framework.

The Third Circuit rejected an identical argument. The court held that the FVRA's exclusivity provisions "plainly prohibited" the Attorney General's attempt to create a de facto U.S. Attorney with "the full panoply of [the office's] powers" by delegating the authority to conduct "any kind of legal proceedings" that U.S. Attorneys may conduct. *Giraud (NJ Appeal)*, 160 F.4th at 403. The District of Nevada and Central District of California reached the same conclusion. *Garcia (NV)*, 2025 WL 2784640, at *11-14; *Ramirez (CA)*, 2025 WL 3019248, at *11-12. The Attorney General cannot use general delegation statutes to vest the authority of the U.S. Attorney for the NDNY in Mr. Sarcone.

### B.  The Subpoenas are Quashed and Mr. Sarcone is Disqualified

Mr. Sarcone is not lawfully serving as Acting U.S. Attorney.  Any of his past or future acts taken in that capacity are void or voidable as they would rest on authority Mr. Sarcone does not lawfully have.  The subpoenas issued to the Office of the New York State Attorney General at Mr. Sarcone's direction and under his purported authority as Acting U.S. Attorney are therefore invalid and are quashed.  Mr. Sarcone is also disqualified from any further involvement in prosecuting or supervising the criminal investigations that prompted the subpoenas.

### 1.  Legal Standard

Rule 17 governs subpoenas in criminal proceedings, including those issued by grand juries.  A court "may quash or modify [a] subpoena if compliance would be unreasonable or oppressive."  Fed. R. Crim. P. 17(c)(2).  Ordinarily, courts view grand jury subpoenas with a presumption of "reasonable[ness]."  *United States v. R. Enters., Inc.*, 498 U.S. 292, 300-01 (1991).  This presumption applies when a subpoena is issued "through normal channels."  *Id.* at 301; *see In re Grand Jury Proceeding*, 971 F.3d 40, 50, 53-54 (2d Cir. 2020) ("*Oberlander*") (holding that a subpoena lacking such structural regularity is a "nullity" that cannot be enforced).  Despite this presumption, "courts may not ignore possible abuse of the grand jury process."  *United States v. Calk*, 87 F.4th 164, 186 (2d Cir. 2023), *cert. denied*, 145 S. Ct. 144 (2024).  "Grand juries are not licensed to engage in arbitrary fishing expeditions, nor may they select targets of investigation out of malice or an intent to harass."  *R. Enters., Inc.*, 498 U.S. at 299; *Trump v. Vance*, 591 U.S. 786, 805 (2020).

While subpoena power formally belongs to the grand jury, in modern federal practice, prosecutors often issue grand jury subpoenas with little or no involvement of the grand jurors

themselves.[13]  The court's role in "[e]nsuring the regularity of the grand jury process is especially important because of the risks for abuse that inhere in proceedings over which trial and appellate courts rarely have insight."  *Calk*, 87 F.4th at 186.  Rule 17 therefore functions as a key mechanism to ensure that the grand jury is not "misused" by the Department of Justice.  *In re Grand Jury Subpoena Duces Tecum Dated Jan. 2, 1985 (Simels)*, 767 F.2d 26, 29 (2d Cir. 1985).

### 2.  The Subpoenas Are "Unreasonable" under Rule 17

The subpoenas here were issued through an official acting without lawful authority.  The subpoenas therefore lacked the regularity required for a presumption of reasonableness.  Three weeks after Mr. Sarcone claimed the title of Acting U.S. Attorney, he used that authority to subpoena a state law-enforcement office that the President had publicly cast as a political adversary.  The subpoenas' cover letters direct the Office of the New York State Attorney General to send all materials to Mr. Sarcone personally.  Grand juries are "not meant to be the private tool of a prosecutor," *Calk*, 87 F.4th at 186, much less one who is not lawfully appointed.  Because Mr. Sarcone lacked lawful authority to invoke the grand jury's power in the capacity he claimed, the subpoenas were not issued "through normal channels," *R. Enters., Inc.*, 498 U.S. at 301, and are unreasonable under Rule 17.

---

[13] *See Lopez v. DOJ*, 393 F.3d 1345, 1349 (D.C. Cir. 2005) ("[T]he term 'grand jury subpoena' is in some respects a misnomer, because the grand jury itself does not decide whether to issue the subpoena; the prosecuting attorney does."); *First Nat'l Bank of Tulsa v. DOJ*, 865 F.2d 217, 220 (10th Cir. 1989) ("[A] United States Attorney has the authority to obtain a blank grand jury subpoena form, fill in the blanks, and serve the subpoena without the authorization (or even knowledge) of the grand jury."); *Doe v. DiGenova*, 779 F.2d 74, 80 (D.C. Cir. 1985) ("[G]rand jury subpoenas are issued at the request, and in the discretion of the prosecuting attorney involved in the case . . . ."); Charles Doyle, Cong. Rsch. Serv., 95-1135, *The Federal Grand Jury* 8-9 (2025) (explaining that prosecutors usually direct the issuance of grand jury subpoenas).

Contrary to the Federal Government's assertion, Mr. Sarcone's "Special Attorney" appointment under § 515 does not cure the defect. As a preliminary matter, Mr. Sarcone did not direct issuance of these subpoenas under the authority of his § 515 appointment. He did so as "Acting United States Attorney." In six pages, the two subpoenas and their supporting materials identify Mr. Sarcone as "Acting U.S. Attorney" six different times. The enforceability of the subpoenas therefore turns on whether Mr. Sarcone was lawfully serving as Acting U.S. Attorney -- not on whether he also held a lawful "Special Attorney" appointment. In any event, while § 515 authorizes the Attorney General to appoint "special attorneys" to "conduct any kind of legal proceeding . . . which United States attorneys are authorized by law to conduct," 28 U.S.C. § 515(a), such an appointment neither confers the office of U.S. Attorney nor does it validate subpoenas issued in a different capacity. *Cf. In re Persico*, 522 F.2d at 45-46 (upholding § 515 authority where special attorneys were operating under the supervision of a properly appointed U.S. Attorney, not purporting to hold the office itself). Section 515 cannot be used to bypass the FVRA's framework or ratify actions undertaken by Mr. Sarcone using his purported authority as "Acting U.S. Attorney."

The Federal Government's argument rests on the proposition that any defect is immaterial because "Special Attorney" Sarcone or other Assistant U.S. Attorneys in the office could have sought the same subpoenas. The Second Circuit has rejected that approach. In *Oberlander*, the Second Circuit held that a court could not enforce a subpoena after the issuing grand jury had concluded its term, despite the Government's contention that enforcing the old subpoena would be no different than enforcing a fresh one. *Oberlander*, 971 F.3d at 51. The Second Circuit disagreed, finding "no great administrative difficulty in requiring, as a precondition to the use of coercive contempt power, the issuance of a new subpoena" by a

properly constituted body. *Id*. at 52 (treating subpoenas as a "nullity" where the grand jury had

expired). The same logic applies here. When the Federal Government seeks to invoke the

district court's coercive power, it must do so based on lawful authority, not by asking courts to

treat an unauthorized subpoena as interchangeable with a valid one.

Characterizing the defect as inconsequential also misconstrues what makes the subpoenas

unreasonable. The problem is not a lack of subpoena power in the abstract; it is the Federal

Government's choice to invoke that power through a statutory end-run and then leverage that

power against a perceived rival of the President. Those choices matter for the Rule 17 analysis,

even if other prosecutors could request similar subpoenas. *Cf. Simels*, 767 F.2d at 29-30

(focusing on the "dominant purpose" for which the grand jury's process is invoked to police

misuse by prosecutors); *Calk*, 87 F.4th at 186 (reaffirming courts' duty not to "ignore possible

abuse of the grand jury process"). As Mr. Sarcone lacked lawful authority to request the

subpoenas in the capacity of Acting U.S. Attorney, the subpoenas are quashed.[14]

### 3. Disqualification

Mr. Sarcone is disqualified from any further involvement in prosecuting or supervising

the instant investigations, regardless of his title. Recent U.S. Attorney appointment opinions

have adopted similar remedies. The Third Circuit affirmed disqualification of an unlawfully

serving Acting U.S. Attorney from further participation in the affected prosecutions. *See Giraud*

*(NJ Appeal)*, 160 F.4th at 396, 407. The District of Nevada similarly disqualified an unlawfully

serving Acting U.S. Attorney from the relevant cases. *See Garcia (NV)*, 2025 WL 2784640, at

*18. Beyond the U.S. Attorney context, courts often set aside actions taken under unlawful

---

[14] This result also follows *Comey (VA)* and *James (VA)*, where the court dismissed indictments obtained solely by the unlawfully appointed Interim U.S. Attorney. *Comey (VA)*, 2025 WL 3266932, at *3, *10; *James (VA)*, 2025 WL 3266931, at *3, *9.

appointments and require new proceedings before properly appointed officials.  *See Lucia v. SEC*, 585 U.S. 237, 251-52 (2018); *Ryder v. United States*, 515 U.S. 177, 187-88 (1995); *Flinton v. Comm'r of Soc. Sec.*, 143 F.4th 90, 99 (2d Cir. 2025).  The same principles prevent Mr. Sarcone from continuing to direct the investigations at issue.

## IV.    CONCLUSION

For the foregoing reasons, the State Government's motion to quash is **GRANTED.**  Mr. Sarcone is disqualified from any further involvement in prosecuting or supervising any investigation pertaining to *New York v. Trump*, Index No. 452564/2022 (Sup. Ct. N.Y. Cnty.), and *New York v. National Rifle Association*, Index No. 451625/2020 (Sup. Ct. N.Y. Cnty.). Should the Federal Government re-issue the subpoenas at the direction of a lawfully authorized attorney for the Federal Government, without Mr. Sarcone's involvement, the State Government may renew its motion to quash.

The Clerk of Court is respectfully directed to close the motion at Dkt. No. 1 and close the case.

Dated: January 8, 2026
      New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE